**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SOLID 21, INC., | : | |
|     Plaintiff, | : | |
| | : | C.A. NO. 3:19-CV-00514-MPS |
| v. | : | |
| | : | |
| BREITLING U.S.A., INC.; BREITLING SA; | : | |
| AND BREITLING AG, | : | JANUARY 5, 2021 |
|     Defendants. | : | |
| | : | |

**<ins>DEFENDANTS AND COUNTERCLAIMANTS BREITLING U.S.A., INC. AND
BREITLING SA'S (a/k/a BREITLING AG) MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT</ins>**

Defendants and counterclaimants Breitling U.S.A., Inc. and Breitling SA (a/k/a Breitling

AG) (collectively, "Breitling"), pursuant to Federal Rule of Civil Procedure 56 and D. Conn. L.

Civ. R. 56, respectfully move this Honorable Court for summary judgment in their favor on all of

Plaintiff Solid 21, Inc.'s ("Plaintiff"), claims and on Breitling's counterclaims.

For the reasons set forth in this Memorandum of Law, and in Breitling's concurrently-

filed Local Rule 56(a)(1) Statement, Declarations and Exhibits, and Request for Judicial Notice,

Breitling is entitled to summary judgment on all counts in Plaintiff's Complaint (Dkt. No. 1) and

Breitling's Counterclaims (Dkt. No. 16, 35).

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................. 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 2

   A.  "Red Gold" is a Gold Alloy Comprised of Gold and Copper................................. 2

   B.  Use of "Red Gold" in the United States for Over 150 Years................................. 3

   C.  Plaintiff's Registration and Use of "Red Gold" to Identify the Gold Alloy ......................... 5

   D.  Breitling's Non-Trademark, Fair Use of "Red Gold"........................................... 8

III.  ARGUMENT ................................................................................................................... 9

   A.  Summary Judgment Standard ................................................................................. 9

   B.  "Red Gold" is Generic and Plaintiff's Trademark is Invalid ............................... 10

      1.  Generic Terms Cannot Be Trademarks ........................................................ 11

      2.  The Undisputed Facts Show that "Red Gold" Is Generic ............................. 13

   C.  Breitling's Use of "Red Gold" is Classic, Non-Infringing Fair Use................................. 17

      1.  Breitling's Use of the Term "Red Gold" to Identify Its Watches Made of Red Gold Is
         Descriptive ..................................................................................................... 18

      2.  Breitling's Use of the Term "Red Gold" Was and Is in Good Faith.............................. 20

IV.   CONCLUSION................................................................................................................ 27

**TABLE OF AUTHORITIES**

**Cases**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976) .................... 12, 19

*Aegis Software, Inc. v. 22nd District Agricultural Association*, 255 F. Supp. 3d 1005 (S.D. Cal. 2017) ............................................................................................................................ 24

*Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2d Cir. 1986) ........................... 12

*Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S. Ct. 1601, 63 L. Ed. 2d 787 (1980) ......................................................... 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 10

*Anthem Sports, LLC v. Under the Weather, LLC*, 320 F. Supp. 3d 399 (D. Conn. 2018) ........... 11

*Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8 (9th Cir. 1970) ............................................. 12

*Badia Spices, Inc. v. Gel Spice Co.*, 2017 WL 2082794 (S.D. Fla. May 15, 2017) .................... 14

*Big Island Candies, Inc. v. The Cookie Corner*, 269 F. Supp. 2d 1236 (D. Haw. 2003) .............. 15

*Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188 (S.D.N.Y. 1983) ........................ 11

*Brandwynne v. Combe Int'l Ltd.*, 74 F. Supp. 2d 364 (S.D.N.Y. 1999) ...................................... 13

*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996) .............................................. 9

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267 (2d Cir. 1995) ........................... 17

*Carling Brewing Co. v. Philip Morris Inc.*, 297 F. Supp. 1330 (N.D. Ga. 1968) ........................ 16

*Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 U.S.P.Q.2d 1713 (Fed. Cir. 2012) ....................................................................................................................... 24, 25

*Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28 (2d Cir. 1997) . 17, 18, 21, 22

*Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416 (S.D.N.Y. 2008) ........................... 18, 20, 21, 22

*Dickinson v. Zurko*, 527 U.S. 150, 160-61 (1999) ...................................................................... 16

*Donchez v. Coors Brewing Co.*, 392 F.3d 1211 (10th Cir. 2004) ................................................. 15

*Dupont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir. 1936), *cert. denied*, 304 U.S. 575, 82 L. Ed. 1539, 58 S. Ct. 1047 (1938) ............................................................. 12

*Eastern Wine Corp. v. Winslow-Warren, Ltd.*, 137 F.2d 955 (2d Cir. 1943), *cert. denied*, 320 U.S. 758, 64 S. Ct. 65 (1943).................................................................................................... 12

*Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477 (S.D.N.Y. 1983)............................................ 19

*EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 1999 U.S. Dist. LEXIS 9637, No. 98 Civ. 8066, 1999 WL 439052 (S.D.N.Y. June 28, 1999) ................. 18, 21

*Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 73 U.S.P.Q.2d 1580, 2005-1 Trade Cas. (CCH) ¶ 74677 (8th Cir. 2005) ...................................................... 24

*Fawcett Publications, Inc. v. Popular Mechanics Cop.*, 80 F.2d 194 (4th Cir. 1935) ................ 19

*Flintkote Co. v. Tizer*, 266 F.2d 849 (3d Cir. 1959) .................................................................. 12

*Florida Van Rentals, Inc. v. Auto Mobility Sales, Inc.*, 85 F. Supp. 3d 1300 (M.D. Fla. 2015)... 10

*Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir. 1997) ................................. 12

*GMA Accessories, Inc. v. Croscill, Inc.*, No. 06-CV-6236, 2008 U.S. Dist. LEXIS 16052, 2008 WL 591803 (S.D.N.Y. Mar. 3, 2008) .................................................................................... 11

*Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060 (S.D.N.Y. 1991) ....................... 11

*Hybrade Food Products Corp. v. H.D. Lee Mercantile Co.*, 46 F.2d 771 (9th Cir. 1931)........... 19

*In Re Colonial Stores Inc.,* 394 F.2d 549, 551, 55 C.C.P.A. 1049 (C.C.P.A. 1968) .................... 19

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270 (11th Cir. 2006) ................................ 22

*Intel Corp. v. Advanced Micro Devices, Inc.*, 756 F. Supp. 1292 (N.D. Cal. 1991)..................... 15

*JA Apparel Corp. v. Abboud*, No. 07 Civ. 7787 (THK), 591 F. Supp. 2d 306, 2008 U.S. Dist. LEXIS 44599, 2008 WL 2329533 (S.D.N.Y. Jun. 5, 2008)..................................................... 18

*Johnson Publishing co. v. Etched-In-Ebony, Inc.*, 213 U.S.P.Q. 995 (D.D.C. 1981).................. 20

*Journal Co., Inc. v. Mktg. Res. Consultants Inc.*, No. 3:05CV1027 (PCD), 2006 WL 8447006 (D. Conn. July 25, 2006)........................................................................................................ 26

*King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963) ............. 12, 15

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)........................................................................................................ 18, 26

*Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27 (1st Cir. 1982) ......................................... 20

*Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934 (7th Cir. 1986)........................... 15

