# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SOLID 21, INC., <br>     Plaintiff, <br><br> v. <br><br> BREITLING U.S.A., INC.; BREITLING SA; AND BREITLING AG, <br>     Defendants. | : <br> : <br> : C.A. NO. 3:19-CV-00514-MPS <br> : <br> : <br> : <br> : FEBRUARY 9, 2021 <br> : <br> : |

**<u>DEFENDANTS AND COUNTERCLAIMANTS BREITLING U.S.A., INC. AND BREITLING SA'S (A/K/A BREITLING AG) REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

                                                                                                      **Page**

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT ...................................................................................................................... 2

        A.    Plaintiff's Alleged "Red Gold" Mark is Invalid ...................................................... 2

                1.    A Generic Mark Is Not Protectable Regardless of Any Incontestable Registration ................................................................................................... 2

                2.    Plaintiff's Proffered Evidence Fails to Create a Genuine Material Dispute that "Red Gold" is A Generic Term for the Gold-Copper Alloy Identified by that Name ... 4

                      i.    Plaintiff's Proffered Linguistics Expert Report Is Irrelevant and Nevertheless Confirms the Generic Meaning of "Red Gold" ............................ 4

                      ii.   Plaintiff's Proffered Declarations of Friends and Affiliates Are a Sham..... 6

                      iii.  Plaintiff's Proffered Consumer Survey Fails to Test Consumer Understanding of the Term "Red Gold" ................................................................ 8

        B.    Plaintiff Fails to Rebut Breitling's Fair Use of the Term "Red Gold" ...................... 8

        C.    Plaintiff Makes No Argument Whatsoever to Support Its Dilution Claims ............ 10

III.  CONCLUSION ................................................................................................................. 10

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
   626 F.3d 699 (2d Cir.2010) ............................................................................................. 7

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
   769 F.2d 919 (2d Cir. 1985).............................................................................................. 2

*Buzz Bee Toys, Inc. v. Swimways Corp.*,
   20 F. Supp. 3d 483 (D.N.J. 2014).................................................................................... 6

*CES Publishing Corp. v. St. Regis Publications, Inc.*,
   531 F.2d 11 (2d Cir. 1975) ................................................................................................ 3

*CG Roxane LLC v. Fiji Water Co. LLC*,
   569 F. Supp. 2d 1019 (N.D. Cal. 2008)....................................................................... 3, 4

*Colt Def. LLC v. Bushmaster Firearms, Inc.*,
   486 F.3d 701 (1st Cir. 2007) ............................................................................................. 4

*Donchez v. Coors Brewing Co.*,
   392 F.3d 1211 (10th Cir. 2004)........................................................................................ 8

*Door Sys., Inc. v. Pro–Line Door Sys., Inc.*,
   83 F.3d 169 (7th Cir. 1996) .............................................................................................. 2

*Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*,
   1996 WL 143903 (S.D.N.Y. Mar. 29, 1996).................................................................... 6

*Frito-Lay, Inc. v. Bachman Co.*,
   704 F. Supp. 432 (S.D.N.Y. 1989) ................................................................................. 10

*Genesee Brewing Co. v. Stroh Brewing Co.*,
   124 F.3d 137 (2d Cir. 1997) ............................................................................................. 4

*In re Cordua Rests., Inc.*,
   823 F.3d 594 (Fed. Cir. 2016)...................................................................................... 2, 4

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
   478 F. Supp. 2d 340 (E.D.N.Y. 2007)............................................................................. 6

*Loctite Corp. v. National Starch and Chemical, Corp.*,
   516 F. Supp. 190 (S.D.N.Y. 1981) .................................................................................. 6

*Luv N Care, Ltd. v. Regent Baby Prods. Corp.*,
   841 F.Supp.2d 753m(S.D.N.Y. 2012)........................................................................... 10

*Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*,
   561 F.2d 75 (7th Cir. 1977) .................................................................................................. 3

*Packman v. Chi Tribune Co.*,
   267 F.3d 628 (7th Cir. 2001) .............................................................................................. 10

*Palmieri v. Lynch*,
   392 F.3d 73 (2d Cir. 2004) ................................................................................................. 10

*Park 'n Fly v. Dollar Park and Fly, Inc.*,
   469 U.S. 189 (1985) ............................................................................................................. 2

*Perma Research and Dev. Co. v. Singer Co.*,
   410 F.2d 572 (2d Cir.1969) ................................................................................................. 7

*Pilates, Inc. v. Current Concepts, Inc.*,
   120 F.Supp.2d 286 (S.D.N.Y. 2000) ................................................................................... 2

*Quad Cities Waterkeeper v. Ballegeer*,
   84 F. Supp. 3d 848 (C.D. Il. 2015) ...................................................................................... 5

