**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SOLID 21, INC., | : | |
|     Plaintiff, | : | |
| | : | C.A. NO. 3:19-CV-00514-MPS |
| v. | : | |
| | : | |
| BREITLING U.S.A., INC.; BREITLING SA; | : | |
| AND BREITLING AG, | : | |
|     Defendants. | : | |
| | : | |

**DEFENDANTS AND COUNTERCLAIMANTS BREITLING U.S.A., INC. AND**
**BREITLING SA'S (A/K/A BREITLING AG) MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO EXCLUDE THE REPORT OF RONALD BUTTERS, PH.D.**

      Defendants and Counterclaimants Breitling U.S.A., Inc. and Breitling SA's (a/k/a Breitling

AG) (collectively, "Breitling"), by and through counsel, respectfully move this Honorable Court

for an Order excluding the report and opinions of Plaintiff and Counter-Defendant Solid 21, Inc.'s

("Plaintiff") designated linguistics expert, Ronald Butters, Ph.D. and in support states as follows:

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...................................................................................................... 5

II. APPLICABLE LEGAL STANDARD ...................................................................... 6

III. ARGUMENT ............................................................................................................ 8

    A.    Dr. Butters' Opinion Is Not Relevant because His Opinion Does Not Address How the Relevant Public Understands the Term "Red Gold" ............................... 8

    B.    Dr. Butters' Opinion Is Not Reliable ................................................................. 11

        1.    Dr. Butters' Methodology is Unreliable and Contradicts Other Linguists' and His Prior Methodology in Formulating Genericness Opinions .......... 11

        2.    Dr. Butters Failed to Consider Sufficient Facts or Data in Formulating His Opinions ................................................................................................ 17

        3.    Dr. Butters Failed to Reliably Apply His Methodology to the Facts of the Case ..................................................................................................... 18

    C.    The Probative Value of Dr. Butters' Opinion, if Any, Is Outweighed by Its Prejudicial and Misleading Nature ...................................................................... 20

IV. CONCLUSION ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ............................................................................ 7, 18

*Ashley v. City of Bridgeport*,
  473 F. Supp. 3d 41 (D. Conn. 2020) ................................................................ 8, 21

*Bell v. Harley Davidson Motor Co.*,
  539 F. Supp. 2d 1249 (S.D. Cal. 2008) .......................................................... 10, 14

*Blisscraft of Hollywood v. United Plastics Co.*,
  294 F.2d 694 (2d Cir. 1961) ................................................................................. 9

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001) ................................................................................. 7

*CES Publ'g Corp. v. St. Regis Publications, Inc.*,
  531 F.2d 11 (2d Cir. 1975) ................................................................................... 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ................................ 7, 8, 11

*Dongguk Univ. v. Yale Univ.*,
  Civ. No. 3:08CV441 (TLM) 2012 WL 1977978 (D. Conn. June 1, 2012) ............... 7

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014) ................................................................... 18

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
  629 F. Supp. 2d 175 (D. Conn. 2009) ................................................................. 11

*Kumho Tire Co., Ltd. v. Carmichael, etc., et al.*,
  526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ......................................... 6

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
  192 F.3d 337 (2d Cir. 1999) ................................................................................. 9

*Leadership Studies, Inc. v. Blanchard Training and Dev., Inc.*,
  Case No.: 15cv1831-WQH(KSC), 2018 WL 1989554 (S.D. Cal. Apr. 27, 2018) ............ 13, 17

*Miller v. City of New London*,
  No. 3:13-cv-619 (VAB), 2015 WL 2179773 (D. Conn. 2015) ................................ 8

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ................................................................................. 8

*Nycal Offshore Development Corp. v. United States*,
  148 Fed. Cl. 1 (Fed. Cl. 2020) ............................................................................ 15

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*,
  175 F.3d 266 (2d Cir. 1999) ............................................................................. 8

*Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*,
  391 F. Supp. 3d 1261 (N.D. Ga. 2019) ...................................................... 10, 13

*Riegel v. Medtronic, Inc.*,
  451 F.3d 104 (2d Cir. 2006) ........................................................................... 11

*Shire City Herbals, Inc. v. Blue*,
  410 F. Supp. 3d 270 (D. Mass. 2019) .................................................. 10, 13, 19

*Steak n Shake Co. v. Burger King Corp.*,
  323 F. Supp. 2d 983 (E.D. Mo. 2004) ...................................................... 14, 15

*United States Patent and Trademark Office v. Booking.com B.V.*,
  591 U.S. __, 140 S.Ct. 2298, 207 L.Ed.2d 738 (2020) .................................... 9

*United States v. Farhane*,
  634 F.3d 127 (2d Cir. 2011) ............................................................................. 6

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*,
  3:14-cv-00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018) .................. 17