*Luv N Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F.Supp.2d 753 (S.D.N.Y. 2012)................. 24

*Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671 (W.D. Ky. 2010), *judgment aff'd on other grounds*, 679 F.3d 410, 102 U.S.P.Q.2d 1693 (6th Cir. 2012) 24

*Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184 (D. Conn. 2005)............... 23, 25, 26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................... 10

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312 (11th Cir. 2012)10, 15

*Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95 (2d Cir. 1989) .......................... 15

*MyPlayCity, Inc. v. Conduit Ltd.*, 2012 U.S. Dist. LEXIS 47313 (S.D.N.Y. Mar. 30, 2012)...... 11

*Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d. Cir. 2000)................................................ 9

*Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397 (6th Cir. 2002).................................... 14

*Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985)............................................ 11, 13

*Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286 (S.D.N.Y. October 19, 2000).. 13, 22

*Sandshaker Lounge & Package Store, LLC v. Quietwater Entm't Inc.*, 602 Fed. Appx. 784 (11th Cir. 2015) ............................................................................................................................ 10

*Schwan's IP, L.L.C. v. Kraft Pizza Co.*, 460 F.3d 971 (8th Cir. 2006)......................................... 10

*Se. Clinical Nutrition Centers, Inc. v. Mayo Found. for Med. Educ. & Research*, 135 F. Supp. 3d 1267 (N.D. Ga. 2013) .......................................................................................................... 22

*Seaboard Seed Co. v. Bemis Co.*, 632 F. Supp. 1133 (N.D. Ill. 1986) ........................................ 19

*Something Old, Something New, Inc. v. QVC, Inc., et al.,* 1999 U.S. Dist. LEXIS 18878 (S.D.N.Y. December 7, 1999) ............................................................. 10, 13, 17, 21

*Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995)......................... 19

*TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88 (2d Cir. 2001) ........................... 11, 25

*Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) .................................... 24

*The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955 (2d Cir. 1996).................... 10

*Universal Church, Inc. v. Toellner*, 752 Fed. Appx. 67, 2018 U.S. App. LEXIS 31153 (2d Cir. November 2, 2018) ......................................................................................................... 9, 11

*Upjohn Co. v. Schwartz*, 246 F.2d 254 (2d Cir. 1957) ............................................................... 12

*Urban Home, Inc. v. Cordillera Inv. Co., LLC*, No. 13-08502, 2014 WL 3704031, at *6 (C.D. Cal. June 19, 2014) ...................................................................................................... 24

*Verilux, Inc. v. Hahn*, No. 3:05CV254(PCD), 2007 U.S. Dist. LEXIS 58507, 2007 WL 2318819 (D. Conn. 2007) .......................................................................................................... 11

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567 (2d Cir. 1993) ......................... 21

*Warehouse Foods, Inc v. Great Atlantic and Pacific Tea Co., Inc.*, 1984 WL 63624 (N.D. Fla., Mar. 2, 1984, No. 83-7296) ...................................................................................... 10

*Warner Publication, Inc. v. Popular Publications, Inc.*, 87 F.2d 913 (2d Cir. 1937) ................. 19

*Welding Svcs. Inc. v. Forman*, 509 F.3d 1351 (11th Cir. 2007) ............................................. 10, 13

*Wonder Labs, Inc. v. Procter & Gamble Co.,* 728 F. Supp. 1058 (S.D.N.Y. 1990) .................... 21


**Statutes**

15 U.S.C. § 1064 ........................................................................................................................ 13

15 U.S.C. § 1065 ........................................................................................................................ 13

15 U.S.C. § 1115 ........................................................................................................................ 17

15 U.S.C. § 1125 ........................................................................................................................ 23

15 U.S.C. § 1125(c)(3) ............................................................................................................... 26


**Constitutional Provisions**

4 McCarthy on Trademarks and Unfair Competition § 24:104 (5th ed.) .............................. 23, 24


**Rules**

D. Conn. L. Civ. R. 56 ................................................................................................................. 1

Fed. R. Civ. P. 56 .................................................................................................................. 1, 10

## I.     INTRODUCTION

This action arises out of alleged trademark infringement in a spate of cases filed by Plaintiff against several well-known luxury watch brands over the use of the term "red gold"—a generic term linguistically no different than "yellow gold" and "white gold" to identify a gold and copper metal alloy used to make watches and jewelry—dating back to ancient Egyptian times.  Indeed, consistent with these well-documented historical uses, Plaintiff itself uses "red gold" to identify the material of its watches of jewelry made with that material.  The undisputed facts show that numerous jewelry and watch companies have used "red gold" to identify the material of their products' components long before Plaintiff made any trademark claim to the term.  Lay, technical, and industry-specific publications and issued patents confirm this generic meaning of "red gold" to identify a metal alloy of gold and copper.

Despite the genericness of "red gold" and its widespread use spanning more than a century throughout the jewelry and watch industries to identify a gold and copper alloy, in 2003, the USPTO issued to Plaintiff a trademark registration for the term "Red Gold."  Notably, in 2019 and continuing to this day, the USPTO has refused registration of Plaintiff's trademark application for "Signature Red Gold" on the grounds that "red gold" is a descriptor of the type of metal used in the jewelry and therefore "appears to be generic as to the material composition of [Plaintiff's] goods namely, goods made in significant part of gold including red gold."  Plaintiff's trademark registration for "Red Gold" should meet a similar fate here—namely, that the Court declare the mark invalid for genericness and put a stop to Plaintiff's years-long campaign to monopolize this generic term and extract windfall settlements from others who lawfully use it to refer to jewelry and watches made out of a gold and copper alloy.  U.S. trademark law, and the pro-competitive principles it espouses, do not allow Plaintiff to wield its dubious trademark

registration in this way, and summary judgment in favor of Breitling is proper for at least two independent reasons.

First, the Lanham Act and cases interpreting it prohibit any person from asserting rights in a generic term such as "red gold." The undisputed facts show that "red gold" is generic in the jewelry and watch industry, and in the eyes of consumers and speakers of the English language. No one objectively perceives "red gold" as a brand or indicator of source, much less one that identifies the Plaintiff. Because Plaintiff's asserted "Red Gold" mark is invalid, there can be no infringement.

Second, the Lanham Act expressly permits any person to use any term—even a valid trademark—in a non-trademark manner to describe its own goods or services. Here, it is undisputed and a matter of law that Breitling's uses of the term "red gold" is quintessential fair use in a non-trademark manner and in good faith to describe its goods comprised of red gold material and components.

Plaintiff's trademark registration from 2003 does not change the undisputed fact that "red gold" is and has been a generic term to identify a type of gold and copper alloy for centuries. Breitling's use of "red gold" is consistent with the term's generic meaning, and is therefore fair use of the term to identify the material of which certain of its watches are made.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   "Red Gold" is a Gold Alloy Comprised of Gold and Copper

Gold is an element which, due to its softness, the jewelry industry only uses in its pure (*i.e.*, unalloyed) form for special functions. For most uses, gold is commonly combined with copper and silver to form alloys in order to alter its physical characteristics. *See* concurrently filed Local Rule 56(a)(1) Statement of Undisputed Materials Facts ("SUMF"), ¶ 1. As the

proportion of these elements varies, gold alloys demonstrate an observable change in color. SUMF, ¶ 2.  Common gold alloys are referred to as white gold, yellow gold, and red gold.  *Id*.