*Rudolph Int'l, Inc. v. Realys, Inc.*,
   482 F.3d 1195 (9th Cir. 2007) ............................................................................................. 3

*S.S. Kresge Co. v. United Factory Outlet, Inc.*,
   598 F.2d 694 (1st Cir. 1979) ........................................................................................... 6, 8

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
   978 F.2d 947 (7th Cir. 1992) ............................................................................................. 10

*Schwan's IP, LLC v. Kraft Pizza Co.*,
   460 F.3d 971 (8th Cir. 2006) ........................................................................................... 3, 4

*Self-Realization Fellowship Church v. Ananda Church of Self Realization*,
   59 F.3d 902 (9th Cir.1995) .................................................................................................. 6

*Sheetz of Delaware, Inc. v. Doctor's Associates Inc.*,
   108 U.S.P.Q. 2d 1341 (T.T.A.B. 2013) ............................................................................... 3

*Something Old, Something New, Inc. v. QVC, Inc.*,
   98-Civ-7450-SAS, 1999 WL 1125063 (S.D.N.Y. 1999) .................................................... 2

*U. S. Patent & Trademark Office v. Booking.com B. V.*,
   140 S. Ct. 2298 (2020) ......................................................................................................... 8

*Universal Church, Inc. v. Universal Life Church/ULC Monastery*,
   2017 WL 3669625 (S.D.N.Y. Aug. 8, 2017),
   *aff'd sub nom.* 752 F. App'x 67 (2d Cir. 2018) ................................................................... 6

*Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*,
   736 F.2d 656 (11th Cir. 1984) ............................................................................................. 7

*Woodard v. Town of Oakman, Ala.*,
  970 F. Supp. 2d 1259 (N.D. Ala. 2013) .................................................................................. 5

**Statutes**

15 U.S.C. Section 1064 ................................................................................................................. 2

15 U.S.C. Section 1065 ................................................................................................................. 2

D. Conn. L. Civ. R. 56 .................................................................................................................. 1

Fed. R. Civ. P. 56 ..................................................................................................................... 1, 5

**Regulations**

1941 *Montgomery Ward – Fall & Winter Catalogue* ..................................................................... 4

Appleton's Dictionary from 1861 .................................................................................................. 4

*McCarthy* Section 12:10 (4th ed. rev. March 2013) ..................................................................... 3

Pursuant to Fed. R. Civ. P. 56 and D. Conn. L. Civ. R. 56, Defendants and Counterclaimants Breitling U.S.A., Inc. and Breitling SA (a/k/a Breitling AG) (collectively, "Breitling") respectfully submit this Reply in support of Breitling's Motion for Summary Judgment (Dkt. No. 107) ("Motion") and in response to the Opposition (Dkt. No. 123) ( "Oppo.") filed by Plaintiff Solid 21, Inc. ("Plaintiff")[1].

## I. INTRODUCTION

It would be improper, as Plaintiff posits, to undo centuries of use of "red gold" as a generic term to identify a gold and copper metal alloy used in metallurgical applications, including jewelry and watch making. Plaintiff itself does not and cannot dispute that in its own marketing and product communications, it used the term "red gold" to identify the metal material of which Plaintiff's jewelry or watch products or their components are made. Other than *pro forma* declarations of interested witnesses who are Plaintiff's friends or affiliates, and who themselves have been discredited through prior sworn testimony, Plaintiff's only proffered evidence is the pedantic report of a linguistics professor, who necessarily concedes that multiple English language dictionaries, including the Oxford dictionaries and the New Oxford American Dictionary, define "red gold" precisely as Breitling and others do, citing a reference dating back to 1707:

> **B.** *n.* **red-gold**
> Frequently as two words
> 1. An alloy of gold with a proportion of copper, having a reddish-yellow colour.
> 1707 T. HETON *Some Acct. Mines* 52 Red Gold is less valuable, as containing most Copper; the Yellow is better.
> 1800 tr. E. J. B. Bouillon-Lagrange *Man. Course Chem.* II. 141 Jewelers gold, and that used for plate and coins, is allayed with this metal [sc. copper]. When this mixture is made in the arts, the workmen call it Red Gold.
> 1948 A. SELWYN *Retail Jeweler's Handbook.* (ed. 3) x. 137 Red gold had a revival when Paris jewelers reintroduced it in jewelry in 1937–38.
> 1992 C. FOWLER *Red Bride* (1993) (BNC) 253 It's a lady's eternity ring, red gold, Victorian.
> 2007 *Jewelers' Circular-keystone* (Nexis) 1 July 114 While stainless steel dominates watchmaking, there's much more red gold (also called pink or rose, depending on the copper alloy) on fine watches.