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
  No. 1:03-CV-414, 2005 WL 3088339 (W.D. Mich. Nov. 17, 2005) ...................... 14

*World Boxing Council v. Cosell*,
  715 F. Supp. 1259 (S.D.N.Y. 1989) .......................................................... 21, 22

**Statutes**

15 U.S.C. § 1064(3) ........................................................................................... 9

**Rules**

Fed. R. Evid. 401 ................................................................................. 5, 7, 8, 22

Fed. R. Evid. 403 ........................................................................... 5, 7, 8, 21, 22

Fed. R. Evid. 702 ......................................................................... 5, 6, 7, 11, 22

## I.      INTRODUCTION

In response to Plaintiff's claims that Breitling has infringed its registered trademark RED GOLD, Breitling counterclaimed that the registration should be cancelled because "red gold" is a generic term for an alloy of gold and copper, and therefore is neither registrable nor protectable as a trademark.  Breitling designated Gary Smith, a jewelry and watch industry expert, to opine on the historical and current use of the term "red gold" as it relates to the jewelry and watch industry. Plaintiff designated Dr. Ronald Butters, a linguist, to opine on the understanding of the term "red gold" by "ordinary contemporary SPEAKERS[1] of the English language in the United States" without any more defining characteristic, such as a prospective purchaser of the goods identified in the RED GOLD registration.

While Dr. Butters has an extensive resume of expert witness engagements on trademark issues, including genericness, which is at issue here, Dr. Butters' methodology, fact and data considerations, and application of the methodology to the facts of this case do not meet the requirements of Fed. R. Evid. 401 (relevance), 702 (reliability), and 403 (probative value outweighs prejudice).  Dr. Butters' extensive resume only makes it that much easier to review his opinions and, as set forth below, determine that he has not followed the established methodology of linguist-lexicographers in trademark cases as he has extensively articulated and previously applied. [2]

---

[1] Dr. Butters' reports include words in all capitalization to denote terms of art to linguists.  Other than the mark, RED GOLD, any capitalized terms in this memorandum are transcription of the capitalized term from the portion of the report quoted.

[2] Breitling requested Dr. Butters' deposition.  However, Dr. Butters was not made available due to cited ongoing medical issues.  On the afternoon of April 19, 2021, Plaintiff's counsel informed Breitling's counsel that Dr. Butters had passed away and that Plaintiff intended to seek leave to designate a new expert to offer Dr. Butters' previously disclosed opinions.  Breitling reserves the right to object to such proposed designation at the appropriate time.

Dr. Butters' opinions in this case are not relevant because they do not address how the relevant public, i.e., actual and prospective purchasers of the goods identified in the RED GOLD registration as made of a "special alloying of gold with a distinct color," understand the term "red gold." Dr. Butters' opinions are not reliable because he uses a methodology for empirical analysis that, in looking only to the Corpus of Contemporary American English ("COCA"), contradicts the methodology articulated in his prior opinions and that other linguists have used. As a result, he fails to consider sufficient facts and data and fails to reliably apply the methodology to the facts and data. Finally, even if relevant and reliable (which they are not), Dr. Butters' opinions should be excluded because they are more prejudicial than probative and will confuse and mislead the jury. Dr. Butters' opinions will confuse or mislead the jury to believe that Mr. Smith is not qualified to give opinions solely because he is not a linguist, does not use linguist terminology, and does not use linguist methodology. Dr. Butters' opinions, which are stripped of any technical issue since they are divorced from the understanding of the relevant public, are opinions on common sense issues wrapped up in confusing linguistic technical jargon. In other words, Dr. Butters' proffered linguistic expertise is not required to understand the meaning of the term "red gold" which is an uncomplicated and common term. Dr. Butters' pedantic opinions would only serve to confuse the jury. As such, Dr. Butters' report and proposed testimony should be excluded.

## II.     APPLICABLE LEGAL STANDARD

Fed. R. Evid. 702 imposes a "gatekeeping" responsibility on federal courts in determining whether expert testimony is admissible. *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011). This gatekeeping responsibility applies to "scientific" knowledge, "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael, etc., et al.*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Expert opinions must be relevant and reliable and their

probative value cannot be outweighed by prejudice.

The trial court's first step in its gatekeeping role is to analyze whether the proffered expert's opinions are relevant pursuant to Fed. R. Evid. 401. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). Evidence is relevant if it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401). In deciding relevance, the district court must decide "whether the expert testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Dongguk Univ. v. Yale Univ.*, Civ. No. 3:08CV441 (TLM) 2012 WL 1977978, at *2 (D. Conn. June 1, 2012) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

"Next, the district court must determine 'whether the proffered testimony has a sufficiently "reliable foundation" to permit it to be considered.'" *Dongguk Univ.*, 2012 WL 1977978, at *2 (quoting *Daubert*, 509 U.S. at 597). The indicia of reliability are set forth in Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

Finally, the trial court must determine whether the opinions satisfy Rule 403, which

provides: "'[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Ashley v. City of Bridgeport*, 473 F. Supp. 3d 41, 48 (D. Conn. 2020) (quoting Fed. R. Evid. 403). Rule 403 plays a "'uniquely important role…in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations.'"  *Ashley*, 473 F. Supp. 3d at 46 (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595)).