"Red gold" is an alloy of gold with copper and a smaller amount of silver, featuring a reddish hue due to the addition of copper.  SUMF, ¶ 3.  For instance, jewelers and watchmakers make 18-karat red gold from three-quarters pure gold while the copper content commonly varies between a fifth and a quarter with silver making up the balance.  *Id*.  There are variations of red gold, with higher copper content yielding a darker reddish-brown color, and lower copper content yielding a lighter red gold alloy with more of a pink hue, i.e., what has commonly become known as "pink gold" or "rose gold."  *Id*.  A change in the copper content of "red gold" can be discerned from the relative redness of the material.  *Id*.

Use of the red gold alloys made of copper and gold dates back to ancient Egypt, as far back as 1352 B.C.  SUMF, ¶ 4.  In 1987, to provide objective criteria for determining the chemical composition of gold alloys, the International Standards Organization ("ISO"), a worldwide federation of national standards bodies, published International Standard ISO 8654, titled "Jewellery – Colours of gold alloys – Definition, range of colours and designation." SUMF, ¶ 5.  ISO 8654 set forth a numbered scheme for six gold alloys instead of using color terminology.  *Id*.  For instance, "4N" and "5N" denote two different gold alloys which, in English, are referred to as "pink gold" and "red gold."  *Id*.  In 2018, ISO 8654 added a seventh gold alloy, "6N" or, in English, "dark red gold." *Id*.

## B.    Use of "Red Gold" in the United States for Over 150 Years

In the United States, "Red Gold" was identified as a gold alloy in published sources, including since at least the 19th century.  SUMF, ¶¶ 6-7.  Some of earliest uses include:

- an 1861 publication called *Appleton's Dictionary of Machines, Mechanics, Engine-work*

3

*and Engineering – Metals and Alloys*, providing formulas for various colored golds "red gold," "full red gold," "green gold," and "gray gold," and where red gold is listed as 10 dwt gold, 4 dwt copper, and 1 dwt silver (SUMF, ¶ 7(a));

- an 1874 publication called *Spons Dictionary of Engineering, Civil, Mechanical, Military and Naval* by Byrne & Spon that gives the formulas for "red gold" as 5 parts gold and 1 part copper, or 4 parts gold and 1 part copper (SUMF, ¶ 7(b));

- an 1889 general-purpose dictionary defining "red gold" as "In *jewelry*, gold alloyed with copper" (emphasis in the original) (SUMF, ¶ 7(c)); and

- an 1897 encyclopedia listing "red gold" as 75 parts gold and 25 parts copper (SUMF, ¶ 7(d)).

"Red gold" continued to be used in a similar variety of publications in the United States through each decade of the 20th Century.  SUMF, ¶ 7.  The following brief sample highlights uses during this era:

- Published in 1941, *Montgomery Ward – Fall & Winter Catalogue*, showing dozens of "red gold" watches and watch cases with descriptions such as "modern Red Gold" and "The latest style – popular new Red Gold," (SUMF, ¶ 7(r));

- Published in 1979, *The Beauty of Jewellery* compared white gold to red gold, which "in the case of red gold there is more copper added," whereas "with white gold the proportion of silver or palladium is increased." (SUMF, ¶ 7(u));

- Published in 1999, *Horological Times*, a trade publication, feature titled "Industry News" reporting the auction of a "Prototype No. 1 of the Omega coaxial wristwatch… in red gold," (SUMF, ¶ 7(w)).

4

Myriad examples of the unceasing usage of "red gold" persist into the 21st century. SUMF, ¶ 7-10.  Numerous utility patents refer to "red gold" as a gold alloy or material between 1975 and 2019.  SUMF, ¶ 8.  From 2001 to 2017, *The Wristwatch Annual*, an annual trade publication, contains over one-thousand-three-hundred references to "red gold" watch components by fifty-three watchmakers to describe the kind of gold used in their products. SUMF, ¶ 9.  Media publications frequently use "red gold" as an alloy or material when referring to Plaintiff's own products.  SUMF, ¶ 10.  Dr. David Neal, Breitling's survey expert, conducted a survey among prospective and actual purchasers of fine jewelry and watches in which the majority of the respondents—67%—indicated they understood "red gold" to be a common name, whereas only 16.1% understood it to be a brand name.  SUMF, ¶ 11.

Finally, Plaintiff's own customers understand "red gold" to mean a material.  SUMF, ¶¶ 12, 25, 27.  Plaintiff's witness Aaron Goodwin, when specifically asked the material of his Solid 21 "Aire Traveler" watches, stated "[i]t's red gold."  SUMF, ¶¶ 25, 26.

## C.     Plaintiff's Registration and Use of "Red Gold" to Identify the Gold Alloy

On July 25, 2002, Plaintiff filed an application to register "red gold" with the USPTO for "fine jewelry <u>made of a special alloying of gold with a distinct color</u> made into fine jewelry, namely, watches, necklaces, bracelets, rings, anklets, cuff links, ornamental hair pins, belt buckles of precious metal, tie clips and pegs, and earrings."  SUMF, ¶ 13 (emphasis added). Plaintiff's "red gold" application matured to registration on December 16, 2003.  *Id*.

On January 15, 2019, Plaintiff applied to the USPTO to register the trademark "Signature Red Gold" for "watches and jewelry."  SUMF, ¶ 14.  The application was rejected and continues to be rejected by the USPTO because, among other reasons, "the wording merely describes applicant's goods because it is merely descriptive of a feature of applicant's goods, namely, the

material composition of the jewelry and watches, namely jewelry and watches made at least in part of red gold." SUMF, ¶ 15. Accordingly, the USPTO concluded that the mark "appears to be generic as to the material composition of [Plaintiff's] goods namely, goods made in significant part of gold including red gold." *Id*.

For "red gold," Plaintiff claims a date of first use of 1989, but has not produced any documents to establish its use of the term prior to 2002. SUMF, ¶¶ 16, 17. Press reports discuss Plaintiff's "launch" of "red gold" no earlier than July 2002. SUMF, ¶ 17. A 2007 business plan for Plaintiff stated Plaintiff ███████████████████████████████████ and Plaintiff's press release for its 20th anniversary asserted a similar date, "Red Gold® trademark established in 2003." *Id*. Plaintiff has also testified in prior litigation to first launching its "red gold products" in the early 2000's. SUMF, ¶ 18.