PSIO 17, Butters Report ¶¶ 33-35. None of Plaintiff's evidence creates a genuine triable issue of material fact in the face of Breitling's insurmountable evidence that Plaintiff was not the first to use the term "red gold" on jewelry and watches, much less the one who coined it. And, even if Plaintiff's trademark registration were valid, despite indisputable evidence to the contrary, Plaintiff fails to create any genuine dispute of fact on Breitling's fair use of the term "red gold." There is no dispute that Breitling uses the term for its literal meaning to identify and describe the metal material of which the accused Breitling watches are made. This is classic, non-infringing fair use, which

---

[1] Breitling has recently learned that Solid 21, Inc. is in default status as a corporate entity with the Secretary of State of Nevada, where Plaintiff is incorporated, potentially indicating that Plaintiff is not a going concern with any bona fide commercial activity involving the use of the asserted trademark, but rather exists only to file these lawsuits against the Swiss Watch Industry. *See* Supplemental Decl. of Hazel M. B. Pangan ("Pangan Supp. Decl.") at ¶ 9; Exhibit AC thereto.

is a complete defense to liability. Accordingly, summary judgment in Breitling's favor is proper and should be granted.[2]

## II. ARGUMENT

### A. Plaintiff's Alleged "Red Gold" Mark is Invalid

#### 1. A Generic Mark Is Not Protectable Regardless of Any Incontestable Registration

Plaintiff's assertion that its asserted "RED GOLD" trademark registration cannot be challenged or invalidated is wrong and contrary to law. A generic mark lacks protection even if it is incontestable, and is "subject to cancellation at any time." *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 296 (S.D.N.Y. 2000) (incontestable mark "Pilates" held generic) (citing *Park 'n Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) (emphasis added)). A generic mark lacks protection even if it is incontestable. *Id.* at 195. In other words, "[a]n incontestable mark is not invincible: a registered mark can be canceled at any time if it becomes generic." *Something Old, Something New, Inc. v. QVC, Inc.*, 98-Civ-7450-SAS, 1999 WL 1125063 at *14 (S.D.N.Y. 1999) (citing 15 U.S.C. § 1064 (3); *Park 'N Fly*, 469 U.S. at 200-01); *see also* 15 U.S.C. § 1065 (4). Indeed, once a defendant shows evidence that a registered mark is generic, a plaintiff "cannot obtain any residual mileage from the registration of its trademark." *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir. 1996).

"[A] proper genericness inquiry focuses on the description of services set forth in the certificate of registration." *In re Cordua Rests., Inc.*, 823 F.3d 594, 602 (Fed. Cir. 2016) (internal quotations omitted). Here, Plaintiff misleadingly argues that the classes of goods specified in the trademark registration "are not directed towards an alloy." Oppo. at 19. This is false, as shown by the plain language of the registration, which identifies the goods as "fine jewelry made of a special alloying of gold with a distinct color made into fine jewelry, namely, watches, necklaces, bracelets, rings, anklets, cuff links, ornamental hair pins, belt buckles, of precious metal, tie clips and pegs, and earrings." SUMF, ¶ 13. (emphasis added). By Plaintiff's own admission, this "alloying of

---

[2] Plaintiff's passing claim that it needs additional discovery lacks merit, as shown by Plaintiff's opposition briefing, which includes the same lay and expert witness declarations it has offered before, and which have been discredited in prior litigation involving Plaintiff and the same claims it makes here against Breitling. Moreover, it is patently false for Plaintiff to claim that it has not had an opportunity for discovery. Even if the ten years of prior litigation involving the same asserted trademark in this case were not enough, Plaintiff has had approximately sixteen months of discovery in this case alone. Summary judgment is therefore proper and appropriate at this time. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927 (2d Cir. 1985) ("Claims of a need for more discovery by a party who has diligently used the time available, however, should be given more favorable consideration than claims by one who has allowed months to pass unused."); *see also* Breitling's Oppo. to Plaintiff's Motion To Extend Time, Dkt. No. 117.

2

gold with a distinct color" is in fact the "5N" red gold alloy purchased by Plaintiff from Swiss watch manufacturers. Pangan Supp. Decl., Ex. AK, Aire Depo. Trans., pp. 85:8-87:13 ("When I would present my Swiss watch manufacturers a design and -- that I was trying to make a part of our Red Gold Collection -- I generally like a rich, you know, distinct color, and the closest thing that they were making at the time that was comparable to what I was doing, they called 5N."). Red gold is neither distinctive nor proprietary to Plaintiff, whether in terms of the alloy, its color, or its name. It never has been and is not now. Plaintiff cannot dispute this fact with any credible evidence.