## III.  ARGUMENT

### A.   Dr. Butters' Opinion Is Not Relevant because His Opinion Does Not Address How the Relevant Public Understands the Term "Red Gold"

Evidence is relevant if it tends to "make the existence of a fact that is of consequence in determining the action more probable or less probable."  Fed. R. Evid. 401.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Miller v. City of New London*, No. 3:13-cv-619 (VAB), 2015 WL 2179773, at *2 (D. Conn. 2015) (citing *Daubert*, 509 U.S. at 579, 591)).

The issue on which Dr. Butters' testimony purports to relate is whether or not the term "red gold" is generic.  "Generic terms are not eligible for protection as trademarks; everyone may use them to refer to the goods they designate."  *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999) (citations omitted).  "This rule protects the interest of the consuming public in understanding the nature of goods offered for sale, as well as a fair marketplace among competitors by insuring that every provider may refer to his goods as what they are."  *Id.* (citing *CES Publ'g Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13, (2d Cir. 1975)).  Thus, "'[t]he primary significance of the registered mark to the <u>relevant public</u>… shall be the test for

determining whether the registered mark has become the generic name of goods or services.'"

*United States Patent and Trademark Office v. Booking.com B.V.*, 591 U.S. __, 140 S.Ct. 2298, 2304, 207 L.Ed.2d 738 (2020) (quoting 15 U.S.C. § 1064(3)) (emphasis added).  "[T]he relevant purchasing public is not the population at large, but <u>prospective purchasers of the product</u>."  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 699 (2d Cir. 1961)) (emphasis added).  A claimed trademark's "meaning to a nonpurchasing segment of the population is not important."  *Blisscraft of Hollywood*, 294 F.2d at 699.

> Dr. Butters' Report states that he was engaged to provide his
>
> linguistic analysis and expert opinion concerning the meaning and use of the COLLOCATION *red gold* (including the meaning and use of SOLID 21's registered trademark for "fine jewelry" such as watches and bracelets, RED GOLD) as it is understood by ordinary contemporary SPEAKERS of the English language in the United States.

**Exhibit A**: Dr. Butters' Feb. 10, 2021 Report in this case ("Dr. Butters' Report") ¶ 1.  Dr. Butters recites the goods and services for which RED GOLD has been registered.  *Id.* n.2.  The good and services for which RED GOLD is registered are "Fine jewelry made of a special alloying of gold with a distinct color made into fine jewelry, namely, watches, necklaces, bracelets, rings, anklets, cuff links, ornamental hair pins, belt buckles of precious metal, tie clips and pegs, and earrings."  *Id.*

Despite identifying the class of goods for which RED GOLD has been registered, Dr. Butters analysis and opinions are about the understanding of "ordinary contemporary SPEAKERS of the English language in the United States"—i.e., the population at large including the non-purchasing segment of the population.  *Id.* ¶ 1.  Dr. Butters' opinion is not relevant because it does not aid the trier of fact in determining the primary significance of the term "red gold" to prospective purchasers of "[f]ine jewelry made of a special alloying of gold with a distinct color",

which is the test for genericness in this Circuit.

Dr. Butters' genericness opinions in other trademark cases reflect that he is aware that the relevant public is more nuanced than English speakers in the United States generally.  For example, in his opinion on the term "discount tire," Dr. Butters focused his analysis on "speakers who are members of the sociolinguistic cohort who reside in Florida and Georgia and who may be interested in the retail purchase of automobile and light truck tires and wheels."  **Exhibit B**: Dr. Butters' March 4, 2019 report in the case captioned, *The Reinalt-Thomas Corporation d/b/a Discount Tire v. Mavis Tire Supply, LLC*, Case No. 1:18-cv-05877-TCB (N.D. Ga.) ("Discount Tire Report")  ¶ 4.  In his opinion on the term "fire cider," Dr. Butters focused his analysis on speakers who are "actual and potential users of *fire ciders*, whether they are offered for sale or made for personal use and prepared according to home recipes."  **Exhibit C**: Dr. Butters' March 6, 2018 report in the case captioned, *Shire City Herbals, Inc. v. Mary Blue d/b/a Farmacy Herbs, et al.*, Case No. 3:15-cv-30069-KAR (D. Mass.) ("Fire Cider Report") ¶ 3.  In his opinion on the term "ride hard," Dr. Butters focused his analysis on customers of "rideable things such as horses, bicycles, motorcycles, and the like."  **Exhibit D**: Dr. Butters' November 6, 2006 report in the case captioned, *Bell v. Harley Davidson Motor Co.*, Case No. 3:05-cv-02151-JLS-BLM (S.D. Cal.) ("Ride Hard Report") ¶ 39; *see also* 539 F. Supp. 2d 1249, 1257 (S.D. Cal. 2008).