Plaintiff uses "red gold" to describe and identify the alloy or metal in its jewelry products, including a chain, dog tags, earrings, and bangles in "red gold." SUMF, ¶ 33. Indeed, in 2005, Plaintiff's website boasted that its founder, Chris Aire, " [. . .] developed and trademarked Red Gold® – a special blend of gold enhanced with several alloys that exudes a rich, autumnal hue" and that he began developing new alloys and experimenting with different colors of gold, including black, purple, and green[.]" SUMF, ¶ 17. Plaintiff's press releases from 2004 also described "Red Gold" as "a special blend of gold." SUMF, ¶ 19. In 2005, well into its alleged use of the term as mark, Plaintiff used "red gold" on its invoices to customers to indicate its products' material: ███████████████████████████████████ ███████████████████ SUMF, ¶ 20. In internal documents, Plaintiff listed "metals to be made" and "metal type" as "18K red gold" and "18K white gold." SUMF, ¶ 21. Plaintiff unequivocally acknowledged that it used "Red Gold" to identify an "amber hue gold alloy" when it sued 13

defendants for trademark infringement in its first lawsuit in 2010, referring to "Red Gold" as a "metal alloy gold derivative with an amber hue."  SUMF, ¶ 22.  In fact, Plaintiff's own witnesses, including its customers and a former employee, testified at deposition that they themselves used the term "red gold" to refer to the color and gold material of the product being ordered.  SUMF, ¶¶ 25, 27. One of Plaintiff's customers, Samuel Appiah, "testified that "red gold," like "yellow gold" and "white gold," is a form of gold, and described one of Plaintiff's necklaces as being "made out of red gold and white gold" and one of its belt buckles as "two-tone, like red gold and another color gold."  SUMF, ¶ 27.  Even the press frequently referred to "Red Gold" as a material offered by Plaintiff in its products.  SUMF, ¶ 10.

Plaintiff has also testified, in this litigation and in others, that it creates its "red gold" products with a "5N alloy" consisting of "amber hue gold" through a combinations of copper, palladium, silver, and/or nickel.  SUMF, ¶¶ 23-24.  And, by virtue of Plaintiff's failure to timely respond to Breitling's requests for admissions under Fed. R. Civ. P. 36(a)(3), Plaintiff admits that "red gold" is a generic word for this gold metal alloy that contains copper with reddish color or hue, which "is not proprietary or exclusive to" Plaintiff or anyone else.  SUMF ¶¶ 31-32. These facts, which are undisputed and admitted, are further confirmed by the consumer survey of Mark Keegan, whose survey of current and prospective luxury watch purchasers shows that consumers "do not identify 'red gold' as a brand" and that the term "red gold" "does not function as a brand in the consumer purchase decision for Breitling luxury watches."  SUMF, ¶ 34.

Plaintiff's current efforts to now disavow its prior usage of the term to identify the red gold metal alloy to avoid a finding of genericness in this litigation strain credulity and are belied by the undisputed facts.

/ / /

7

**D.**     **Breitling's Non-Trademark, Fair Use of "Red Gold"**

Based in Switzerland, Breitling SA is a luxury watch company that manufactures and sells watches under the brand BREITLING.  SUMF, ¶ 28.   Breitling U.S.A., Inc. is a Connecticut corporation and is the exclusive United States distributor of its parent company, Breitling SA.  *Id.*  Breitling has consistently used the term "red gold" over the years only to indicate the particular gold alloy it uses in its products and product components.  *Id.*  On its website, Breitling states "red gold" in smaller text beneath a watch model's name when identifying the case material and dial color (e.g., "18k Red gold – Mother-Of-Pearl Diamonds," "Steel & 18k red gold – Black") as depicted below:



*See* SUMF, ¶ 29 (also showing "18k Red Gold – Silver," "18k Red Gold – Anthracite," "18k Red Gold – Blue").

As is plain from the foregoing, Breitling diminutively uses the term "red gold" in its catalogs only to accurately identify and describe the material and other product features and specifications of the watch, including the metal material of which the watch's band, bezel, case, or other component is made.  SUMF, ¶ 30.  Breitling uses "red gold" in its literal meaning to accurately identify the gold material of the watch's component(s) as part of a larger phrase, *e.g.*, "18k Red Gold – Mother-of Pearl Diamonds" or "Steel & 18k red gold – Black [in reference to the color of the watch's dial]." *Id.*  Breitling did not emphasize or highlight "red gold" and clearly indicates itself as the source of its products by prominently using the BREITLING and/or "B" trademarks and the names of its timepieces in its advertising and promotional materials, *e.g.*, "Breitling Navitimer B01 Chronograph 46." *Id.*  Breitling's use is unadorned by trademark symbols such as "™" or "®," and in no way indicates any association between its products and Plaintiff. *Id.*

### III.  ARGUMENT

#### A.  Summary Judgment Standard

"Summary judgment is appropriate when, after reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d. Cir. 2000) (citing Fed.R.Civ.P. 56(c)); *see Universal Church, Inc. v. Toellner*, 752 Fed. Appx. 67, 70, 2018 U.S. App. LEXIS 31153, *4-5 (2d Cir. November 2, 2018) (affirming summary judgment of cancellation of plaintiff's trademark registrations as generic)[1]; *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir. 1996) ("Summary

---

[1] Courts frequently find terms generic and unprotectable on summary judgment as demonstrated by the following cases: "Ale House" for facility that serves beer and ale,

judgment in a trademark action may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely.") Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*

## B.   "Red Gold" is Generic and Plaintiff's Trademark is Invalid

To prevail on Lanham Act claims of trademark infringement, false designations of origin, false descriptions and representations, a plaintiff must show (1) that it has a valid mark that is entitled to protection and (2) that defendant's actions are likely to cause confusion between plaintiff's and defendant's products. *Something Old, Something New, Inc. v. QVC, Inc.*, *et al.,* 1999 U.S. Dist. LEXIS 18878, *13-14 (S.D.N.Y. December 7, 1999) (citing *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)). The elements

---

with or without food (*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1317 (11th Cir. 2012)); "Bushwhacker" for a chocolaty frozen drink containing rum and coffee liqueur (*Sandshaker Lounge & Package Store, LLC v. Quietwater Entm't Inc.*, 602 Fed. Appx. 784, 78788 (11th Cir. 2015)); "Welding Services Inc." and "WSI" for weld metal overlay services and fabrications (*Welding Svcs. Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007)); "Warehouse Foods" for grocery stores (*Warehouse Foods, Inc v. Great Atlantic and Pacific Tea Co., Inc.*, 1984 WL 63624, at *1 (N.D. Fla., Mar. 2, 1984, No. 83-7296)); "Brick Oven" for pizza (*Schwan's IP, L.L.C. v. Kraft Pizza Co.*, 460 F.3d 971, 973 (8th Cir. 2006)); and "Medical Travel" in reference to the medical tourism industry (*Florida Van Rentals, Inc. v. Auto Mobility Sales, Inc.*, 85 F. Supp. 3d 1300 (M.D. Fla. 2015))).

required to succeed on trademark infringement and unfair competition claims are substantially the same and are examined together, and both require a valid trademark. *MyPlayCity, Inc. v. Conduit Ltd.*, 2012 U.S. Dist. LEXIS 47313, at \*50-51 (S.D.N.Y. Mar. 30, 2012); *Gucci Am., Inc. v. Action Activewear, Inc*., 759 F. Supp. 1060, 1063 (S.D.N.Y. 1991); *GMA Accessories, Inc. v. Croscill, Inc*., No. 06-CV-6236, 2008 U.S. Dist. LEXIS 16052, 2008 WL 591803, at \*3 n.2 (S.D.N.Y. Mar. 3, 2008) ("The legal standards governing § 1114(1)(a) and § 1125(a) claims are identical."); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188, 1192 (S.D.N.Y. 1983) (quoting *Am. Footwear Corp. v. Gen. Footwear Co*., 609 F.2d 655, 664 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S. Ct. 1601, 63 L. Ed. 2d 787 (1980)) ("The law of trademark infringement is but a part of the law of unfair competition and the same test is applied in determining each claim."); *Anthem Sports, LLC v. Under the Weather, LLC*, 320 F. Supp. 3d 399, 417 (D. Conn. 2018); *Verilux, Inc. v. Hahn*, No. 3:05CV254(PCD), 2007 U.S. Dist. LEXIS 58507, 2007 WL 2318819, at \*10 (D. Conn. 2007) ("The test for trademark infringement and unfair competition under Connecticut law is identical to the test under the Lanham Act.").