Plaintiff's argument that "red gold" is descriptive and not generic strains credulity and does not matter under the law in any event. Even if the registration only identified "fine jewelry" and/or "watches," "red gold" would still be generic because a term need not be the name of a genus, but, instead, may be a type or category of, or an adjective for, a good within the genus. *See Sheetz of Delaware, Inc. v. Doctor's Associates Inc.,* 108 U.S.P.Q. 2d 1341, 1366 (T.T.A.B. 2013) (citing *McCarthy* §12:10 (4th ed. rev. March 2013) ("Although it has sometimes been said that 'generic names are nouns and descriptive names are adjectives,' such a rule is not consistent with the Board's precedent or that of many courts; genericness cannot be determined simply by applying prescriptivist rules based on parts of speech."; finding that "Footlong" is generic when used with sandwiches, even though it is not the name of a food product.)); *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,* 561 F.2d 75, 80 (7th Cir. 1977) (citing *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir. 1975) ("The fact that 'light' is an adjective does not preclude it from being a generic or common descriptive word" as applied to beer."); *Rudolph Int'l, Inc. v. Realys, Inc.,* 482 F.3d 1195, 1198 (9th Cir. 2007). In each of these cases, the mark found generic "relate[d] to the type of product rather than its source and consequently f[e]ll[] on the 'what-are-you' side of the genericness test." *Id.* at 1198-99; *see also CG Roxane LLC v. Fiji Water Co. LLC,* 569 F. Supp. 2d 1019, 1026 (N.D. Cal. 2008) ("Generic adjectives are not protected either since they describe a characteristic of a class of products … Allowing a producer to trademark a generic word or phrase would place an undue burden on competition contrary to the goals of trademark law and is therefore prohibited."). The genericness test looks at the "primary significance" of the mark—such as "brick oven" for pizza "to identify the product, … not to identify the source of th[e] product"—regardless of whether the word was an adjective or a noun. *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006).

Here, "red gold" is generic because it merely and necessarily identifies the type of product— jewelry (including watches) made of red gold— just as "gold," "white gold," and "silver" used with jewelry are generic

because they identify types of jewelry made of gold, white gold, and silver, respectively, or, as Plaintiff concedes, "mechanical" or "digital" are generic for watches because they "describe a type of watch." Oppo. at 19; *see also In re Cordua,* 823 F.3d at 605 ("[A] a term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole. Thus, the term 'pizzeria' would be generic for restaurant services, even though the public understands the term to refer to a particular sub-group or type of restaurant rather than to all restaurants."). Accordingly, under this immense weight of authority, courts and the Trademark Office regularly find such terms generic, often on summary judgment. *See Schwan's IP, LLC*, 460 F.3d at 973-75 ("Brick Oven" identifies pizza made in a brick oven); *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 148-49 (2d Cir. 1997) ("Honey Brown" identifies brown ales made with honey, just as "rose" for wine, "blended" for whisky, and "white" for bread are generic); *Colt Def. LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701, 705-10 (1st Cir. 2007) ("M4" identifies "a type of carbine with certain characteristics"); *CG Roxane LLC*, 569 F. Supp. 2d at 1027 ("Bottled At The Source" "describes a type of water that is manufactured or bottled at the source").

2. Plaintiff's Proffered Evidence Fails to Create a Genuine Material Dispute that "Red Gold" is A Generic Term for the Gold-Copper Alloy Identified by that Name

   i. *Plaintiff's Proffered Linguistics Expert Report Is Irrelevant and Nevertheless Confirms the Generic Meaning of "Red Gold"*

As Plaintiff concedes, Breitling has introduced "scores" of evidence showing the use of "red gold" for centuries, and long pre-dating Plaintiff's alleged trademark use of the term. Oppo. at 21. Plaintiff does not meaningfully rebut this evidence, which includes various publications from technical documents to newspaper articles and spanning all audiences, including trade persons, lay persons, and consumers. SUMF, ¶¶ 4 (red gold alloys of gold and copper used by Ancient Egyptians), 5 (International Standards Organization ("ISO") Standard 8654, "Jewellery – Colours of gold alloys – Definition, range of colours and designation" including "5N" "red" gold), 6 ("Red Gold" was identified in the U.S. as a gold alloy in published sources, including since at least the 19th century), 7 (Appleton's Dictionary from 1861, providing alloy formulas for various colored golds including "red gold" and "full red gold"; 1941 *Montgomery Ward – Fall & Winter Catalogue*, showing dozens of "red gold" watches and watch cases with descriptions such as "modern Red Gold" and "The latest style – popular new Red Gold"); Ex. A to Index, Smith Report, ¶ 17 (listing the use of "red gold" in General Circulation Newspapers, Magazines, Catalogs, and Advertisements" in the U.S., including an 1871 *The New York Times* article; 1928 *San*

*Francisco Examiner* newspaper article; 1881 article in *St. Louis Globe-Democrat* (St. Louis, Missouri); 1920 article in the *Decatur Herald* (Decatur, Illinois) advertising red gold watches to women).[3]