Here, Dr. Butters ignored prospective purchasers of the goods identified in the RED GOLD registration in favor of a broad analysis of the population at large.  Dr. Butters' opinion is therefore irrelevant and should be excluded for failing to meet the first prong of the admissibility test for expert opinions.

### B.     Dr. Butters' Opinion Is Not Reliable

#### 1.     *Dr. Butters' Methodology is Unreliable and Contradicts Other Linguists' and His Prior Methodology in Formulating Genericness Opinions*

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (citing Fed. R. Evid. 702).  District courts apply a flexible test for the reliability of the expert's reasoning and methodology, considering several factors, including

> (1) whether the theory or technique on which the expert relies "can be (and has been) tested"; (2) whether the expert's methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error" of the technique when applied; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has been generally accepted in the scientific community.

*Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 188 (D. Conn. 2009) (quoting *Daubert*, 509 U.S. at 593-94).

Dr. Butters' Report explains generally, "This report is made based on my professional knowledge and expertise, and my own research using established and accepted scientific principles and the methodology of linguistics and the subfield of lexicography or dictionary making." **Ex. A** ¶ 2.  His report does not explicitly explain the steps in this methodology.  However, one of Dr. Butters' prior opinions on genericness has explained the proper linguist-lexicographer methodology for analyzing trademark issues.  *See* **Exhibit E**: Dr. Butters' March 28, 2011 report in the case captioned, *Microsoft Corp. v. Apple, Inc.*, Opposition No. 91195582 (TTAB) ("App Store Report").

A lexicographer's analysis begins with dictionaries because they are "scientifically highly reliable with respect to overall aspects of the language at the time of collection and analysis of the primary data." *Id.* ¶ 15.  Following an analysis of dictionaries, the linguist-lexicographer moves to an analysis of empirical data.

The application of linguistics to trademark issues such as genericness thus often requires that the analyst verify and expand upon the conclusions that are presented in dictionaries of record, even the most recently published ones, so as to be as accurate, complete, and timely as possible about the definitions of particular words and constructions.  The linguist must examine the same kinds of representative empirical data that lexicographers rely on in creating and updating their dictionary entries, looking in particular at how the items under consideration are presented within the assembled archive of relevant particular, real-life linguistic and pragmatic contexts.  Of great importance is that the linguist make sure that the assembled data archive and the search terms employed are the most relevant and revealing (see footnote 1 above).

*Id.* ¶ 17.  Dr. Butters explained that in assembling data,

[o]ne must be mindful that the relevant body of "ordinary users" may vary according to the nature of the inquiry.  For example, if one were interested in the lexicographical knowledge only of people who buy dog food, one might not find and archive of all English-language newspapers as relevant as one that contained only pet-food commercials and other sources related to people who keep dogs.

*Id.* ¶ 15 n.1.  The final step in the linguist-lexicographer's methodology is to "make use of specialized scientific knowledge to interpret the findings presented in dictionaries and in the empirical record, utilizing the principals of linguistics as necessary, for example, in construing the meanings of multi-word constructions such as *app store*, which is not found as such in standard dictionaries."  *Id.* ¶ 18.

The scope of a linguist-lexicographer's empirical analysis is not specifically prescribed. However, based on many of Dr. Butters' prior genericness opinions as well as other linguist-lexicographer's genericness opinions, the empirical analysis goes beyond a single source and looks to "relevant particular, real-life linguistic and pragmatic contexts", in the context of the "relevant body of 'ordinary users.'"

In his Discount Tire Report, Dr. Butters' empirical analysis began with COCA searches. **Ex. B** § V(A).  However, Dr. Butters noted that "[b]ecause the number of items that my search of the COCA archive returned was small, I performed an additional search using the COCA companion search tool, the iWeb Corpus, which is 25 times the size of the COCA site."  *Id.* ¶ 20.

His complete empirical analysis included iWeb searches, *id.* § V(B), Newspapers.com, *id.* § V(C), Google Books searches, *id.* § V(D), Westlaw, *id.* § V(E), and Customer reviews on Yelp.com, *id.* § V(F).  Dr. Butters' methodology and opinions were accepted by the trial court in assessing the markholder's motion for preliminary injunction.  *Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*, 391 F. Supp. 3d 1261, 1269, 1274-75 (N.D. Ga. 2019).