     1.    <u>Generic Terms Cannot Be Trademarks</u>

    "Generic marks, consisting of words that identify the type or species of goods or services to which they apply, are totally lacking in distinctive quality; they are not entitled to any protection against infringement, even if they have become famous as marks, because according such protection would deprive competitors of the right to refer to their goods by name." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001). Indeed, "a generic term can never be trademarked . . . ." *Universal Church, Inc.*, 752 Fed. Appx. at 70, 2018 U.S. App. LEXIS 31153 at \*4-5 (citing *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985);

*Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)).  Generic marks are invalid.  *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986) (citing *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963) (thermos bottle); *Dupont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir. 1936) (cellophane), *cert. denied*, 304 U.S. 575, 82 L. Ed. 1539, 58 S. Ct. 1047 (1938)).  "A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term…" *Am. Cyanamid Corp.*, 800 F.2d at 308 (citing *Flintkote Co. v. Tizer*, 266 F.2d 849, 852 (3d Cir. 1959); *Upjohn Co. v. Schwartz*, 246 F.2d 254, 262 (2d Cir. 1957); *Eastern Wine Corp. v. Winslow-Warren, Ltd.*, 137 F.2d 955, 959 (2d Cir. 1943), *cert. denied*, 320 U.S. 758, 64 S. Ct. 65 (1943).  "Trademark protection benefits consumers by enabling them to select products on the basis of their origin.  This encourages sellers to create and maintain good will by marketing products of reliable quality that consumers associate with their mark.  Consumers will not benefit, however, if trademark law prevents competitors from using generic or descriptive terms to inform the public of the nature of their product." *Id.* (citing *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970) ("word which is in its primary meaning merely descriptive of the goods to which it is applied may not be appropriated as the exclusive trademark of a single seller, since one competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods"), *cert. denied*, 400 U.S. 916, 91 S. Ct. 174, 27 L. Ed. 2d 155 (1970); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976).

/ / /

/ / /

2.      *The Undisputed Facts Show that "Red Gold" Is Generic*

"Generic marks are subject to cancellation at any time." *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 296 (S.D.N.Y. October 19, 2000) (citing *Park 'n Fly*, 469 U.S. at 194). A generic mark lacks protection even if it is incontestable. *Id.* at 195. In other words, "[a]n incontestable mark is not invincible: a registered mark can be canceled at any time if it becomes generic." *Something Old, Something New*, 1999 U.S. Dist. LEXIS 18878 at *14 (citing 15 U.S.C. § 1064(3) (permitting cancellation of a registration at any time for a mark that is the generic name for goods or services); *Park 'N Fly*, 469 U.S. at 200-01); *see also* 15 U.S.C. § 1065(4) ("no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered").

"Types of evidence to be considered in determining whether a mark is generic include: (1) dictionary definitions; (2) generic use of the term by competitors and other persons in the trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys." *Pilates, Inc.*, 120 F. Supp. 2d at 297 (citing *Brandwynne v. Combe Int'l Ltd.*, 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999)); *Pilates, Inc.*, 120 F. Supp. 2d at 300 ("Newspaper and magazine use of a term in a generic sense is strong evidence of genericness"). "A would-be proprietor's use of the words in the mark to refer to the kind of services it and its competitors provide is powerful evidence that the words in the putative mark are being used generically." *Welding Servs.*, 509 F.3d at 1359; *see also Pilates, Inc.*, 120 F. Supp. 2d at 299 (finding plaintiff's own use of the mark in a generic manner weighed in favor of granting summary judgment that mark was generic). Generic use of a term by a trademark holder's competitors is also probative of genericness. *Pilates, Inc.*, 120 F. Supp. 2d at 297-98. A "party can demonstrate genericness by showing that industry participants use the contested term to denote a

type of good, not the good associated with the mark holder." *Badia Spices, Inc. v. Gel Spice Co.*, 2017 WL 2082794, at * 3 (S.D. Fla. May 15, 2017) (citing *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002)).

Here, there can be no material dispute of fact that "red gold" has been and is the generic name for an alloy of gold and copper used in jewelry and watches.  Indeed, Plaintiff *admits* that "'red gold' is a way of describing the color or hue of an alloy of gold that contains copper," and that "the color or hue of the alloy of gold known as 'red gold' is not proprietary or exclusive to any single source."  SUMF ¶¶ 31, 32.  Thus, there is no dispute of material of fact that "red gold" is a generic word used to describe the color of a specific gold alloy.  *Id.*

Indeed, red gold metal dates back to ancient times, and the term "red gold" is and always has been commonly used by watchmakers—including Breitling and Plaintiff, and the several dozen other third parties in the jewelry and watch industries—to identify a gold and copper alloy used for watch components, including cases.  SUMF, ¶¶ 4-10.  This is because "red gold" has long been an industry term of art, not a brand.  Starting as early as 1861 in the United States, and continuing to the present, authoritative sources—both general (*e.g.*, the *Century Dictionary of the English Language*) and specific to the jewelry industry (*e.g.*, International Standard ISO 8654)—define or describe "red gold" as an alloy of gold and copper.  SUMF, ¶¶ 5, 7.  Similarly, general and industry-specific widely distributed magazines (*e.g.*, *Rolling Stone*, *Modern Jeweler*, *ESPN*), catalogs (*e.g.*, *Montgomery Ward*), and publications use "red gold" in this manner.  SUMF, ¶¶ 7, 9-10.  That Plaintiff now attempts to distance itself from its own generic uses of "red gold" and sue others who use the term in the same way is immaterial.  When "the mark has 'entered the public domain beyond recall,' policing is of no consequence to a resolution of whether a mark is generic."  *Pilates, Inc.*, 120 F. Supp. 2d at 300 (citing *Murphy Door Bed Co. v. Interior Sleep*

14

*Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989); *King-Seeley Thermos Co.*, 321 F.2d at 579.

Additionally, numerous patents have issued that use the term "red gold" to identify a gold and copper alloy for inventions relating to jewelry and watches.  SUMF ¶ 8.  This is further evidence of the term's genericness. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir. 1986) (holding that three patent applications using plaintiff's alleged mark generically weighed in favor of a finding of genericness).