Plaintiff does not address much of this evidence, relying instead on the report of its proffered linguistics expert, Dr. Ronald Butters,[4] for the proposition that "red gold" is not generic. However, Dr. Butters cannot escape the conclusion that "red gold" is a gold and copper alloy—his own report includes several dictionary definitions that define "red gold" exactly in this way, thereby confirming Breitling's evidence. PSIO, ¶ 17; Butters Report, p. 38, ¶ 52, Fig. 1a, pp. 38-39; *see also* Index, Ex. A, Smith Report, Exs. 5-11 (several dictionary references published in the U.S. with entries for "red gold" referring to the gold metal alloy). Indeed, the U.S. Patent and Trademark Office ("USPTO") rejected Dr. Butters' report and denied Plaintiff's application to register "Signature Red Gold" because "Red Gold" "is generic or at least highly descriptive of the material composition of the goods." SUMF, ¶ 15 (Jul. 2, 2020 Office Action). The USPTO explained:

> Applicant [Plaintiff] submitted an expert report asserting that the wording ["red gold"] is not descriptive of the goods. It is noted that the author [Mr. Butters] is not a gold or jewelry expert as to the wording "red gold" but a linguistics expert. <u>The report concedes that the wording "red gold" has a technical meaning as a precious alloy of various proportions of gold and copper as used in metallurgy and watch designers and jewelry</u>. . . .
>
> [T]he examining attorney must consider the potential significance the wording would have, in context, to the average purchasers of the goods or services in the marketplace. *In re Omaha National Corp.*, 819 F.2d 1117, 2 USPQ2d 1859 (Fed. Cir. 1987) . . .

SUMF, ¶ 15 (emphasis added). The USPTO then proceeded to collect and analyze several <u>marketplace uses</u> of the term "red gold" and concluded that the "wording 'red gold' is often used by jewelry companies to refer to the material composition of the jewelry[,]" and that "consumers understand the phrase 'RED GOLD' to identify the type of gold in the jewelry." *Id.* Plaintiff's assertion that "rose gold" or "pink gold" are substitutes for "red gold" is wrong under the ISO Standards, which define "red gold" as having more copper content, yielding a darker shade

---

[3] Plaintiff makes the unsupported assertion that Wristwatch Annual, an annual industry publication with over 1,300 references to "red gold" watch components by fifty-three watchmakers to describe the kind of gold used in their products between 2001-2017, has not been translated to English. *See* SUMF, ¶ 9; Smith Report, ¶ 18, Ex. 78; Plaintiff's Response to SUMF ¶ 9, at pp. 8-9. Yet, Plaintiff itself states that it has advertised in the very same publication and has submitted an excerpt from that publication in English. PSIO, ¶¶ 4-5, Ex. 4.

[4] Breitling objects to the untimely proffered expert reports of Dr. Butters and Duvall O'Steen, who were not disclosed as of the December 18, 2020 expert disclosure deadline. Pangan Supp. Decl., ¶ 8. Moreover, Plaintiff's untimely designation of these experts was not accompanied by the reports required by Rule 26(a)(2)(B). *Id.* The rule of exclusion for nondisclosure of experts applies when a party attempts to use expert declarations on a motion (*e.g.*, summary judgment). *See Woodard v. Town of Oakman, Ala.*, 970 F. Supp. 2d 1259, 1267 (N.D. Ala. 2013); *Quad Cities Waterkeeper v. Ballegeer*, 84 F. Supp. 3d 848, 870 (C.D. Il. 2015).

in the gold alloy. Index, Exhibit A, Smith Report, ¶¶ 28-29. But even accepting Plaintiff's assertion as true, to determine genericness, "[t]he question … is not whether a term is more frequently chosen colloquially than any of its synonyms, but whether it still retains its generic meaning." *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979); *Loctite Corp. v. National Starch and Chemical, Corp.*, 516 F. Supp. 190, 201 (S.D.N.Y. 1981) ("The existence of synonyms for a term does not mean the term is not generic.").

### ii. *Plaintiff's Proffered Declarations of Friends and Affiliates Are a Sham*

Plaintiff's proffered stale declarations of its affiliates and friends are also unavailing and fail to create a genuine factual dispute. "[U]nlike a survey of disinterested consumers, affidavits from a handful of individuals doing business with one of the parties pose issues of objectivity." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 370 (E.D.N.Y. 2007) (declarations of a party's close associates and employees were "of limited probative value" in determining secondary meaning). A limited number of declarations does not show a "substantial segment of the relevant purchasing public." *Id.* (citing *Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*, 1996 WL 143903 (S.D.N.Y. Mar. 29, 1996) (14 declarations insufficient). "Declarations from a plaintiff's employees have 'little probative value regarding the assessment of consumer perception' because '[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark' and because '[a]ttestations from person in close association and intimate contact with the trademark claimant's business do not reflect the views of the purchasing public.'" *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 500 (D.N.J. 2014) (citing *Self-Realization Fellowship Church v. Ananda Church of Self Realization*, 59 F.3d 902, 910 (9th Cir.1995)); *see also Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 2017 WL 3669625, at *8 (S.D.N.Y. Aug. 8, 2017), *aff'd sub nom.* 752 F. App'x 67 (2d Cir. 2018) (in holding term "universal church" generic, declarations of "plaintiff's own employees" of "little probative value" to show that relevant public "understands" mark refers to plaintiff as source).