In his opinion on the term "situational leadership," "Dr. Butters cites evidence from the leadership training industry, such as a training industry website… Other evidence cited by Dr. Butters includes an excerpt from a training industry magazine, results obtained through a research tool called The Corpus of Contemporary American English (COCA), dictionaries, and internet search engines."  *Leadership Studies, Inc. v. Blanchard Training and Dev., Inc.*, Case No.: 15cv1831-WQH(KSC), 2018 WL 1989554, at *13 (S.D. Cal. Apr. 27, 2018).

In his Fire Cider Report, Dr. Butters' empirical analysis included NewspaperArchive.com, Newspapers.com, Proquest, and Google Books.  **Ex. C** ¶ 11.  The searches returned publications that "in large part represented 'how-to' books and feature stories in small- and medium- sized towns' newspapers and magazines."  *Id.* ¶ 12.  Dr. Butters explained, "The publications were most frequently directed to readers who might logically be more interested in buying tonics and/or making them for home use.  The usage of the authors and the people they quote thus represents the ordinary understanding of *fire cider* as used by those who are most likely to have an interest in acquiring such products."  *Id.*  The texts ranged from 1997 to 2017.  *Id.* ¶ 13.  Dr. Butters' methodology and opinions were accepted at trial.  *See Shire City Herbals, Inc. v. Blue*, 410 F. Supp. 3d 270, 285-87 (D. Mass. 2019).

In his Ride Hard Report, Dr. Butters' empirical analysis included British usage reflected in the Oxford English Dictionary, **Ex. D** ¶ 9 n.1, literary works from the late 1800s, *id.* ¶ 9,

"newspapers and magazines over the past 37 years," *id.* ¶ 13, book and movie titles, newspaper headlines and photo captions, and Google search results, *id.* ¶¶ 15-16, non-party advertisements, *id.* ¶ 20, and party use of the phrase, *id.* ¶¶ 21-25.  Dr. Butters' methodology and opinions were accepted to support the motion for summary judgment.  *See Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1257 (S.D. Cal. 2008).

In his opinion on the term "whisper quiet," Dr. Butters' empirical analysis included literary usage dating back to 1830 and the early 1900s.  **Exhibit F**: Dr. Butters' November 30, 2004 report in the case captioned, *Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, Case No. 1:03-CV-414 (W.D. Mich.) ("Whisper Quiet Report") ¶ 30.  His empirical analysis also included advertisements in magazines and newspapers dating from the early 1900s, *id.* ¶¶ 31-42, 47; ProQuest searches, NewspaperArchive.com searches, *id.* ¶¶ 43-45; internet searches, *id.* ¶ 48; radio and television commercials, *id.* ¶ 49; consumer affairs articles, *id.* ¶ 56; journals and books, ¶¶ 57-58; and consumer reviews on epinions.com, *id.* ¶ 61.  Dr. Butters' methodology and opinions were accepted to support the motion for summary judgment.  *See Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03-CV-414, 2005 WL 3088339, at *9 (W.D. Mich. Nov. 17, 2005).

In his opinion on the term "steakburger," Dr. Butters' empirical analysis included "general internet searches, and specialized online resources such as Lexis/Nexis, ProQuest, and NewspaperArchive."  **Ex. G**: Dr. Butters' June 8, 2004 report in the case captioned, *Steak n Shake Co. v. Burger King Corp.*, Case No. 4:04-CV-00525-CDP (E.D. Mo.) ("Steakburger Report") ¶ 7. More specifically, his sources included "(1) public documents and newspaper and other advertising from the 1930s until today; (2) newspaper stories in which reporters use the term *steakburger*; (3) books in which the word *steakburger* appears; [sic] current second-party use; (5) sworn testimony from food-industry professionals; and (6) Steak n Shake's menus, advertising, and

14

annual reports." *Id.* ¶ 24.  Dr. Butters' methodology and opinions were accepted by the trial court in assessing the markholder's motion for preliminary injunction.  *See Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 987-88, 993 (E.D. Mo. 2004).

The methodology of reviewing a wide range of sources, specific to the relevant goods or services, and over a period of time is also reflected in several cases describing other linguists' analysis and opinions on genericness.  *See, e.g., Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*, 340 F. Supp. 3d 706, 714 (N.D. Ill. 2018) ("A linguistics professor searched dictionaries and databases—including the Corpus of Contemporary American English, Google Books, Lexis-Nexis Academic, and the Newspaper Archive—for two relevant time periods (1970-80 and 2009-15) for uses of the word ugg."); **Ex. E** (Dr. Leonard's empirical analysis included searches of COCA, Google, and Lexis-Nexis).

As set forth above, it is clear that the linguist-lexicographer methodology requires review and analysis of multiple sources of empirical data, that such sources should include sources specific to actual use and users of the term, and that such analysis should include sources that go back in time as far as possible.  Here, Dr. Butters used a different methodology for empirical analysis that included only the review of COCA[3] searches.  **Ex. E** § IV.  Limiting one's analysis to the COCA is not an established methodology and is contradicted by the empirical analysis methodology presented in Dr. Butters' own prior work as well as other linguist's opinions.