Survey evidence also unequivocally supports a finding of genericness.  *See Miller's*, 702 F.3d at 132, *McCarthy* § 12:14 (holding that consumer surveys are also probative of genericness).  Irrespective of its origin, any registered mark loses both its protected status and its qualification for registration when it undergoes a genericizing shift in its primary significance— i.e., when the majority of consumers stop viewing it as a source signifier and start seeing it as a generic product name.  *See Big Island Candies, Inc. v. The Cookie Corner*, 269 F. Supp. 2d 1236, 1251 (D. Haw. 2003) (citing 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:6 ("for a genericness survey, 'majority usage controls.'"; entering summary judgment for defendant)); *Intel Corp. v. Advanced Micro Devices, Inc.*, 756 F. Supp. 1292, 1297 (N.D. Cal. 1991) (survey of 400 computer manufacturers that revealed that 72% of them viewed "386" as a generic name, not as a trademark for a type of microprocessor, was "an important piece of evidence" the court relied on to find that "386" was a generic name); *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (survey showing that 76% of respondents viewed "beerman" as a generic name; summary judgment for defendant affirmed); *see also American Thermos Prods. Co. v. Alladin Indus.,* 207 F. Supp. 9, 20-22, 27-28 (D. Conn. 1962), *aff'd sub nom. King-Seeley Thermos Co. v. Alladin Indus.,* 321 F.2d 577 (2d Cir. 1963) (finding THERMOS generic in light of survey results showing seventy-five percent of respondents used it

15

as a generic term, despite trademark use by a minority of consumers). In this case, Breitling's expert, Dr. Neal, conducted a survey showing that a decisive majority—67%—of survey respondents understand "red gold" to be a common name, whereas only 16.1% understand it to be a brand name. SUMF, ¶ 11. These results were confirmed by Mr. Keegan, whose consumer survey of 396 prospective watch consumers shows that consumers "do not identify 'red gold' as a brand" and that the term "red gold" "does not function as a brand in the consumer purchase decision for Breitling luxury watches." SUMF, ¶ 34. The reason is simple: "red gold" is not a brand; it is a generic term for a type of gold metal alloy, as Plaintiff admits and centuries of undisputed evidence shows. SUMF ¶¶ 4-10, 31-32.

Finally, the USPTO itself refused Plaintiff's application to register "Signature Red Gold" for "watches and jewelry" because, *inter alia*, "the wording 'red gold' ... is not inherently distinctive [and is] at best ... merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services." SUMF, ¶ 15. Indeed, in a recent office action, the USPTO doubled down on its continuing refusal to allow registration of "Signature Red Gold" because the mark also "appears to be generic as to the material composition of [Plaintiff's] goods namely, goods made in significant part of gold including red gold." *Id*. In support of its finding, the USPTO attached evidence reflecting the common understanding of "red gold" as a gold-copper alloy used in jewelry. *Id*.; *see Carling Brewing Co. v. Philip Morris Inc.*, 297 F. Supp. 1330 (N.D. Ga. 1968) (holding that an USPTO refusal to register, while not binding, is "certainly entitled to the most respectful consideration"); *see also Dickinson v. Zurko*, 527 U.S. 150, 160-61 (1999) (collecting cases and observing that "courts and commentators have long invoked to justify deference to agency factfinding" the agency's expertise in the subject matter with which the agency is tasked with overseeing). In sum, there

16

can be no dispute—even with the presumption of validity of Plaintiff's registered mark—that Plaintiff is not entitled to assert or enforce trademark rights in "Red Gold." Thus, all of Plaintiff's claims against Breitling fail because each is premised on Plaintiff's ownership of valid trademark rights in "Red Gold." For the foregoing reasons, Breitling is likewise entitled to summary judgment on its counterclaims for a declaration of invalidity and cancellation of Plaintiff's registration of "Red Gold" on the grounds that it is generic.

## C.    Breitling's Use of "Red Gold" is Classic, Non-Infringing Fair Use

Fair use is an absolute defense to trademark liability even as to registered and incontestable marks where "the use of the name, term or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . ." 15 U.S.C. § 1115(b)(4). "[T]he crux of the matter is whether (1) defendants used the protected term descriptively, not as a mark and (2) defendants acted in good faith." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995). "The classification of the plaintiff's mark does not affect a fair use analysis . . ."*Something Old, Something New, Inc.*, 1999 U.S. Dist. LEXIS 18878 at *18-19 (citing *Car-Freshner Corp.*, 70 F.3d at 269). Determining whether a defendant's "use was descriptive and in good faith for the purposes of the fair use defense can be determined on a motion for summary judgment." *Something Old, Something New, Inc.*, 1999 U.S. LExIS 18878 at *18-19 (citing *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28 (2d Cir. 1997) (affirming grant of summary judgment for defendant who asserted fair use defense)). If fair use is found, it is an absolute defense to Lanham Act liability, "even if a defendant's conduct would otherwise constitute infringement of another's trademark.'" *Id*. at 30; *See also EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 1999 U.S.

17

Dist. LEXIS 9637, No. 98 Civ. 8066, 1999 WL 439052 at *6 (S.D.N.Y. June 28, 1999). "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *Cosmetically Sealed Indus.*, 125 F.3d at 30; *see also* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:47 (5th ed.)(noting the Second Circuit's view, adopted by the Supreme Court, that a fair use defense can prevent a finding of infringement even if a likelihood of confusion exists); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-22 (2004) ("Since the burden of proving likelihood of confusion rests with the plaintiff, and the fair use defendant has no free-standing need to show confusion unlikely, it follows . . . that some possibility of consumer confusion must be compatible with fair use, and so it is.  The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first… The Lanham Act adopts a similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words.") (internal citations omitted).

        1.      *Breitling's Use of the Term "Red Gold" to Identify Its Watches Made of Red Gold Is Descriptive*

Use of a mark is descriptive if "the words were used to describe the 'ingredients, quality or composition' of a product, not the source of the product."  *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 425 (S.D.N.Y. 2008) (citing *JA Apparel Corp. v. Abboud*, No. 07 Civ. 7787 (THK), 591 F. Supp. 2d 306, 2008 U.S. Dist. LEXIS 44599, 2008 WL 2329533, at *19 (S.D.N.Y. Jun. 5, 2008); *In Re Colonial Stores Inc.,* 394 F.2d 549, 55 C.C.P.A. 1049 (C.C.P.A.

1968)).  A junior user (i.e., a party who uses a mark after it is adopted and acquired by another party referred to as the "senior user") is always entitled to use a descriptive term in good faith in its primary sense.  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976) (fair use of SAFARI for boots in connection with booking African safaris and purchase of clothing for the safari); *Hygrade Food Products Corp. v. H.D. Lee Mercantile Co.*, 46 F.2d 771 (9th Cir. 1931) (defendant's use of "High Grade" not trademark use of plaintiff's HYGRADE mark); *Fawcett Publications, Inc. v. Popular Mechanics Cop.*, 80 F.2d 194 (4th Cir. 1935) (use of MECHANICS on magazine permitted as used in primary, descriptive sense).  Indeed, "[t]he defendant has as good a right to a descriptive title as has the plaintiff."  *Warner Publication, Inc. v. Popular Publications, Inc.*, 87 F.2d 913 (2d Cir. 1937).

The key in the analysis is not whether the senior user's use is descriptive, but rather only that the junior user's use is descriptive.  *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:45; *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995) (the fair use issue is determined by looking at the descriptiveness of the accused designation, not at the descriptiveness of plaintiff's trademark); *Seaboard Seed Co. v. Bemis Co.*, 632 F. Supp. 1133 (N.D. Ill. 1986) (rejecting the argument by the owner of an incontestable registration that fair use is not available because the mark is conclusively presumed not to be descriptive; the issue is not whether the registrant's use is descriptive, but whether the accused infringer's use is descriptive).