Moreover, Plaintiff fails to disclose to the Court that its proffered declarants were actually deposed, and testified under oath that they or Plaintiff's customers did in fact perceive of "red gold" as a material. To wit:

- Shadrach Okoebor, one of Plaintiff's former employees, ordered a wedding ring from Plaintiff with a "red gold" band. Pangan Supp. Decl., Ex. AG, Shadrach Okoebor Depo., 19:17-21:14. During Mr. Okoebor's time taking phone orders for Plaintiff (2006-2010), customers would use the term "red gold" to refer to the color of the product they were ordering and request products made of "red gold." *Id.* at 80:1-82:22, 138:9-25.
- Samuel Appiah, Plaintiff's customer, testified that "red gold" was one the materials that can be in one of Plaintiff's watches. Pangan Supp. Decl., Ex. AE, Samuel Appiah Depo., 71:5-72:15. Mr. Appiah testified that "red gold," like "yellow gold" and "white gold," is a form of gold. *Id.* at 109:7-14. He described one of

Plaintiff's necklaces as being "made out of red gold and white gold" and one of Plaintiff's belt buckles as "two-tone, like, red gold and another color gold." *Id.* at 45:5-48:14.  Mr. Appiah purchased a red gold necklace from a person other than Plaintiff. *Id.* at 73:23-76:7.  Mr. Appiah has seen advertisements for products that include the product in "all three colors": white gold, yellow gold, and red gold. *Id.* at 76:8-24.

- When Robert Filotei, a mentor to, and close personal friend of, Mr. Aire, met Mr. Aire in 1996, he had no understanding that Plaintiff was offering products under the name "red gold." Pangan Supp. Decl., Ex. AH, Robert Filotei Depo., 25:4-28:443; 126:23-127:11. Mr. Filotei received a "red gold" watch from Mr. Aire, which he thought was "novel" because it was "red gold." *Id.* at 26:23-28:4.
- Michael Obeng testified that "red gold" is better known than "Chris Aire" because people know "red gold" as the name of a material. Pangan Supp. Decl., Ex. AF, Michael Obeng Depo., 164:10-166:1. When Dr. Obeng first began seeing the term "red gold," he did not associate it with a particular brand. *Id.* at 198:5-10. Dr. Obeng also considers Mr. Aire a friend and mentor. *Id.*, at pp. 52:7-18; 63:11-20.
- Lucille Bilyeyev testified that Mr. Aire is a friend with whom she has texted, and when she met him in 2000, he had not yet developed his "red gold" brand. Pangan Supp. Decl., Ex. AI, Lucille Bilyeyev Depo., 14:5-19:21. She testified that she purchased a dog tag from Plaintiff "in red gold." *Id.* at 34:14-15.

The Court may properly disregard these witnesses' outdated affidavits proffered by Plaintiff as sham affidavits that are less reliable than their statements at deposition. *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 577 (2d Cir.1969) (trial court could "properly conclude that [a] statement made [in] the affidavit was less reliable than the contradictory statements in the deposition"); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 736 (2d Cir.2010) (plaintiff's expert report that contradicted plaintiff's prior representations was insufficient to defeat motion for summary judgment); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (a party cannot create an issue of fact with an affidavit that contradicts deposition testimony).  Under this test, Plaintiff's business acquaintance and supposed industry "expert," Duvall O'Steen, fares no better: despite her statements as an "expert" in this case, she herself was quoted in a May 2, 2010, article in the L.A. Times, entitled "The vintage appeal of rose gold jewelry" as follows:  "Alloy metal suppliers will vary the copper, but <u>whether you call it red, pink or rose gold</u>, it's all the same process."  Pangan Supp. Decl. ¶ 5, Ex. AD, Duvall O'Steen Deposition, 55:18-24, 274:22-275:23, 278:18-21 (emphasis added).  Ms. O'Steen was also quoted in an article in *Hyde Park* magazine entitled "Rose gold blossoms as a top trend," which article also states that men refer to "rose gold" as "red gold" and encourages readers to "[s]tack slim rose and red gold bands altogether . . . for a ring look that only you will have." *Id.* at 276:20- 282:22.

In sum, none of Plaintiff's witnesses, including its principal Mr. Aire, can walk back their documented uses or sworn deposition testimony regarding the term red gold's meaning: it is a metal alloy used in jewelry and watches.  Their declarations stating otherwise are a sham and should be rejected in the face of Breitling's objective evidence showing third party generic use of the term.