Indeed, Dr. Butters' reliance on COCA as the sole source of empirical data, as opposed to in conjunction with multiple other sources, is unreliable for reasons best described by himself in

---

[3] "The COCA is a search engine that allows a user 'to generate a list of the most common words used near' a searched term 'instead of guessing what they might be,' which 'will give you some insight into the ordinary meaning' of the searched term."  *Nycal Offshore Development Corp. v. United States*, 148 Fed. Cl. 1, 13 n.6 (Fed. Cl. 2020) (analyzing use of corpus linguistics to construe statutory text).

critiquing another linguist designated in trademark cases, Dr. Robert Leonard.

> Although COCA is a respected archive of nearly 415,000,000 words, it is a somewhat poor choice as a data base for the kinds of searches that Dr. Leonard's investigation requires: in reality it is far too small.  The corpus for each year is only about 20,0000,000 words… [and] as the home page of the COCA website states, "the corpus is evenly divided between the five genres of spoken, fiction, popular magazines, newspapers, and academic journals."  But fiction, academic journals, and even many popular magazines are not particularly likely to have published articles that occasioned the use of the term *app store*, especially not in the first years after the term came into popular use…The fact that COCA is in reality so small goes far to explain why Leonard's COCA search-results turned up only 33 instances of *app store*.

**Ex. E** ¶ 20.  Materials in the COCA corpus only go back to 1990.  **Ex. A** ¶ 51 n.38.  While COCA in a vacuum may be reliable as "a cross-section of the usage of typical Americans", **Ex. A** ¶ 51, it does not have the historical breadth or subject matter depth necessary to assess usage of "red gold" by prospective purchasers of fine jewelry and watches, as Solid 21's RED GOLD registration defines the relevant goods.  This is made patently clear by the voluminous record of use of "red gold" identified in Mr. Smith's research.[4]  *See* Smith's Report and Exhibits (Docs. 107-4–107-15).

Further, Dr. Butters' rebuttal opinion attacks the sources Mr. Smith identifies that illustrate usage of the term "red gold"—the exact type of sources that the correct execution of linguist-lexicographer methodology would uncover and that Dr. Butters himself has used in prior opinions.  For example, Dr. Butters finds fault with Mr. Smith's record including sources that are "over eighty years old".  **Ex. A** ¶ 8.  Locating a long historical use is exactly what Dr. Butters' prior opinions assert is part of the established methodology of empirical analysis.  *See* **Ex. D** ¶ 9 (a 2006 opinion citing to literary works from the late 1800s and "newspapers and magazines over the past 37

---

[4] Mr. Smith is not a linguist and has not been designated as a linguist, contrary to Dr. Butters attacks on Mr. Smith's qualifications and methodology.  Mr. Smith is a forensic jeweler and gemologist with over 50 years in the jewelry and watchmaking, repair, and restoration industry.  His analysis and opinions are about the historical usage, meaning, and conception of the term "red gold" in the United States.

years"); **Ex. F** ¶ 30 (a 2004 opinion citing literary usage in 1830 and the early 1900s), ¶ 31-42 (citing advertisements in magazines and newspapers dating from the early 1900s); **Ex. G** ¶ 24 (a 2004 opinion citing to public documents, newspapers, and advertising dating from the 1930s).

Dr. Butters also finds fault with Mr. Smith's sources including "technical publications in the field of metallurgy or jewelry". **Ex. A** ¶¶ 9, 16.  Again, locating persons who use or purchase the product is exactly what Dr. Butters' prior opinions assert is part of the established methodology of empirical analysis.  *See Leadership Studies, Inc.*, 2018 WL 1989554, at *13 (stating that Dr. Butters' report cited evidence from "the leadership training industry, such as a training industry website" and "an excerpt from a training industry magazine"); **Ex. C** ¶ 12 (empirical analysis included "'how-to' books"), ¶ 13 (empirical analysis included "publications [that] were most frequently directed to readers who might logically be more interested in buying tonics and/or making them for home use); **Ex. G** ¶ 24 (empirical analysis included "sworn testimony from food-industry professionals").

Thus, Dr. Butters' rebuttal opinions that attack the sources Mr. Smith analyzed in formulating his opinions and Dr. Butters' proffered opinions that American dictionaries and COCA establish that "red gold" is not generic are the product of unreliable methodology that is contradictory to established linguist-lexicographer methodology of empirical analysis in trademark cases.