Emphasis of a descriptive term on a label, packaging or advertising does not necessarily mean that the term is being used in a trademark sense.  *Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477 (S.D.N.Y. 1983) ("Emphasis of a descriptive term on packaging does not show that the term is being used as a trademark").  Notably, even including the descriptive term within a

trademarked phrase does not necessarily make it trademark usage. *See, e.g.*, *Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27 (1st Cir. 1982) (defendant's use of "Leathersmith" in its trade name "Tantalus Custom Leathersmiths & Bookbinders" found to be a fair use); *Johnson Publishing co. v. Etched-In-Ebony, Inc.*, 213 U.S.P.Q. 995 (D.D.C. 1981) (use of "Ebony" in corporate name "Etched-In-Ebony" found to be a fair use). Additionally, use of a separate, conspicuously visible trademark in association with the goods also indicates fair use. *Dessert Beauty, Inc. v. Fox*, 568 F. Supp.2d 416 (S.D.N.Y. 2008) (summary judgment for declaratory judgment that use of "love potion" was not trademark use because there was a separate trademark on the container).

Here, Breitling's use of the term "red gold" is descriptive because Breitling used the term truthfully and accurately to identify and describe Breitling's watches made of the red gold alloy, as that metal is defined in the metallurgical standards under the ISO. Thus, Breitling's use of the term "red gold" in its product descriptions is in the term's primary sense—namely, to identify the specific gold alloy material of which the watches are made. SUMF, ¶¶ 28-30. It is undisputed based on the overwhelming evidence produced by Breitling in discovery that Breitling consistently uses its own mark BREITLING word and/or stylized mark(s) prominently in association with its watches with red gold components. *Id*. Thus, the very presence of the BREITLING marks alongside any use of "red gold" as a descriptor or identification of red gold metal material, conclusively establishes that Breitling's use of the term "red gold" is descriptive within the fair use defense as a matter of law.

    2.    <u>*Breitling's Use of the Term "Red Gold" Was and Is in Good Faith*</u>

The fair use defense also requires a finding "that defendants used the protected mark in good faith." *Dessert Beauty, Inc.*, 568 F. Supp. 2d at 426-27. A "'lack of good faith [is equated]

with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship.'" *Id.* (citing *EMI Catalogue,* 228 F.3d at 6) (alterations in original). "In analyzing the good faith element, 'the focus of the inquiry is . . . whether defendant in adopting its mark intended to capitalize on plaintiff's good will.'" *Id.* Notably, the "'failure to completely abandon the use after receiving a cease and desist letter is insufficient to support an allegation of bad faith'" as a matter of law. *Id.* (citing *Something Old, Something New*, 1999 U.S. Dist. LEXIS 18878, 1999 WL 1125063, at *7; *see also Wonder Labs, Inc. v. Procter & Gamble Co.,* 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (failure to abort advertising campaign upon receipt of cease and desist letter "is absolutely no proof that the defendant acted in bad faith to capitalize on the plaintiff's trademark"). Notice of the trademark claimant's asserted rights—"either by [a] trademark registration or the cease and desist letters—'does not preclude use of the words contained in [plaintiff's] registered mark in their primary[, descriptive] sense' . . . . especially where [the defendant] believed that its use was descriptive[.]" *Dessert Beauty, Inc.*, 568 F. Supp. 2d at 427 (citing *Something Old, Something New*, 1999 U.S. Dist. LEXIS 18878, 1999 WL 1125063, at *7.

In contrast, good faith is shown by "the display of defendant's own name or trademark in conjunction with the mark it allegedly infringes." *Dessert Beauty, Inc.*, 568 F. Supp. 2d at 427 (citing *EMI Catalogue*, 228 F.3d at 67; *Cosmetically Sealed,* 125 F.3d at 30). "This is so because the use of a distinct trademark minimizes any likelihood of confusion as to the source or sponsorship of a product." *Dessert Beauty, Inc.* 568 F. Supp. 2d at 427 (citing *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir. 1993) ["Where a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened."]).

Here, Plaintiff has no evidence that Breitling used the term "red gold" to mislead or confuse consumers into thinking that its products were in any way associated with Plaintiff, or to otherwise capitalize on Plaintiff's alleged goodwill. *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1275 (11th Cir. 2006). Indeed, Plaintiff *admits* that it has no such evidence. *See* SUMF, ¶ 31 at RFA No. 33; SUMF, ¶ 32. Breitling used "red gold" in its primary, descriptive sense as a generic term to identify the red gold material of which its watches are made, while believing that its use was descriptive consistent with countless others' uses in the jewelry and watch industry to describe products made of or with red gold. SUMF, ¶¶ 28-30. Moreover, Breitling prominently used its own brand and watch names in the ads and catalogs in question, and did not use any designs or other indicia to suggest any affiliation with Plaintiff. *See id.*; *see also Dessert Beauty, Inc.*, 568 F. Supp. 2d at 427(citing *EMI Catalogue*, 228 F.3d at 67; *Cosmetically Sealed*, 125 F.3d at 30); *Se. Clinical Nutrition Centers, Inc. v. Mayo Found. for Med. Educ. & Research*, 135 F. Supp. 3d 1267, 1279 (N.D. Ga. 2013) ("[I]dentifying the actual source of a product – with prominent displays of the defendant's own trademark, for example – suggests that the defendant used an allegedly infringing phrase in good faith."[citing examples of same]). Breitling did not have any other "commonly used alternative means to describe [its] product[s]" made of or with red gold, which has a standard definition in terms of metallurgical composition—namely, ISO 8654 and other industry publications specify that "red gold," "pink gold," and "rose gold," are all distinct alloys with varying and specific amounts of copper and gold. *Pilates, Inc.*, 120 F.Supp. 2d at 297; SUMF, ¶¶ 2-7. Although "rose gold" may be similar to "red gold," they are not the same as a matter of chemical and material composition. There is no authority holding that Plaintiff's alleged rights in a mark can be used to force a defendant to

identify its products less than optimally.  In sum, Breitling's use of "red gold" is a fair use immune from liability as a matter of law, and no reasonable juror could conclude otherwise.

**D.      Solid 21 Cannot Establish a Triable Issue That Its Mark is Famous or That Breitling's Advertisements Dilute Solid 21's Trademark**

In addition to bringing counts for trademark infringement and unfair competition under the Lanham Act and common law, Plaintiff also claims trademark dilution under the Lanham Act and section 35-11i of the Connecticut General Statutes.

*1.      Solid 21 Cannot Establish That Its Mark Is Famous*

To prevail on a dilution claim, a plaintiff must first prove that "its mark is famous." *Tyr Sport, Inc. v. Tyr Nat. Spring Water, Inc.*, No. 3:12-CV-761 SRU, 2013 WL 2455925, at *3 (D. Conn. June 5, 2013); *see Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110-11 (2d Cir. 2010) ("The Trademark Dilution Revision Act ('TDRA') allows the owner of a 'famous mark' to enjoin a person from using 'a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.'" ) (quoting 15 U.S.C. § 1125(c)(1)); *see also Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 192 (D. Conn. 2005) (listing elements of federal dilution claim under 15 U.S.C. § 1125(c)(1)).