### iii. *Plaintiff's Proffered Consumer Survey Fails to Test Consumer Understanding of the Term "Red Gold"*

Plaintiff's survey evidence purporting to show non-genericness is irrelevant and fails to test the proper question: whether consumers <u>understand</u> "red gold" to mean a gold alloy metal used in jewelry and watches, not whether they use that term. PSIO, ¶ 18; Ericksen Report, ¶ 10. The proper genericness inquiry in a consumer survey tests how consumers <u>understand</u> the term "red gold," not whether consumers have "used" the term. *See, e.g., S.S. Kresge Co.*, (the term "mart" was generic for a shopping mart, with "no showing that the term in this case has any <u>meaning in the minds of the consuming public</u> other than store or market.") (emphasis added). Any registered mark loses both its protected status and its qualification for registration when it undergoes a genericizing shift in its primary significance—i.e., when the majority of consumers stop viewing it as a source signifier and start seeing it as a generic product name. *See, e.g., U. S. Patent & Trademark Office v. Booking.com B. V.*, 140 S. Ct. 2298, 2307 (2020) (whether a term is generic "depends on whether consumers in fact perceive that term as the name of a class or, instead, as a term capable of distinguishing among members of the class"); *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (76% of survey respondents viewed "beerman" as a generic name; summary judgment for defendant affirmed).

The survey by Breitling's expert Dr. David Neal properly tested consumers on their understanding of the term "red gold," asking respondents to "tell us whether you understand the name below to be a brand name used by one company or a common name used by a number of different companies." SUMF, ¶ 11; Index, Ex. B, Neal Report, pp. 17-18. Likewise, Breitling expert Mark Keegan conducted a survey of prospective watch purchasers, showing respondents a Breitling advertisement with the phrase "[a]vailable in stainless steel or 18K red gold," consistent with Breitling's use of the term, and asking respondents to "please list all of the brands that are used in the advertisement." *See* SUMF, ¶ 34; Index, Ex. C, Keegan Report, p. 20. Based on the survey results, Dr. Neal concluded that a decisive majority--67%--understand "red gold" to be a common name, while Mr. Keegan, in testing brand awareness and the consumer understanding of Breitling's use of the term "red gold" in its advertisements, concluded that consumers "do not identify 'red gold' as a brand" and that the term "red gold" "does not function as a brand in the consumer purchase decision for Breitling luxury watches." SUMF, ¶¶ 11 34. Dr. Ericksen's survey does not contradict these results. PSIO, ¶ 18; Ericksen Report ¶¶ 10, 34.

### B. Plaintiff Fails to Rebut Breitling's Fair Use of the Term "Red Gold"

Plaintiff fails to create a genuine dispute of fact that Breitling used the term "red gold" in its literal

meaning—a gold copper alloy—consistent with the countless documented historical uses of the term long pre-dating Plaintiff's assertion of trademark rights. Breitling has established each element of fair use of the term "red gold." First, Breitling used the term "red gold" other than as a trademark. Plaintiff does not – and cannot – deny that for each of its allegedly infringing uses: Breitling used "red gold" diminutively and within a list of other watch specifications; Breitling primarily used "red gold" as part of a larger phrase, e.g., "18k Red Gold"; Breitling did not highlight or emphasize "red gold," much less use it with a ™ or ® symbol; and Breitling clearly indicated the source of its watches by prominently using the BREITLING mark and the watch model names in its advertisements and catalogs at issue. SUMF, ¶¶ 28-30. Second, Breitling used the term "red gold" in its literal meaning and in its descriptive sense. The evidence is overwhelming that "red gold" is used generically to refer to watches and jewelry made of an alloy of gold and copper. Even if this evidence does not establish genericness (it does), it undoubtedly establishes that "red gold" is used to describe products including an alloy of gold and copper. This is precisely how Breitling uses the term.

With no other argument to rebut Breitling's fair use, Plaintiff argues that Breitling is not using "red gold" in a descriptive sense because it is not clear if it is using the term to identify a metal or a color. Oppo., at p. 26. This is a false distinction. Gold, silver, platinum, white gold, yellow gold, and red gold—to name a few—are all both materials and colors; the two properties are inextricably linked. SUMF ¶¶ 2, 5; Index, Ex. A, Smith Report ¶ 7(t). Plaintiff acknowledges this fact in the identification of goods for its "Red Gold" registration: "fine jewelry made of a special alloying of gold with a distinct color …" SUMF ¶ 13. Plaintiff does not dispute that Breitling's watches appear to be made of red gold; in its prior lawsuits against other Swiss watch companies, Plaintiff asserted that they "tried to mimic and use a manufacture [sic] RED GOLD ® with a red hue in the manufacture of its … watches." SUMF ¶ 22. Further, Breitling U.S.A., Inc.'s President, Thierry Prissert, states, without contradiction, that "Breitling has consistently used the term 'red gold' only to identify the particular gold alloy it uses in its products and product components." SUMF 28. Plaintiff makes much of Breitling's use of "#redgold" in those very same advertisements of products made of red gold, in the same way that it uses hashtags for the other generic materials of the components of the same watch—e.g., "#motherofpearl" "#diamonds," and "#steel"—along with other generic words like "#style," "#elegance," "#luxury," "#swissmade." None of these uses is trademark use, and Plaintiff cites to no law in support of its assertion. Oppo. at pp. 4, 16; PSIO, ¶ 16. Plaintiff also argues that third-party use of "red gold" in the same manner that Breitling uses the term is irrelevant to fair use because "following