### 2. *Dr. Butters Failed to Consider Sufficient Facts or Data in Formulating His Opinions*

As set forth above, Dr. Butters' methodology is not consistent with established linguist-lexicographer methodology of empirical analysis.  "[A]n expert may not disregard relevant information in conducting [his] analysis."  *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, 3:14-cv-00549 (VLB), 2018 WL 1525709, at *15 (D. Conn. Mar. 28, 2018)

(citing *Amorgianos*, 303 F.3d at 268).   "To ignore contradictory testimony in order to arrive at a

desired conclusion highlights the unreliability of [an expert's] methodology."   *Faulkner v. Arista*

*Records LLC*, 46 F. Supp. 3d 365, 383 (S.D.N.Y. 2014).

Established empirical analyses require review of numerous sources, which may include

newspapers, magazines, books, literature, industry material, advertisements, and consumer

reviews.   Here, Dr. Butters only reviewed results from COCA searches, which he has previously

opined are insufficient for trademark cases.   **Ex. E** ¶ 20; *see also* **Ex. B** ¶ 20.   Therefore, the facts

and data Dr. Butters considered in formulating his opinions—English language dictionaries and

COCA searches—is not sufficient to formulate a reliable opinion.

Further, in his rebuttal of Mr. Smith's report, Dr. Butters faults Mr. Smith for appropriately

focusing his research on the source data that actually use the term "red gold" in the jewelry and

watch industry and as directed to prospective purchasers of jewelry and watches.   **Ex. A** ¶¶ 1, 8-

10.   As such, Dr. Butters fails to consider the kinds of facts and data that he asserted was relevant

and necessary to his opinions in other cases.

### 3.      *Dr. Butters Failed to Reliably Apply His Methodology to the Facts of the Case*

Dr. Butters' execution of the final step in the linguist-lexicographer methodology—

interpretation of the data—is not reliable either.

First, Dr. Butters has often opined that the fact a compound term is not present in a

dictionary does not make the term any less generic.   *E.g.,* **Ex. E** ¶ 42 ("it is basic understanding

among linguists and lexicographers that, because of time, space and resource limitations, standard

dictionaries are unlikely to define new words and multi-word constructions"); **Ex. C** ¶ 9 ("Owing

to limits of space and financial resources, even unabridged dictionaries cannot contain all the

words that subgroups of the population know well and use frequently.   The highly specialized

vocabulary of SPEAKERS who are concerned with purchasing herbal remedies and health tonics and making them for their own use might thus understandably be passed over for publication."); **Ex. F** ¶ 28 ("Although dictionaries do not list *whisper quiet* as a separate entry, this in no way indicates that it is in any way a novel or unusual construction in contemporary American English").

Here, Dr. Butters places great weight on the lack of dictionary entries for "red gold" to conclude that "red gold" is not generic. **Ex. A** ¶ 25 ("The general absence of the listing of *red gold* in authoritative American dictionaries strongly suggests that the term *red gold* has not been sufficiently lexicalized in ordinary English vocabularies to create a recognition of it as a COMPOUND WORD"); ¶ 63(D) ("The absence of *red gold* from authoritative American dictionaries is solid evidence in support of the foregoing conclusions [that it is not a generic term]").

Second, Dr. Butters has previously opined that the complete absence of a term from any dictionary does not indicate a term is not generic. In his "fire cider" opinion, Dr. Butters did not find "fire cider" in any dictionary. *Shire City Herbals, Inc.*, 410 F. Supp. 3d at 286. "He gave several reasons for its absence from the dictionary: the term is relatively new, no dictionary can contain every word, dictionaries have limited resources for identifying new words to add, dictionaries are often wary of adding new words before they are tested, and dictionaries often add new words based on the outcome of litigation." *Id.* at 286-87. Further, those that use the term have a highly specialized vocabulary that would not necessarily be reflected in even an unabridged dictionary. **Ex. C** ¶ 9. Rather than conclude that "fire cider" is not generic, Dr. Butters concluded, based on his empirical analysis of multiple sources, that "fire cider" is generic, *id.* ¶¶ 21-22, and even drafted a recommended dictionary listing which he proposes dictionaries include. *Id* ¶ 6. He has also formulated genericness opinions that are based in part on his review of terms found in the Oxford English Dictionary. *See* **Ex. D** ¶ 9 n.1; **Ex. F** ¶¶ 16, 23, 25; **Ex. E** ¶ 40 (New Oxford

English Dictionary).

Here, Dr. Butters' Report identifies four entries for "red gold" or "red-gold": (1) "red gold" in the Lexico Oxford dictionaries online, **Ex. A** ¶ 33, Ex. 26; (2) "red gold" in the *New Oxford American Dictionary*, *id.* ¶¶ 34, 35; (3) "red-gold", which is also notated as "Frequently as two words", in the unabridged Oxford English Dictionary Online, *id.* ¶ 35, Ex. 24; and (4) "red gold" in the New Shorter Oxford English Dictionary, *id.*, Ex. 25.   Contrary to his application of the methodology to the same types of facts in the above cases, in this case, Dr. Butters completely disregards these four entries as "technical" in nature and reflective of usage in England. *Id.* ¶¶ 36, 37.   Indeed, Dr. Butters takes great pains to, instead of attaching the *New Oxford American Dictionary* entry for "red gold" as with the other dictionary entries, to state that the term's presence is a carryover from earlier British dictionaries and should, in effect, be disregarded. *Id.* ¶¶ 34, 35.