Under both state and federal anti-dilution laws, the rule is that only very well-known and strong marks need apply for the extraordinary scope of exclusivity given by anti-dilution laws.  4 McCarthy on Trademarks and Unfair Competition § 24:104 (5th ed.).  Under the TDRA, in order to be "famous," a mark must be "widely recognized by the general consuming public of the United States" as a designation indicating a single source of goods or services.  *Id.* (citing Lanham Act § 43(c)(2), 15 U.S.C. § 1125(c)(2)).  That is a difficult and demanding requirement. 4 McCarthy on Trademarks and Unfair Competition § 24:104.

23

As the Federal Circuit observed: "It is well-established that dilution fame is difficult to prove." *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373, 101 U.S.P.Q.2d 1713 (Fed. Cir. 2012) (evidence did not prove that "COACH" for high-end handbags and leather goods was a "famous" mark for purposes of the TDRA); *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 910 (9th Cir. 2002) ("famousness is … a hard standard to achieve."); *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 73 U.S.P.Q.2d 1580, 2005-1 Trade Cas. (CCH) ¶ 74677 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard."); *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671, 688 (W.D. Ky. 2010), *judgment aff'd on other grounds*, 679 F.3d 410, 102 U.S.P.Q.2d 1693 (6th Cir. 2012) ("Congress intended for dilution to apply only to a small category of extremely strong marks."); *Coach Services, Inc.*, 668 F.3d at 1373 ("In other words, a famous mark is one that has become a 'household name.'").

The mark must be famous to the whole consuming public of all of the United States. 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:105 (citing *Coach Services, Inc.*, 668 F.3d at 1372 (The TDRA eliminated the possibility of niche fame.); *Aegis Software, Inc. v. 22nd District Agricultural Association*, 255 F. Supp. 3d 1005, 1011 (S.D. Cal. 2017) (The "niche market" theory was expressly repudiated by the 2006 TDRA). Fame in just one geographic region or one industry or line of business is not sufficient. *Id.*; *see also Urban Home, Inc. v. Cordillera Inv. Co., LLC*, No. 13-08502, 2014 WL 3704031, at *6 (C.D. Cal. June 19, 2014) ("The trademark dilution statute was revised in 2006 to deny protections to marks whose fame extends only to niche markets...."); *Luv N Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F.Supp.2d 753, 757–58 (S.D.N.Y. 2012) (finding plaintiffs' alleged fame among baby product

24

consumers to be insufficient in light of the inclusion in the TDRA of the phrase "widely recognized by the general consuming public of the United Stated.").

"Under Second Circuit precedent, the plaintiff must prove that, 'the senior mark possesses both a 'significant degree of inherent distinctiveness' and, to qualify as famous, 'a high degree of ... acquired distinctiveness.'"  *Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 192 (D. Conn. 2005) (citing *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004); *TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 97, 98 (2d Cir.2001)).  "[T]o be famous within the meaning of the statute, the mark must have achieved a high 'degree of ... acquired distinctiveness,' meaning that it must have become very widely recognized by the U.S. consumer public as the designator of the plaintiff's goods [or services]."  *TCPIP Holding Co.*, 244 F.3d at 97; *see CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 368 (D. Conn. 2018) ("A mark is considered famous 'if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'").

In related trademark litigation regarding the same asserted "Red Gold" mark brought by Plaintiff against another watchmaker, the Eastern District of New York recently dismissed Plaintiff's federal dilution claim, holding that "Plaintiff has failed to allege facts indicating that its mark is recognized beyond a niche market — namely, the high-end luxury watch market." *See* November 30, 2020 Memorandum Opinion & Order in *Solid 21, Inc. v. Jomashop, Inc. f/k/a Giftports, Inc*., Case No. 1:19-cv-01179-MKB-SJB, ECF Dkt. No. 35.  Plaintiff's purported mark is not recognized among the American consumer public at large.  Recognition even in a niche market is insufficient to establish a mark as "famous" enough to warrant protection under the TDRA, and summary judgment on Plaintiff's dilution claims is proper.  *See Coach Services,*

Case 3:19-cv-00514-MPS   Document 107-1   Filed 01/05/21   Page 32 of 34

*Inc.*, 668 F.3d at 1372 ("By using the 'general consuming public' as the benchmark, the TDRA eliminated the possibility of 'niche fame'").

>    2.    *Even if Its Mark Is Famous, the Fair Use Defense Defeats Any Dilution Claim*

Assuming, *arguendo*, that Plaintiff can establish that its mark is famous, the descriptive fair use defense nevertheless bars Plaintiff's dilution claim.  *See* 15 U.S.C. § 1125(c)(3) ("the following shall not be actionable as dilution by blurring or dilution by tarnishment… (A) Any fair use, including a… descriptive fair use… of a famous mark by another person other than as a designation of source for the person's own goods or services."); *see also KP Permanent Make-Up*, 543 U.S. at 123-24.  As established above, any use by Breitling was non-infringing fair use.

>    3.    *Plaintiff's Dilution Claim Under Connecticut Law Fails for the Same Reasons*

Connecticut's dilution statute mirrors the Lanham Act, and Plaintiff's claim thereunder likewise fails for the same reasons.  *See Journal Co., Inc. v. Mktg. Res. Consultants Inc.*, No. 3:05CV1027 (PCD), 2006 WL 8447006, at *7 (D. Conn. July 25, 2006) ("Plaintiff must show under this statute [Conn. Gen. Stat. § 35-11i] that their marks are "famous," such that another partys [sic] 'use of the mark ... dilutes its value.'"); *see also Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 195 (D. Conn. 2005) (plain language of Conn. Gen. Stat. § 35-11i "indicates that the Connecticut legislature intended the statute to require actual dilution.  For the same reasons it failed to prove the federal dilution claim, [Plaintiff] has not proven dilution under state law.").  As shown above, Plaintiff cannot establish that its mark is famous, and even if it could, Breitling's fair use defeats any dilution claim.  Plaintiff has no recourse under either the federal or Connecticut dilution statute as a matter of law.

/ / /

/ / /

26

## IV.   **CONCLUSION**

Based on the foregoing, Breitling respectfully requests that the Court grant summary judgment in favor of Breitling as to all of Plaintiff's claims and Breitling's counterclaims, and declare that Plaintiff's "Red Gold" trademark is generic and therefore invalid and cancelled, or in the alternative, that Breitling's use of the term "red gold" is fair use as a matter of law.

Dated: January 5, 2021

Respectfully submitted,

GORDON REES SCULLY MANSUKHANI, LLP

By ___ _/s/ Craig J. Mariam_____
     Thomas C. Blatchley (ct25892)
     Craig J. Mariam (*pro hac vice*)
     Hazel Mae B. Pangan (*pro hac vice*)
     Raymond J. Muro (*pro hac vice*)
     Gordon & Rees LLP
     95 Glastonbury Blvd., Ste. 206
     Glastonbury, CT 06033
     Phone: (860) 494-7525
     Fax: (860) 560-0185
     Email: tblatchley@grsm.com
     Attorneys for Defendants and
     Counterclaimants Breitling U.S.A., Inc.;
     Breitling SA (a/k/a Breitling AG)

## CERTIFICATION OF SERVICE

I hereby certify that on January 5, 2021, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.

By   */s/ Craig J. Mariam*    
      Craig J. Mariam
      Attorneys for Defendants and
      Counterclaimants Breitling U.S.A., Inc.;
      Breitling SA (a/k/a Breitling AG)