9

the crowd is not a defense to trademark infringement." But the fact that a phrase was and is commonly used is relevant to fair use, especially where, as here, Breitling has shown that this third party use by the "crowd" long predated Plaintiff's alleged first use and continues to this day. *See Packman v. Chi Tribune Co.,* 267 F.3d 628, 641 (7th Cir. 2001).

Finally, Breitling used the term "red gold" in good faith. Plaintiff does not credibly dispute that Breitling uses the term "red gold" diminutively, in a list of other watch features, and in materials emphasizing Breitling's own brand and model names. Oppo. at pp. 28-29. Plaintiff cites to cases that are wholly distinguishable on their facts, including *Frito-Lay, Inc. v. Bachman Co.,* 704 F. Supp. 432, 436 (S.D.N.Y. 1989), where the defendant's use of the asserted mark "appear[ed] on the package as prominently as the housemark." Plaintiff's reliance on *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 954 (7th Cir. 1992) is also inapposite. There, the court found trademark usage of the term "Thirst Aid" by the defendant based on facts not present here, including "the rhyming quality of 'Gatorade' and 'Thirst Aid,'" which created an "association between the two terms" that was "likely to be very strong." *Id*. In contrast, here, there is no such rhyming quality between "Breitling" and "red gold," nor is there evidence of an "association between [Breitling] and 'red gold' that is "likely to be strong." *Id.*

In sum, Breitling has indisputably shown that it used the term "red gold" only for its literal meaning, to describe and identify the gold copper alloy material of which its watches and their components are made, and never as a trademark. Plaintiff does not and cannot dispute this.

### C. Plaintiff Makes No Argument Whatsoever to Support Its Dilution Claims

Knowing the weakness of its asserted mark, Plaintiff fails to address Breitling's argument that Plaintiff's dilution claim fails as a matter of law because its "red gold" term is generic, and because Plaintiff has no evidence that its purported mark is famous.[5] A failure to rebut an argument at summary judgment concedes the issue. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (party waived argument that was not raised in his opposition to summary judgment). As such, Plaintiff's dilution claim must fail as a matter of law.

### III. CONCLUSION

Based on the foregoing, Plaintiff has not shown and cannot show a genuine dispute of material fact to survive summary judgment, which Breitling respectfully requests the Court enter in Breitling's favor.

---

[5] Indeed, Dr. Ericksen described Plaintiff's market as a "niche market," which is insufficient for a dilution claim as a matter of law. Ericksen Report p. 4; *see, e.g.*, *Luv N Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F.Supp.2d 753, 757-58 (S.D.N.Y. 2012) (Lanham Act intended to reject niche fame).

Dated: February 9, 2021　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　GORDON REES SCULLY MANSUKHANI, LLP

　　　　　　　　　　　　　　　　　　　By <u>  */s/ Craig J. Mariam*</u>
　　　　　　　　　　　　　　　　　　　　　Thomas C. Blatchley (ct25892)
　　　　　　　　　　　　　　　　　　　　　Craig J. Mariam (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　Hazel Mae B. Pangan (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　Samuel B. Laughlin (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　Gordon Rees Scully Mansukhani, LLP
　　　　　　　　　　　　　　　　　　　　　95 Glastonbury Blvd., Ste. 206
　　　　　　　　　　　　　　　　　　　　　Glastonbury, CT 06033
　　　　　　　　　　　　　　　　　　　　　Phone: (860) 494-7525
　　　　　　　　　　　　　　　　　　　　　Fax: (860) 560-0185
　　　　　　　　　　　　　　　　　　　　　Email: tblatchley@grsm.com
　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendants and Counterclaimants
　　　　　　　　　　　　　　　　　　　　　Breitling U.S.A., Inc.;
　　　　　　　　　　　　　　　　　　　　　Breitling SA (a/k/a Breitling AG)

## CERTIFICATION OF SERVICE

I hereby certify that on February 9, 2021, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this document through the court's CM/ECF System.

By   /s/Craig J. Mariam
       Craig J. Mariam