Dr. Butters methodology here is plainly and simply unreliable.   His methodology is contradictory to the methodology espoused in other opinions, which have been accepted by various courts at different stages of litigation.   Because Dr. Butters' methodology is flawed, he failed to consider sufficient facts and data—relying only on certain dictionaries and COCA searches.   The result is an inconsistent and unreliable application of the methodology to the facts and data in this case.   When compared to the methodology, facts and data, and application of that methodology to the facts and data in Dr. Butters' other opinions, it appears that Dr. Butters' methodology here is subjective and created to reach Solid 21's desired conclusion that "red gold" is not generic.

### C.     The Probative Value of Dr. Butters' Opinion, if Any, Is Outweighed by Its Prejudicial and Misleading Nature

Even if relevant and reliable, expert opinions may be excluded if their "'probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence.'"  *Ashley*, 473 F. Supp. 3d at 48-49 (quoting Fed. R. Evid. 403).  As set forth above, Dr. Butters' opinions are not relevant or reliable, but even assuming *arguendo* that they satisfy those tests, Dr. Butters' opinions should be excluded because his testimony would be more prejudicial than probative and runs the risk of confusing and misleading the jury.

First, Dr. Butters' rebuttal opinion that holds a non-linguist industry expert to a linguist expert standard is highly prejudicial and likely to confuse and mislead the jury.  Dr. Butters' "Response to the Report of Gary Smith" attacks Mr. Smith's opinions for failing to use linguist terminology or following linguist's methodology (notwithstanding the fact that Dr. Butters did not even do so in his report).  **Ex. A** § II.  Mr. Smith is not a linguist and never purports to be.  His report is clear on his education and experience and that his opinions are based on his "50+ years of experience in the jewelry and watch industry" and his "research of the use and meaning of 'red gold' in hundreds of historical sources and periodicals," many of which are from his own library. Doc. 107-4 ¶ 4.  There is no legal requirement that an expert for the proponent of cancelling a mark as generic be qualified as a linguist.  Yet, Dr. Butters' rebuttal opinions are either made under the mistaken belief that there is such a requirement or they will give the jury the false and misleading impression that there is such a requirement.  Such testimony is highly prejudicial and has no probative value, and as such, should be excluded.

Second, Fed. R. Evid. 403 bars a linguist's opinion that "transforms a common sense issue into a technical one, and relies on virtually incomprehensible pseudo-scientific jargon."  *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1264-65 (S.D.N.Y. 1989).  While linguists' opinions are often admissible in trademark infringement cases, as reflected in the cases set forth above, Dr. Butters' opinions here are stripped of the methodology and factual analysis that make a linguists' opinion a technical rather than a common sense issue.  Dr. Butters' opinion, which

ignores any sources that actually reflect usage of "red gold" by the relevant public, proposes to tell the jury what they as members of the general public would understand "red gold" to mean while using technical linguistic jargon to give credence to his common sense opinion.  Such testimony "is more confusing than probative, ultimately unhelpful to the trier of fact, and would discourage the factfinder from using his own judgment on an issue for which a factfinder is amply suited to make his own judgment."  *Id.* at 1264.

## IV.   CONCLUSION

In sum, Dr. Butters' opinions should be excluded because they fail to meet the requirements of Fed. R. Evid. 401, 702, and 403—they are not relevant or reliable and any possible probative value is outweighed by prejudice and their likelihood of confusing and misleading the jury.  For these reasons, the Court's gatekeeping function demands that Dr. Butters' opinions be excluded in their entirety.

Dated: April 21, 2021                        Respectfully submitted,

GORDON REES SCULLY MANSUKHANI, LLP

By   */s/ Thomas C. Blatchley*
    Thomas C. Blatchley (ct25892)
    Craig J. Mariam (*pro hac vice*)
    Hazel Mae B. Pangan (*pro hac vice*)
    Julia K. Whitelock (*pro hac vice*)
    Raymond J. Muro (*pro hac vice*)
    Samuel B. Laughlin (*pro hac vice*)
    Gordon Rees Scully Mansukhani, LLP
    95 Glastonbury Blvd., Ste. 206
    Glastonbury, CT 06033
    Phone: (860) 494-7525
    Fax: (860) 560-0185
    Email: tblatchley@grsm.com
    Attorneys for Defendants and
    Counterclaimants Breitling U.S.A., Inc.;
    Breitling SA (a/k/a Breitling AG)