# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------  x
SOLID 21, INC.,                                          :
                                                        :
          Plaintiff,                                     :   C.A. NO. 3:19-CV-00514-MPS
                                                        :
              v.                                         :
                                                        :
BREITLING U.S.A., INC.; BREITLING SA;                    :
AND BREITLING AG,                                        :   JUNE 18, 2021
                                                        :
          Defendants.                                   :
-------------------------------------------------------  x
```

## SUBMISSION OF ADDITIONAL AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR TERMINATING SANCTIONS ET SEQ.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Sci. & Eng'g, Inc. v. Autoclear, LLC,*
606 F. Supp. 2d 617 (E.D. Va. 2008) ....................................................... 4

*Dareltech, LLC v. Xiaomi Inc.,*
No. 18 CIV. 8729 (AKH), 2019 WL 10966200 (S.D.N.Y. Sept. 10, 2019) ........................ 2, 3

*In re Conduct of Huffman,*
|331 Or. 209, 13 P.3d 994 (Or.2000) ....................................................... 2

*In re Discipline of Hafter*,
128 Nev. 905, 381 P.3d 623 (2012) ....................................................... 1, 2

*In re Surrick,*
338 F.3d 224 (3d Cir.2003) ....................................................... 2

**Statutes**

35 U.S.C. § 285 ....................................................... 2

**Rules**

Connecticut Rules of Professional Conduct Rule 4.1 ....................................................... 1

Connecticut Rules of Professional Conduct Rule 4.4(a) ....................................................... 3

Connecticut Rules of Professional Conduct Rule 8.4(c) ....................................................... 1, 3

 **Other Authorities**

Colorado Ethics Opinion 130 ....................................................... 3

Commentary to Rule 4.1 of the Connecticut Rules of Professional Conduct ................................... 1

New York Ethics Opinion 977 ....................................................... 1

Defendants and Counterclaimants Breitling U.S.A., Inc. and Breitling SA (a/k/a Breitling AG) (collectively, "Defendants" or "Breitling") hereby respectfully submit to this Honorable Court the following citations of additional or pertinent authority further to this Court's hearing of June 15, 2021.

<u>First</u>, Rule 4.1 of the Connecticut Rules of Professional Conduct is facially on point, as follows:

> A misrepresentation can occur ***if the lawyer incorporates or affirms a statement of another person*** that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or ***omissions*** that are the equivalent of affirmative false statements.

*See* Commentary, RPC 4.1 (emphasis added).

<u>Second</u>, by distributing a link to the offending prior circa 2015 article(s), a lawyer is effectively disseminating the materials that are the subject of the link.

> As to the second component we start by considering whether distributing a link to the petition would constitute making extrajudicial statements. The petition itself includes extrajudicial statements, as it is a document that is being distributed online and it characterizes the nature and merits of the dispute in particular ways. The fact that it was the client who created and posted the petition does not make the rule inapplicable. The lawyer, by distributing the link, is effectively disseminating the petition – and thus "mak[ing]" the statements it contains – over the internet as a means of public communication."

*See* New York Ethics Opinion 977 at 3-4, attached hereto as **Exhibit 1**.

<u>Third</u>, the intentional failure to disclose material facts is a misrepresentation. *See In re Discipline of Hafter*, 128 Nev. 905, 381 P.3d 623, 2012 WL 762036 (2012), attached hereto as **Exhibit 2**.

> Hafter's false statements to the press support the panel's conclusion that he violated RPC 8.4(c). That rule states: "It is professional misconduct for a lawyer to ... [e]ngage in conduct involving ...

misrepresentation." The evidence presented at the hearing clearly demonstrated that Hafter either intended to mislead in his press release or, at the least, acted in reckless disregard for the truth. *See In re Surrick,* 338 F.3d 224, 234 (3d Cir.2003); *In re Conduct of Huffman,* 331 Or. 209, 13 P.3d 994, 998 (Or. 2000) ("'Misrepresentation' may include an affirmative misstatement, an intentional failure to disclose material facts that may or may not have been intended to deceive, or a combination of both.").

*See id.* at *2.

Fourth, the Court in *Dareltech, LLC v. Xiaomi Inc.*, No. 18 CIV. 8729 (AKH), 2019 WL 10966200, at *2 (S.D.N.Y. Sept. 10, 2019), attached hereto as **Exhibit 3**, in which Mr. Hecht was personally involved, stated:

Although I conclude that Dareltech's litigation conduct was not "exceptional" within the meaning of 35 U.S.C. § 285, my ruling should not be interpreted as overlooking improper behavior of counsel.

*See id.* at fn. 1. In *Dareltech,* defense counsel filed a motion to recover attorney's fees due to Mr. Hecht's misconduct, there, described in their motion as:

[Plaintiff's counsel on a LinkedIn posting] disparaged lead counsel for the Xiaomi Defendants, calling him "pathetic" and claiming his advocacy was "worse than nearly any law student on a moot court board." Mr. Hecht claimed to be "posting [all of] this as a warning to in-house counsel," stating that "[j]ust because you are paying someone $1000/hr+ does not mean you are getting a pro." . . . .

In addition, on February 28, 2019, Mr. Hecht (or someone at his or his client's direction) did exactly what Mr. Hecht had previously threatened to do--the purportedly "very embarrassing facts" about the Xiaomi Defendants were made public. On that date, two articles appeared in the Chinese press that included false and misleading reports that one of the Xiaomi Defendants' executives had allegedly committed perjury. The articles exaggerated the potential consequences (including criminal prosecution and imprisonment) of the unfounded perjury allegations and smeared the reputation of the Xiaomi Defendants' executive. These reports cited an "insider" source who did not want to be identified. While Pierce Bainbridge denied any involvement, there is no credible explanation other than that Dareltech or its counsel (or someone else acting on their behalf) was the "insider," as there was no other plausible way that the

- 2 -

> purported facts referenced in the articles could have been obtained.
> Dareltech has never denied that at least some of the information in
> the articles was known only to the parties and their lawyers. . . .

*See Dareltech, LLC v. Xiaomi Inc. et al.*, S.D.N.Y. Case No. 1:18-cv-08729 (AKH), Dkt. No. 84

(Memo. of Law in support of Defs.' Mot. To Recover Attorney Fees) at 9-11, an excerpt of which

is attached hereto as **Exhibit 4** for foundation.

Fifth, sharing of edited or misleading litigation materials is an ethical infraction.

> Even with informed client consent, sharing edited or misleading
> litigation materials may violate the Rules. Under Colo. RPC 8.4(c),
> a lawyer may not "engage in conduct involving dishonesty, fraud,
> deceit or misrepresentation." A lawyer would likely violate this rule,
> for example, by posting only an edited portion of a video deposition
> that presents information in a false or misleading light. Similarly,
> other discovery materials or recorded information could be
> misleading if presented out of context or in a manipulated fashion.
> This is particularly true when an answer to a particular question
> posed during a deposition or through some other form of discovery
> is placed immediately after a question to which the answer was not
> intended to respond.

> When "representing a client, a lawyer shall not use means that have
> no substantial purpose other than to embarrass, delay, or burden a
> third person." Colo. RPC 4.4(a).  Materials obtained concerning an
> opposing party in litigation may be of a highly personal and
> sensitive nature. Sharing such information could be extremely
> embarrassing to parties involved in the litigation process. Similarly,
> sensitive information learned during the course of representation can
> be embarrassing to a lawyer's former client if revealed in connection
> with a subsequent dispute with the former client. Lawyers who
> contemplate publishing materials, even when not precluded from
> doing so by any direct court order, must carefully consider whether
> there is a legitimate purpose for making the material generally
> available.

*See* Colorado Ethics Opinion 130 at 10-11 (rev. Nov. 17, 2018), attached hereto as **Exhibit 5**.

And, sixth, as discussed in Defendants' Motion for Sanctions, sanctions are appropriate

when a party makes misleading extrajudicial statements, even if such misleading statements are

unintentional.  *See* Dkt. No. 163-1 at 18-19 (citing *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 625-626 (E.D. Va. 2008)).

> The Court finds that both Mr. Buff and Mr. Conway are attorneys, that both are deemed capable of understanding the difference between default judgment and summary judgment, and that it is difficult for the Court to believe that the issuance of this press release was accidental. It is incredible that Defendants would issue a press release concerning the Court's denial of default judgment, which occurred in May 2008, approximately six months after the Court's ruling. Additionally, Defendants do not provide any excuse for the misleading statements about actions taken by the USPTO.
>
> Accordingly, the Court concludes that Defendants issued the objectionable press release intentionally and in bad faith. Furthermore, even if the misstatements were unintentional, the Court finds that the issuance of a patently misleading press release on a nationally available, widely-read internet site is completely irresponsible.

*See id.* at 625 (attached hereto as **Exhibit 6**).

Dated: June 18, 2021                          Respectfully submitted,

                                              GORDON REES SCULLY MANSUKHANI, LLP

                                              By    */s/ Craig J. Mariam*
                                                    Thomas C. Blatchley (ct25892)
                                                    Craig J. Mariam (*pro hac vice*)
                                                    Gordon Rees Scully Mansukhani, LLP
                                                    95 Glastonbury Blvd., Ste. 206
                                                    Glastonbury, CT 06033
                                                    Phone: (860) 494-7525
                                                    Fax: (860) 560-0185
                                                    Email: tblatchley@grsm.com
                                                    Attorneys for Defendants and
                                                    Counterclaimants Breitling U.S.A., Inc.;
                                                    Breitling SA (a/k/a Breitling AG)

# EXHIBIT 1

NEW YORK STATE BAR ASSOCIATION

One Elk Street, Albany, New York 12207 ● PH 518.463.3200 ● www.nysba.org

**New York State Bar Association**
**Committee on Professional Ethics**

Opinion 977 (8/1/13)

**Topic**:   Trial publicity in administrative proceeding; distributing via social media a petition and survey in support of client's pending case

**Digest**:   A lawyer who represents a client in an administrative proceeding may distribute an online petition and survey in support of the client's case unless there is reason to believe that distributing those statements would have a substantial likelihood of materially prejudicing the adjudication.

**Rule**:   3.6

**FACTS**

1.   The inquiring lawyer is defending a client in a cancellation proceeding before the U.S. Trademark Trial and Appeal Board ("TTAB").  In the pending TTAB proceeding, a third-party petitioner has alleged that the client's registered mark is confusingly similar to the petitioner's registered mark and is seeking cancellation of the client's registration.

2.   The client has created an online petition to garner opposition to cancellation.  The petition presents the proceeding as a contest between a family business and a big corporation, and asks readers to sign in order to demonstrate that there is no likelihood of confusion between the petitioner's mark and the client's mark.  The lawyer asks if there is any ethical prohibition of distributing a link to the client's online petition via social media (specifically, using Facebook and Twitter) if the lawyer will merely tell readers it is there but not ask them to sign it.

3.   In addition, the lawyer asks if it is ethically permissible to post online a survey asking questions along the lines of the following:  "Do you think Mark X is confusingly similar to Mark Y?  Click here to express your opinion."

4.   The lawyer does not indicate what he intends to do with the petition or the survey results (*e.g.*, whether he intends to try to present the results as evidence in the proceeding).

**QUESTIONS**

5.   If a client has set up an online petition in support of his case in a trademark cancellation proceeding, may the client's lawyer distribute a link to the petition via social media?

6.   May a lawyer in a trademark cancellation proceeding post an online survey asking

readers whether they find two trademarks confusingly similar?

**OPINION**

7.   Rule 3.6(a) of New York's Rules of Professional Conduct (the "Rules") provides that a lawyer who is participating (or has participated) in a criminal or civil matter "shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."   This provision attempts to balance the public value of informed commentary with a party's right to a fair proceeding.[1]   We note that such provisions have been the subject of constitutional challenge,[2] but we are limited to interpreting the rules of legal ethics and do not undertake to assess their validity.

8.   The prohibition in Rule 3.6(a) can be divided into a few components:  (i) it applies to a lawyer who is participating in "a criminal or civil matter" in which there is or will be an adjudicative proceeding; (ii) it applies when the lawyer "make[s] an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication"; and (iii) it applies to statements "that the lawyer knows or reasonably should know … will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."   We consider how each of these components applies to the communications proposed in the inquiry.

9.   The first component is clearly satisfied.   "Matter" is defined by Rule 1.0(*l*) to include "any … administrative proceeding."   A trademark cancellation proceeding is an administrative and adjudicative proceeding.[3]   The inquiring lawyer is therefore subject to Rule 3.6(a).

10. As to the second component we start by considering whether distributing a link to the petition would constitute making extrajudicial statements.   The petition itself includes extrajudicial statements, as it is a document that is being distributed online and it characterizes

---

[1] *See* Rule 3.6, Cmt. [1] (discussing "balance between protecting the right to a fair trial and safeguarding the right of free expression," and noting "vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves").

[2] *See*, *e.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063, 1075 (1991) (holding in criminal case that "'substantial likelihood of material prejudice' standard … satisfies the First Amendment" as "it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech"); *Hirschkop v. Snead*, 594 F.2d 356, 373-74 (4th Cir. 1979) (concluding that a rule limiting lawyers' speech on matters pending before administrative tribunals, more restrictive than Rule 3.6, was unconstitutional because overbroad, and noting lack of record evidence "that any administrative decision has been set aside because the comments of lawyers impaired the fairness of the proceedings").

[3] *See* Trademark Trial and Appeal Board Manual of Procedure §102.02 (3d ed., rev. 2, June 2013) (describing proceedings within jurisdiction of TTAB, including cancellation proceedings); *id*. §102.03 (cancellation proceedings include pleadings, motions and trial).  This TTAB Manual is available at http://www.uspto.gov/trademarks/process/appeal/Preface_TBMP.jsp.

the nature and merits of the dispute in particular ways.  The fact that it was the client who created and posted the petition does not make the rule inapplicable.  The lawyer, by distributing the link, is effectively disseminating the petition – and thus "mak[ing]" the statements it contains – over the internet as a means of public communication.

11. Whether the proposed survey meets this second component is less clear and may depend on a more detailed description of its contents. It may not make any "statement" subject to the Rule if it is limited to posing questions in neutral terms and giving readers the opportunity to express opinions.  But if it includes leading questions, they could constitute implied statements subject to the Rule.

12. The final and central element of the prohibition is that the lawyer knows or reasonably should know that the statement "will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."

13. The rule provides some guidance on this final element by identifying certain kinds of statements that are presumptively permissible and other kinds that are presumptively impermissible.  *See* Rule 3.6(b) (1) – (6) (listing kinds of statements "ordinarily" deemed likely to be prejudicial; Rule 3.6(c) (1) – (7) (listing kinds of information a lawyer may state, without elaboration, if the statement does not violate the basic prohibition in Rule 3.6(a)).  As to the communications in question, however, the rule's presumptions do not apply.  Neither the petition nor the survey would be within any of the presumptively permissible categories of information listed in Rule 3.6(c).  Nor would either of those communications be presumptively prohibited, because Rule 3.6(b) applies only to certain statements that refer "to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration."  A trademark cancellation proceeding is not triable to a jury.[4]  For this inquiry, therefore, the rule's lists of categories give no presumptive answer to the question of likely prejudice.

14. However, the presumptions described above do not exhaust the content of Rule 3.6. Whether or not one of the presumptions applies, the governing standard remains the one found in Rule 3.6(a).  We turn to some factors that bear on whether the communications would have a substantial likelihood of materially prejudicing the cancellation proceeding.

15. One factor is the nature of the adjudicative proceeding.  Its relevance may be inferred from Rule 3.6(b), because as noted above, the presumptive prohibitions do not apply to civil matters not triable to a jury.  Here is a more direct statement of this factor's importance:

> Criminal jury trials will be most sensitive to extrajudicial speech. Civil trials may be less sensitive. Non-jury hearings and arbitration proceedings may be even less affected. The Rule will still place limitations on prejudicial comments in these cases, but the likelihood of prejudice may be different depending on the type of proceeding.

---

[4] TTAB Manual, note 2 *supra*, §102.03 (decisions on merits of cases are rendered by panels of TTAB judges).

Rule 3.6, Cmt. [6].  Indeed, it has been said that the concern about improperly influencing a factfinder's decisions

> is largely irrelevant in matters to be decided by judges.  Judicial officers are expected to be immune from the influences of inadmissible evidence and similar sources of information and from the potentially distorting effects of inflamed public opinion.  Thus, media comments by a lawyer outside a nonjury proceeding will pose a significant and direct threat to the administration of justice … only in extreme situations.[5]

16. Another factor is the content of the extrajudicial statements.  For example, statements on peripheral issues may carry little risk of prejudice.  Statements may be more likely to be prejudicial if they address crucial issues committed to the finder of fact or are expressed in an inflammatory way.

17. The likelihood of prejudice will depend in part on the likelihood that the statements will come to the attention of the finder of fact.  Thus the method of disseminating extrajudicial statements may be a relevant factor, and another related one is the statements' timing.[6]  Other relevant factors may include the purpose with which the statements were made[7] and whether the information in the statements is otherwise available from public sources.[8]  Having listed some of

---

[5] Restatement (Third) of The Law Governing Lawyers §109, cmt. b (2000).  *But cf.*, *e.g.*, *United States v. Khan*, 538 F.Supp.2d. 929, 932-35 (S.D.N.Y. 2007) (interpreting analogous local rule against statements likely to "prejudice the due administration of justice" to prohibit not only lawyer's statements likely to taint jury pool but also those likely to threaten safety of witnesses).

[6] *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1991) (citing case law and ABA source for proposition that timing of a statement is significant factor in the assessment of the possible threatened prejudice, and giving as problematic example a statement "which reaches the attention of the venire on the eve of *voir dire*"); Restatement (Third) of The Law Governing Lawyers §109, cmt. c (2000) ("statement made long before a jury is to be selected presents less risk than the same statement made in the heat of intense media publicity about an imminent or ongoing proceeding").

[7] *See Gentile v. State Bar of Nevada*, 501 U.S. at 1064-65, 1080 (disciplinary authority considered purpose of statements in assessing likelihood of prejudice); *id*. at 1079 (minority finding it persuasive that lawyer admitted having called press conference to influence venire, because it was "difficult to believe that he went to such trouble, and took such a risk, if there was no substantial likelihood that he would succeed").

[8] *See id*. at 1046 (minority portion of opinion noting that "[m]uch of the information provided by petitioner had been published in one form or another, obviating any potential for prejudice"); Restatement (Third) of The Law Governing Lawyers §109, cmt. c (2000) (if same information "is available to the media from other sources, the lawyer's out-of-court statement alone ordinarily will not cause prejudice," but this factor is not "controlling" and "the information must be both available and likely in the circumstances to be reported by the media"); *In re Sullivan*, 185 A.D.2d 440, 445 (3d Dept. 1992) (dismissing disciplinary charges against criminal defense

the factors relevant to likely prejudice (but without any claim that the list is comprehensive), we consider their application to the inquiry.

18. The nonjury nature of the TTAB proceeding is a consideration counting strongly against likely prejudice.  On the other hand, while the inquiry does not fully describe the proposed communications, it appears at least that the statements in the petition, and implied ones in the survey if any, would directly address the merits of the dispute.  The inquiry does not reveal the amount of time that would be expected to pass from the making of the statements until the trial.

19. A factor that may assume particular significance on these facts is motive.  In this connection it is useful to distinguish between the mere making of the statements and their ultimate intended uses.  The inquiry does not specify those uses.

20. It is possible that the lawyer's intent is to use the survey results as evidence that the two marks are not confusingly similar.  If so, then the question arises whether such survey evidence would be permissible in a cancellation proceeding.  If conducting the survey were an appropriate means of seeking competent evidence, then it would not have a substantial likelihood of "prejudicing" the proceeding.  On the other hand, if the survey results would not constitute proper evidence, their dissemination could give rise to additional concerns.  *Cf.* Rule 3.6(b)(5) (in jury or criminal context, statement ordinarily likely to be prejudicial if it relates to information the lawyer knows or reasonably should know is "likely to be inadmissible as evidence in a trial and would, if disclosed, create a substantial risk of prejudicing an impartial trial").  Similar questions would apply to possible intended use of the petition in evidence.

21. However, the petition was created by the client and there is no indication of intent to use is as evidence.  In the absence of some other explanation, the inquiring lawyer should consider whether the client's goal is to disseminate the petition so broadly as to influence the finders of fact other than through the tribunal's processes.  Of course in that instance it would be improper for the lawyer to participate in its dissemination.

22. We have mentioned various relevant facts not contained in the inquiry, and their absence limits our ability to balance the above factors.  Even without those facts, however, we can identify an outline of the analysis.  The dominant factor in this case may be the nature of the adjudicative proceeding.  The fact that the adjudication will be by an administrative tribunal like the TTAB counts heavily in favor of the inquiring lawyer being permitted to disseminate the proposed communications.  There could be a different answer if the inquiring lawyer were aware of additional facts indicating that the client seeks to use the petition to exert improper influence, or that prejudice is otherwise likely.  But in the absence of such additional facts, it seems unlikely that distribution of the petition or the survey would materially prejudice an adjudicative proceeding to be conducted by a panel of specialized trademark judges.

23. We have addressed only such constraints on the proposed communications as might be imposed by the rules of legal ethics.  There could also be legal constraints, but issues of law are

---

lawyer whose "television interview was a mere drop in the ocean of publicity" surrounding the trial, when the matters discussed "had been otherwise publicized prior to the interview").

beyond the scope of this Committee.  The inquiring lawyer may be well advised to review TTAB rules and other applicable laws and rules before distributing the petition or survey.

**CONCLUSION**

24. A lawyer representing a client in a trademark cancellation proceeding may use social media to distribute a link to an online petition in support of the client's case, and may post an online survey, where there is no substantial likelihood that the petition or survey would materially prejudice the upcoming administrative adjudication.  If the lawyer knew that the client were trying to use the petition to pressure the trademark judges, or the lawyer had other information indicating a likelihood of materially prejudicing the proceeding, then the lawyer should not participate in disseminating those statements.  But in the absence of such information, such statements may fairly be considered unlikely to prejudice a proceeding conducted by a panel of administrative judges.

(14-13)

# EXHIBIT 2

128 Nev. 905
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

In the Matter of The DISCIPLINE
OF Jacob HAFTER, Esq.

No. 57298.
|
March 7, 2012.

**Synopsis**
**Background:** Disciplinary action was brought against
attorney.

**[Holding:]** The Supreme Court held that private
reprimand was warranted for attorney who engaged in
misrepresentation.

Ordered accordingly.

West Headnotes (3)

**[1]** **Attorneys and Legal
Services** 👈 **Extrajudicial statements; trial
publicity**
Attorney's false statements to press that Attorney
General was involved in attorney disciplinary
matter were not false statements to a disciplinary
authority, and thus, the statements did not
violate rule of professional conduct prohibiting
an attorney in connection with a disciplinary
matter from knowingly making a false statement
of material fact. RPC 8.1(a).

**[2]** **Attorneys and Legal
Services** 👈 **Extrajudicial statements; trial
publicity**
Attorney's false statements to press that Attorney
General was involved in attorney disciplinary

matter constituted a violation of rule of
professional conduct prohibiting an attorney
from engaging in misrepresentation. RPC 8.4(c).

**[3]** **Attorneys and Legal Services** 👈 **Public
Reprimand, Censure, or Admonition**
Private reprimand was warranted for attorney
who engaged in misrepresentation by falsely
claiming in press release that Attorney
General was involved in attorney disciplinary
proceeding. RPC 8.4(c).

**Attorneys and Law Firms**

Law Office of Jacob L. Hafter & Associates

Clark County District Attorney/Civil Division

*ORDER DISAPPROVING PANEL RECOMMENDATION,
REMANDING FOR IMPOSITION OF PRIVATE
REPRIMAND, AND ASSESSING COSTS*

**\*1** This is an automatic review of a Northern Nevada
Disciplinary Board hearing panel's recommendation that
attorney Jacob Hafter receive a public reprimand for violating
RPC 8.1(a) (false statement of material fact in connection
with attorney admission or discipline process) and RPC
8.4(c) (misrepresentation). *See* SCR 105(3)(b). While we
conclude that insufficient evidence supports the panel's
conclusion that Hafter violated RPC 8.1(a), we conclude
that sufficient evidence supports the panel's determination
that Hafter violated RPC 8.4(c). We further conclude that
Hafter's conduct warrants a private reprimand. We therefore
disapprove the panel's recommendation of a public reprimand
and remand for the panel to impose a private reprimand.

*Facts*
Hafter was a candidate for the office of Nevada Attorney
General in 2010. Hafter believed that the incumbent to
that office, Catherine Cortez Masto, violated attorney-
client privilege by releasing to the media correspondence
between the offices of the attorney general and the governor.
Accordingly, Hafter called the Nevada State Bar and asked
whether anyone at the governor's office had reported this

Case 3:19-cv-00514-MPS   Document 182   Filed 06/18/21   Page 17 of 49

alleged misconduct to the Bar, and was told that no one had. Hafter then attempted to file an anonymous complaint against General Masto but was told that this was impossible.

Nevertheless, five days later Hafter issued a press release on his campaign letterhead entitled "Hafter Responds to Allegations Masto Violates Attorney Ethics Rules." In the release, Hafter stated that: "Mr. Hafter, who sits on the Southern Nevada Disciplinary board, was made aware of this issue on Friday, April 2, 2010.... Mr. Hafter called the Bar and confirmed that a report of Ms. Masto's violation was made to the State Bar." The same day, Hafter participated in a conference call hosted by the Nevada News Bureau. The author of the resulting news story reported that "Hafter said today he received confirmation from a reliable source inside the Nevada State Bar that a formal ethics complaint has been filed against the Attorney General for violations of attorney-client privilege."

The State Bar then filed a formal complaint alleging that Hafter's statements to the press amounted to a violation of RPC 8.1(a) for knowingly making a false statement of material fact in connection with a disciplinary matter, RPC 8.4(c) for conduct involving deceit and dishonesty, and RPC 8.4(d) for conduct prejudicing the administration of justice. After a hearing, a panel of the Northern Nevada Disciplinary Board found that Hafter's statements amounted to material misstatements in violation of RPC 8.1(a) and 8.4(c), but did not find a violation of RPC 8.4(d). The panel recommended that Hafter be publicly reprimanded and assessed the costs of the disciplinary proceeding.

*Discussion*

Although persuasive, the panel's findings and recommendations are not binding on this court, *Matter of Discipline of Droz,* 123 Nev. 163, 168, 160 P.3d 881, 884 (2007), and we will conduct an independent, de novo review to determine whether and what type of discipline is warranted, *see In re Stuhff,* 108 Nev. 629, 633, 837 P.2d 853, 855 (1992); *In re Kenick,* 100 Nev. 273, 275–76, 680 P.2d 972, 973–74 (1984).

**\*2** **[1]**   Having reviewed the record of the proceedings before the board and the briefs filed in this court, we conclude that there is not clear and convincing evidence that Hafter violated RPC 8.1(a). In relevant part, RPC 8.1(a) states that "a lawyer ... in connection with a disciplinary matter, shall not ... [k]nowingly make a false statement of material fact." Hafter's statements to the press were certainly false

statements, but we reject the State Bar's assertion that because the subject matter of the statements concerned a disciplinary matter, they were made "in connection with a disciplinary matter." Instead, we conclude that there must be clear and convincing evidence that Hafter's false statements were made to a disciplinary authority in order to sustain a charge that he violated RPC 8.1(a). *See* ABA Annotated Model Rules of Prof 1 Conduct § 8.1 (2011) ("Rule 8.1(a) imposes a duty of candor in connection with all communications *with admission authorities and disciplinary authorities.*" (emphasis added)); Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 62.3, at 62–5 (3d ed. Supp.2008) ( "Rule 8.1(a) states a simple rule: lawyers ... may not deliberately lie to regulatory authorities about material facts."). Hafter did not make his false statements to any disciplinary authority and we therefore conclude that he did not violate RPC 8.1(a).

**[2]**   However, Hafter's false statements to the press support the panel's conclusion that he violated RPC 8.4(c). That rule states: "It is professional misconduct for a lawyer to ... [e]ngage in conduct involving ... misrepresentation." The evidence presented at the hearing clearly demonstrated that Hafter either intended to mislead in his press release or, at the least, acted in reckless disregard for the truth. *See In re Surrick,* 338 F.3d 224, 234 (3d Cir.2003); *In re Conduct of Huffman,* 331 Or. 209, 13 P.3d 994, 998 (Or.2000) (" 'Misrepresentation' may include an affirmative misstatement, an intentional failure to disclose material facts that may or may not have been intended to deceive, or a combination of both.").

Hafter claims that his misrepresentations cannot constitute a violation of an ethical rule because they are protected political speech. Hafter errs. A lawyer who is a candidate for political office has a First Amendment right to discuss public issues and advocate his own election. *Buckley v. Valeo,* 424 U.S. 1, 52, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). However, Hafter did more than simply engage in the pugilistic rhetoric of a political campaign. First, he improperly cloaked himself in the authority of the Southern Nevada Disciplinary Board. *Cf. Jenevein v. Willing,* 493 F.3d 551, 560 (5th Cir.2007) (reaffirming judge's First Amendment right to comment on matters of public concern, but upholding public censure for his "use of the trappings of judicial office to boost his message"). Then, after insinuating that he spoke with some degree of inside knowledge due to his membership on the disciplinary panel, he claimed that he confirmed with the State Bar that an ethical complaint had been filed against the attorney general when he knew no such

thing had happened. He then repeated this statement to the media on a conference call. These misrepresentations are not protected political speech. "The guarantee of freedom of speech will not protect [a lawyer in the context of a political campaign] from disciplinary action ... if he is guilty of known falsehood intentionally used and published for the purpose of misleading the voters and gaining personal advantage for himself or his candidate." *State v. Russell,* 227 Kan. 897, 610 P.2d 1122, 1127 (Kan.1980); *see also Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."). Thus, we conclude that Hafter's actions constitute a violation of RPC 8.4(c).

**\*3** **[3]** The purpose of attorney discipline is to protect the public, the courts, and the legal profession, not to punish the attorney. *State Bar of Nevada v. Claiborne,* 104 Nev. 115, 213, 756 P.2d 464, 527–28 (1988). In determining the appropriate discipline, this court has considered four factors to be weighed: "the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors." *In re Lerner,* 124 Nev. 1232, 1246, 197 P.3d 1067, 1077–78 (2008). In considering the panel's recommended discipline here, we note that Hafter has never been disciplined before, no clients were harmed, and the incident is an isolated one. In those circumstances, a private reprimand is appropriate. *See* ABA Standards for Imposing Lawyer Sanctions § 7.4 (stating that an admonition (the equivalent of a private reprimand) is generally the appropriate discipline when the violation is isolated and "causes little or no actual or potential injury to a client, the public, or the legal system").

We agree that Hafter violated RPC 8.4(c), but we conclude that no RPC 8.1(a) violation was shown. We further conclude that no more than a private reprimand is appropriate. Accordingly, we remand for the panel to impose a private reprimand of attorney Jacob Hafter for violating RPC 8.4(c). Also, Hafter shall pay the costs of the disciplinary proceeding.

It is so ORDERED.

**All Citations**

128 Nev. 905, 381 P.3d 623 (Table), 2012 WL 762036

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

2019 WL 10966200
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

DARELTECH, LLC, Plaintiff,

v.

XIAOMI INC., Beijing Xiaomi Technology
Co., Ltd., Xiaomi USA, Inc. and
Xiaomi Technology, Inc., Defendants.

18 Civ. 8729 (AKH)
|
Signed 09/10/2019

**Attorneys and Law Firms**

Andrew Chan Wolinsky, Yi Wen Wu, David Lawrence Hecht,
Pierce Bainbridge Beck Price & Hecht LLP, New York, NY,
for Plaintiff.

Ryan Boyd McCrum, Susan M. Gerber, Jones Day,
Cleveland, OH, John Joseph Normile, Sarah Ann Geers,
Jones Day, New York, NY, for Defendants.

**ORDER DENYING MOTION FOR ATTORNEYS'
FEES**

ALVIN K. HELLERSTEIN, U.S.D.J.:

 **\*1**  Following dismissal of this patent infringement action
for lack of personal jurisdiction, defendants Xiaomi Inc.,
Beijing Xiaomi Technology, Co., Ltd., Xiaomi USA, Inc., and
Xiaomi Technology, Inc. move for attorneys' fees incurred
during the pendency of the case, which they estimate to
be approximately $735,000. For the reasons that follow,
defendants' motion is denied.

**Background**

The Court assumes the parties' familiarity with the facts
of the case, which are recounted in greater detail in my
July 22, 2019 order dismissing the action. *See* ECF 80.
Defendants offer two overarching bases for their claim for
attorneys' fees. First, Dareltech pursued a meritless case even
after defendants identified operative facts and legal principles
precluding any basis for relief. Second, defendants point to

various objectionable behaviors on the part of Dareltech's
counsel over the course of the litigation.

Specifically, defendants point to the following alleged
bad acts: (1) Dareltech's counsel conducted undisclosed
interviews at a Xiaomi promotional event, in violation
of various New York Rules of Professional Conduct. (2)
Dareltech's counsel threatened to expose perjury allegations
and other "embarrassing facts." (3) Dareltech's counsel made
various disparaging comments to the media and on social
media about the case. (4) Dareltech variously multiplied
the proceedings, by, among other things, filing motions for
reconsideration and relief from judgment.

**Discussion**

**A. Legal Standard**
The Patent Act provides that a "court in exceptional cases
may award reasonable attorney fees to the prevailing party."
35 U.S.C. § 285. "[A]n 'exceptional' case is simply one
that stands out from others with respect to the substantive
strength of a party's litigating position (considering both the
governing law and the facts of the case) or the unreasonable
manner in which the case was litigated." *Octane Fitness, LLC
v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).
"District courts may determine whether a case is 'exceptional'
in the case-by-case exercise of their discretion, considering
the totality of the circumstances." Among other factors,
a court may consider "frivolousness, motivation, objective
unreasonableness (both in the factual and legal components of
the case) and the need in particular circumstances to advance
considerations of compensation and deterrence." *Id.* at 554
n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19
(1994)).

"Section 285 demands a simple discretionary inquiry;
it imposes no specific evidentiary burden" and patent
litigants need only establish their entitlement to fees by a
preponderance of the evidence, not by clear and convincing
evidence. *Octane Fitness, LLC v. ICON Health & Fitness,
Inc.*, 572 U.S. at 557.

A court also has authority to award fees pursuant to 28 U.S.C.
§ 1927, which provides that "[a]ny attorney or other person
admitted to conduct cases in any court of the United States
or any Territory thereof who so multiplies the proceedings
in any case unreasonably and vexatiously may be required
by the court to satisfy personally the excess costs, expenses,

and attorneys' fees reasonably incurred because of such conduct." A court also has inherent power to award attorneys' fees when a party "has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975). To impose sanctions under Section 1927 or under its inherent supervisory power, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay." *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000).

**B. The Strength of Dareltech's Litigating Position**

**\*2** Though I concluded that personal jurisdiction was lacking, the substantive strength of the case does not so stand out from others as to consider it "exceptional." Xiaomi's venue position was not applicable to every Xiaomi defendant. Moreover, among other evidence, the (concededly, sparse) promotional efforts of at least one Xiaomi entity in the forum, including through the display of a device whose subject matter the Court might have found constituted a basis for personal jurisdiction, *see Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1298 (Fed. Cir. 2009), rendered the strength of Dareltech's position better than frivolous and objectively unreasonable, as Xiaomi charges.

**C. Litigation Conduct by Dareltech's Counsel**

Similarly, I conclude that the conduct of Dareltech's counsel does not provide cause to award attorneys' fees. Dareltech's various motions were addressed as a matter of course and did not vexatiously multiply the proceedings. Other complaints, including Dareltech's failure to dismiss Beijing Xiaomi Technology Co., Ltd. as a defendant, various sanctions motions, media comments, and social media posts do not compel a finding that this is an exceptional case meriting attorneys' fees.[1] I similarly conclude that the record is insufficient to find that Dareltech's counsel acted in bad faith, or that the entire case was predicated on achieving a nuisance value settlement of the type sanctioned in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1320 (Fed. Cir. 2011).

Defendants complain of the burden of undergoing jurisdictional discovery, which I allowed, but defendants themselves bear some responsibility for the scope and cost. Defendants also pursued an active litigation posture in this case, including a motion to disqualify counsel. Weighing the relevant factors and the totality of the circumstances, I conclude that awarding attorneys' fees is not appropriate in this case.

**Conclusion**

For the reasons stated, defendants' motion for attorneys' fees is denied. The clerk shall terminate the motion (ECF 83).

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 10966200

---

Footnotes

1    Although I conclude that Dareltech's litigation conduct was not "exceptional" within the meaning of 35 U.S.C. § 285, my ruling should not be interpreted as overlooking improper behavior of counsel. See my Orders at ECF 48, 58-4, 58-10. My ruling is only that this case is not "exceptional" to support fee-shifting.

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

\---------------------------------------------------- x

DARELTECH, LLC,                          :          No. 1:18-cv-08729 (AKH)

                                         :

            Plaintiff,                    :          ECF CASE

                                         :

      v.                                 :

                                         :

XIAOMI INC., BEIJING XIAOMI              :

TECHNOLOGY CO., LTD., XIAOMI             :

USA, INC. and XIAOMI TECHNOLOGY,         :

INC.,                                    :

                                         :

            Defendants.                  :

\---------------------------------------------------- x


### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION TO RECOVER ATTORNEY FEES

John J. Normile
JONES DAY
250 Vesey Street
New York, NY  10281-1047
jjnormile@jonesday.com
(212) 326-3939

Ryan B. McCrum (*pro hac vice*)
Susan M. Gerber (*pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
rbmccrum@jonesday.com
smgerber@jonesday.com
(216) 586-3939

*Attorneys for Defendants*
*Xiaomi Inc., Xiaomi USA, Inc., and Xiaomi*
*Technology, Inc.*

Dated:      August 6, 2019
            New York, New York

Shortly thereafter, on January 28, 2019, Mr. Hecht sent another email that reiterated Dareltech's settlement demands and threatened public disclosure of its baseless perjury allegations if the Xiaomi Defendants refused to pay: "Your client [Xiaomi] … risks that very embarrassing facts, which have tellingly never been denied, are exposed to the public." (Dkt. No. 26-6.)

Mr. McCrum responded a week later, again advising Dareltech's counsel that none of the Xiaomi Defendants sold the accused products in the United States, that personal jurisdiction was lacking in this Court, and that venue was improper also as to the newly-added Defendants:

> Our client [Xiaomi, Inc.] does not sell the accused products in the United States and prohibits its distributors from doing so. Aside from that, this case should have never been brought in this court. Venue does not exist over Xiaomi Technology or Xiaomi USA. Under the Supreme Court's *TC Heartland* case, those companies [Xiaomi Technology and Xiaomi USA] must be incorporated in New York or have a "regular and established place of business" there. These entities [Xiaomi Technology and Xiaomi USA] have neither. It is not even a close call. There is no proper venue over these parties. Additionally, there is no personal jurisdiction over Xiaomi, Inc.

(Dkt. No. 58-3 at 2.) Mr. McCrum reiterated the venue and jurisdictional issues during a call that same day. (*Id.*, 1; Dkt. No. 58, ¶ 7.) Once again, Dareltech ignored Mr. McCrum's venue and jurisdictional challenges, and never responded to the substance of Mr. McCrum's communications.

### 4. In February 2019, Dareltech's Counsel Disparaged Xiaomi's Counsel On Social Media After Court Status Conference And Made Good On Threats To Publicly Expose "Embarrassing Facts."

The vexatious conduct of Dareltech and its counsel was not limited to the confines of party communications. For instance, the day after this Court held a short conference to discuss the status of the case, (*See* 2/8/2019 Minute Entry), Mr. Hecht publicly bragged on LinkedIn that he and his colleague had just gone "toe-to-toe" with lawyers from "one of the largest firms in the

world." (Dkt. No. 58-4.) Remarkably, he mischaracterized the brief 5-10 minute conference as a "massacre." (*Id.*) He also disparaged lead counsel for the Xiaomi Defendants, calling him "pathetic" and claiming his advocacy was "worse than nearly any law student on a moot court board." (*Id.*) Mr. Hecht claimed to be "posting [all of] this as a warning to in-house counsel," stating that "[j]ust because you are paying someone $1000/hr+ does not mean you are getting a pro." (*Id.*) Claiming to be a "gentleman," Mr. Hecht said he would not "call this person—or his firm—out by name," although it would only take minutes to connect the dots to figure out the individual and firm being referenced. (*Id.*)

In addition, on February 28, 2019, Mr. Hecht (or someone at his or his client's direction) did exactly what Mr. Hecht had previously threatened to do—the purportedly "very embarrassing facts" about the Xiaomi Defendants were made public. On that date, two articles appeared in the Chinese press that included false and misleading reports that one of the Xiaomi Defendants' executives had allegedly committed perjury. (Dkt. No. 43 at 3, 13.) The articles exaggerated the potential consequences (including criminal prosecution and imprisonment) of the unfounded perjury allegations and smeared the reputation of the Xiaomi Defendants' executive. (*Id.*) These reports cited an "insider" source who did not want to be identified. (*Id.*) While Pierce Bainbridge denied any involvement, there is no credible explanation other than that Dareltech or its counsel (or someone else acting on their behalf) was the "insider," as there was no other plausible way that the purported facts referenced in the articles could have been obtained. Dareltech has never denied that at least some of the information in the articles was known only to the parties and their lawyers. (Dkt. No. 44-1 at 2.) Nonetheless, Dareltech has suggested that someone from *Xiaomi* may have been the culprit for leaking this information and that counsel for Xiaomi failed to conduct a proper investigation. (*Id.* at 1.) On this record, any

10

# EXHIBIT 5

# 130

**ONLINE POSTING AND OTHER SHARING OF MATERIALS RELATING TO THE REPRESENTATION OF A CLIENT**

Approved April 3, 2017
Revised November 17, 2018

## I.      INTRODUCTION AND SCOPE

The Internet has made sharing many forms of information easier.   It is easy, for example, for lawyers to post video clips from depositions, share responses to common motions or deposition transcripts of often-used experts, or publish recent court orders.   The practice of sharing litigation materials, including deposition transcripts, briefs, and discovery responses, allows lawyers to assist one another in representing their respective clients.  A comment to Rule 3.6 of the Colorado Rules of Professional Conduct (Colo. RPC or the Rules) reminds lawyers that "there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves."  Colo. RPC 3.6, cmt. [3].

Despite the strong interest in allowing the free flow of information, including through various electronic media, lawyers must be mindful of and adhere to various provisions of the Rules when sharing or posting materials online.   Lawyers must be particularly vigilant about client confidentiality when revealing information relating to the representation of a client.  In addition, lawyers must be mindful of their duty of candor  and other obligations flowing from court orders and rules.   Although some of the Rules do not apply when a lawyer is not representing a client, most of the Rules relevant to posting or sharing materials obtained or generated during representation apply generally to a lawyer regardless of whether the lawyer posts or shares the materials as part of the representation of a client.  These rules also generally apply even after the representation has concluded.

1

This opinion focuses on posting or sharing materials electronically, through various forms of online media, but the conclusions in this opinion apply to dissemination in any form.  For instance, the principles underlying this opinion would apply to a lawyer showing a video deposition to a live audience or distributing written materials at a CLE presentation.

The opinion is limited to ethical considerations when a lawyer posts online or otherwise shares specific documents or other materials (such as videos) related to the lawyer's representation of a client; it does not address potential limitations on a lawyer's use or disclosure (whether online or otherwise) of other information the lawyer learned during the course of representing former clients.  For example, during conversations with a current or former client, a lawyer might have learned specific factual information related to the representation.  While the Rules would generally prohibit the lawyer from disclosing that information, whether on-line or otherwise, *see* Colo. RPC 1.6(a), 1.9(c)(2), this opinion does not address that circumstance.  Or, a lawyer might have accumulated knowledge on an issue, such as how best to negotiate with a governmental agency, based on a history of representing former clients in negotiations with that agency.  This opinion does not address the limits, if any, on a lawyer's use and disclosure of that type of information, whether in on-line posts or otherwise.

## II.    LAWYER'S DUTY TO MAINTAIN CLIENT CONFIDENCES

### A.    A Lawyer's Broad Duty to Maintain the Confidentiality of Materials Relating to the Representation of Current Clients

A deposition transcript in which an expert admits to lacking certain qualifications might be helpful for other lawyers to review before preparing a response to a summary judgment motion or preparing to examine the same expert in a deposition or at trial.   A video of a deposition in which a government official admits to public corruption might be valuable for the public to watch.  When a lawyer obtains these materials in connection with

2

representing a client, however, Colo. RPC 1.6 is implicated.

Colo. RPC 1.6(a) prohibits a lawyer from revealing "information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure" meets one of a few specific and narrowly drafted exceptions in Colo. RPC 1.6(b). There is no exception for revealing information for educational purposes, to assist another lawyer, or because the information is "newsworthy."

Similarly, Colo. RPC 1.8(b) provides "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules." Comment 5 to Rule 1.8 explains this prohibition applies even when "information is used to benefit either the lawyer or a third person, such as another client or business associate of the lawyer." The Comment clarifies, however, that Rule 1.8(b) "does not prohibit uses that do not disadvantage the client."

The scope of what is confidential under Rule 1.6 is much broader than the evidentiary attorney-client privilege. "The confidentiality rule . . . applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Colo. RPC 1.6, cmt. [3]. The Colorado Supreme Court broadly interprets "client information." *People v. Hohertz*, 102 P. 3d 1019, 1022 (Colo. 2004).

Information relating to the representation of a client often exists in public records. Because a client may not understand that many records, like court filings, are available to the public, a lawyer should advise the client that certain tasks necessary to the representation of the client will result in information about the client, including sensitive

information, becoming public.

Information in public records that relates to the representation of a current client is "information related to the representation of a client" that is covered by the Rules. There is no exception for disclosing information in public records or those public records themselves. *In re Anonymous*, 654 N.E.2d 1128, 1129 (Ind. 1995) (disclosure of information related to the representation of a client that "was readily available from public sources and not confidential in nature" violated Rule 1.6); *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850, 860 (W.Va. 1995) ("The ethical duty of confidentiality is not nullified by the fact that the information is part of a public record or by the fact that someone else is privy to it."). Nor is there an exception for information that is otherwise publicly available. *See* American Bar Association (ABA) Comm. on Ethics and Prof. Resp., Formal Op. 480, "Confidentiality Obligations for Lawyer Blogging and Other Public Commentary" (March 6, 2018) ("Significantly, information about a client's representation contained in a court's order, for example, although contained in a public document or record, is *not* exempt from the lawyer's duty of confidentiality under Model Rule 1.6.") (emphasis in original and footnote omitted). For example, without informed consent, a lawyer may not disclose information relating to the representation of a client even if the information has been in the news.

### B.    A Lawyer's Broad Duty of Non-Disclosure of Information Relating to Representation of Former Clients

Colo. RPC 1.9(c)(2), relating to duties to former clients, provides that "a lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter . . . reveal information relating to the representation," subject to the same exceptions that apply to representation of a current client, *i.e.*, client consent or the exceptions stated in Colo. RPC 1.6(b). Colo.

4

RPC 1.9(c)(1), however, permits a lawyer to "use information relating to  the representation to the disadvantage of the former client," subject to the same exceptions that would apply to representation of a current client *or* "when the information has become generally known."  Comment 8 to Rule 1.9 further provides that "the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client."[1]

Thus, Rule 1.9(c) distinguishes between a lawyer's use and revelation of information relating to the representation of a former client.  It permits the *use* of such information, even to the former client's disadvantage, when "the information has become generally known."  But the lawyer may not *reveal* information relating to the representation of a former client, even when the information is generally known and will not disadvantage the former client, unless a distinct exception applies.  *See, e.g.*, American Bar Association (ABA) Comm. on Ethics and Prof. Resp., Formal Op. 479, "The 'Generally Known' Exception to Former Client Confidentiality" (2017) ("The generally known exception applies only to the "use" of former client confidential information.").

The distinction between a permissible use and an impermissible disclosure, while

---

[1] Neither Rule 1.9 nor any of its comments addresses a lawyer's use of information relating to the representation of a former client when the use of the information would not disadvantage the former client.  The Committee construes this silence as signaling that a lawyer generally may use former client information, regardless of whether it is generally known, so long as the use of that information will not be harmful to the former client.  *See, e.g.*, *Marshall Tucker Band, Inc. v. M T Indus., Inc.*, 209 F. Supp. 3d 854, 861–62 (D.S.C. 2016) ("[B]ecause the Court is of the opinion Plaintiffs' counsel's possession of these limited documents containing only general, non-confidential information has in no way been used and in fact could not be used to the disadvantage of MTI in the current lawsuit, nor has any confidential information relating to MTI been revealed to Plaintiffs' advantage during the course of this lawsuit, the Court holds Plaintiffs' counsel are not in violation of Rule 1.9(c) of the RPC."); *but see In re Glauberman*, 586 N.Y.S.2d 601 (N.Y.App.Div.1992) (disciplining lawyer for his use, in insider trading, of information acquired while representing former client, without regard to harm to former client).

important, is academic in the context of the posting or other sharing of information online, because those acts necessarily result in the revelation (as opposed to the use) of former client information.  Therefore, unless the disclosure would be permitted under Rule 1.6 or other Rules, a lawyer may not post or otherwise disclose even materials that are generally known relating to the lawyer's representation of a former client.

C.      **Client Consent to Posting or Other Sharing of Materials Relating to Representation**

A current or former client may provide informed consent to a lawyer's posting or other sharing of materials that otherwise would be protected from disclosure under Rules 1.6 and 1.9.  "'Informed consent' denotes the agreement by a person to  a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the  proposed course of conduct."  Colo. RPC 1.0(e).  What constitutes "adequate information and explanation" will vary depending on the circumstances, including when the lawyer seeks the client's consent.

At a minimum, the lawyer should ensure that the client understands exactly what materials the lawyer proposes to publish, the manner of publication, to whom the materials will  be available, and the material risks of disclosure to the client and the client's matter. A lawyer must consider and advise the client that once the lawyer discloses the materials, other persons may distribute them further.  The lawyer also should clarify that the client may withhold or withdraw consent but that, as a practical matter, a later withdrawal of consent will be ineffective to reverse the disclosure.   If the lawyer's purpose in posting materials obtained in the course of representing a client is unrelated to the client's legal matter, the  lawyer should disclose that unrelated purpose to the client.

Depending on when a lawyer seeks a current or former client's consent, the lawyer

6

might not know and be able to advise the client of adequate information to obtain an informed consent.  For example, in a litigation matter, the engagement letter might include the client's advance consent to the lawyer's eventual posting or other sharing of deposition transcripts created in the lawsuit; however, because it is unlikely that the client, at the engagement's outset, could appreciate the contents of those deposition transcripts and the material risks that their disclosure could create for the client, the advance consent might not be deemed informed.  To increase the likelihood of obtaining an informed consent, the lawyer should obtain the client's consent after particular materials have come into existence and the client has had a chance to review them.  A lawyer may request consent on an item-by-item basis, or on a broader basis at the end of the engagement.

### D.  Redaction as a Potential Protective Measure

When a client has not provided informed consent to share or post litigation materials, a lawyer may be able to redact the materials sufficiently to share or post the materials in compliance with Colo. RPC 1.6(a) and 1.9(c).  The redactions must be sufficient to ensure that the disclosure no longer provides "information relating to the representation of a client."   Colo. RPC 1.6(a).

The Committee agrees with the  Alaska Bar Association's Ethics Committee, which opined that Rule 1.6 "does not  prohibit informal communication or the exchange of public documents between counsel,"  but that "a cautious lawyer should delete from documents and discussions all information  that might identify the client and that is not relevant for purposes of the disclosure."   Alaska Ethics Op. No. 95-1, "Propriety of Shop Talk and Courtesy Copies Under ARPC 1.6" (1994).

Merely redacting the client's name is usually insufficient to comply with Colo. RPC 1.6(a) and 1.9(c).  When the client has not given informed consent to the  dissemination of

7

the client's information, the lawyer must, at a minimum, redact all information that identifies the client or connects the non-redacted information to the client. This includes redacting all information that could lead to the identification of the client, such as addresses and other personal details about the client. This also includes redacting all information that, through outside research or otherwise, could connect the non-redacted information to the client or show that the information is related to the client, including dates, locations, and specific descriptions of events. A lawyer also should redact information that would enable a person who knows the client's identity from a different source to connect the non-redacted information to the client. In some circumstances, such as when the facts are highly unusual and involve a public figure, it may be extremely difficult to protect confidentiality with any level of redacting. A comment to Rule 1.6 explains:

> Paragraph (a) prohibits a lawyer from revealing information relating to the representation of a client. This prohibition also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person. A lawyer's use of a hypothetical to discuss issues relating to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client or the situation involved.

Colo. RPC 1.6, cmt. [4].

When sharing or posting a summary judgment brief, for example, a lawyer may need to remove paragraphs from the statement of facts, the names of exhibits, and other information specific to the representation of the client. When posting a deposition transcript, a lawyer may need to redact the case caption and all but a few questions and answers that do not reveal information related to the client or the specific matter litigated, depending on the circumstances.

Although a lawyer should broadly interpret the information covered by Colo. RPC

8

1.6(a) and 1.9(c), the Committee believes that some information never needs to be redacted to comply with these rules.  For instance, legal citations, non-legal research from treatises, and curriculum vitae for disclosed experts may generally be shared without obtaining the client's informed consent, as long as the materials do not contain any other information that, if shared without informed consent, would violate these rules.

## III.   OTHER RESTRICTIONS ON SHARING OR POSTING MATERIALS

In some circumstances, even when sharing or posting the materials does not violate Rule 1.6 or 1.9, other Rules may preclude a lawyer from revealing information relating to the representation of the client.

For example, even if a lawyer has obtained the client's consent to share materials,  court orders may prevent disclosure of the information contained in the materials.  Colo. RPC 3.4(c) prohibits a lawyer from "knowingly disobey[ing] an obligation under the rules of a tribunal."  A lawyer may violate this rule by, for instance, sharing discovery responses or specific documents that are subject to a protective order.  In some cases, courts may have entered orders concerning trial publicity, or may have directed that all filings in a case be suppressed.  Before posting any materials obtained in the course of litigation, a lawyer must consider the scope of any orders entered in the case.  A lawyer who is concerned about the potential that an opposing party or lawyer might widely disseminate sensitive materials concerning the lawyer's client should consider seeking an appropriate protective order.

Additionally, Colo. RPC 3.6 prohibits a "lawyer who is participating or has participated in the investigation or litigation of a matter" from making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing

9

an adjudicative proceeding in the matter."   Colo. RPC 3.6(b) permits a lawyer to make statements or post materials about certain specific subjects and Colo. RPC 3.6(c) permits a lawyer to post materials "that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client."   Even when the public statements or posting of materials is allowed under Colo. RPC 3.6(b) or (c), a lawyer must comply with Colo. RPC 1.6 and 1.9 when the statements or posting would reveal information related to the representation of a client or former client.

The Committee, like the drafters, recognizes that a lawyer may have an interest in free expression related to these matters.   *See* Colo. RPC 3.6, cmt. [1] ("It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression.").   Analyzing this balance fully involves consideration of legal issues, including those arising under the First Amendment to the United States Constitution, that are beyond the scope of this opinion.

Even with informed client consent, sharing edited or misleading litigation materials may violate the Rules.   Under Colo. RPC 8.4(c), a lawyer may not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."   A lawyer would likely violate this rule, for example, by posting only an edited portion of a video deposition that presents information in a false or misleading light.   Similarly, other discovery materials or recorded information could be misleading if presented out of context or in a manipulated fashion. This is particularly true when an answer to a particular question posed during a deposition or through some other form of discovery is placed immediately after a question to which the answer was not intended to respond.

When "representing a client, a lawyer shall not use means that have no substantial

10

purpose other than to embarrass, delay, or burden a third person."   Colo. RPC 4.4(a).

Materials obtained concerning an opposing party in litigation may be of a highly personal

and sensitive nature.   Sharing such information could be extremely embarrassing to parties

involved in the litigation process.   Similarly, sensitive information learned during the

course of representation can be embarrassing to a lawyer's former client if revealed in

connection with a subsequent dispute with the former client.   Lawyers who contemplate

publishing materials, even when not precluded from doing so by any direct court order,

must carefully consider whether there is a legitimate purpose for making the material

generally available.

     In some circumstances, a lawyer may wish to post materials obtained or

generated in the course of representing a client in connection with the lawyer's marketing

efforts.  Use of such materials in marketing is beyond the scope of this opinion.  However, a

lawyer contemplating use of materials obtained in the course of representing a client for

marketing purposes must carefully consider the Rules discussed in this opinion and any

other applicable Rules.

     Colo. RPC 8.4(a) prohibits a lawyer from violating the Rules through another and

from knowingly assisting or inducing another to violate the Rules.  Therefore, a lawyer may

not encourage a client to post litigation materials when the lawyer's posting of the

same materials would violate the Rules—for instance, by encouraging a client with a large

social media following from distributing edited video deposition clips that the lawyer knows

will substantially prejudice an upcoming trial.   But this rule does not prohibit a lawyer

from advising a client regarding action the client is legally entitled to take.  Thus, a lawyer

may advise a client about posting litigation materials online as long as the lawyer does not

assist or induce the client to post the materials if the lawyer would be precluded from

doing so directly.

## IV.    CONCLUSION

In many situations, making public information obtained in the course of representing a client is helpful, either to other lawyers or to educate the public.  But client confidentiality must be respected.  When a client gives informed consent to a lawyer's posting or other sharing of materials, or the lawyer redacts client identifying information, a lawyer does not violate Rules 1.6 or 1.9.  However, even where the Rules permit a lawyer to post or otherwise share client materials, the lawyer must nevertheless be careful to adhere to other Rules, including those requiring adherence to court orders, prohibiting communications that are dishonest, deceitful, or substantially likely to materially prejudice the administration of justice, and governing advertising.

# EXHIBIT 6

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Pinpoint IT Services, LLC v. Atlas IT Export Corp.,
E.D.Va., September 27, 2012

606 F.Supp.2d 617
United States District Court,
E.D. Virginia,
Norfolk Division.

AMERICAN SCIENCE AND
ENGINEERING, INC., Plaintiff,
v.
AUTOCLEAR, LLC et al., Defendants.

Civil Action No. 2:07cv415.
|
Dec. 16, 2008.

**Synopsis**
**Background:** Patent owner filed action against competitor
alleging infringement of patent on x-ray inspection systems
and methods. Owner filed motions for sanctions.

**Holdings:** The District Court, Raymond A. Jackson, J., held
that:

[1] competitor's representations regarding reasonable excuse
for neglect at default hearing were in bad faith;

[2] competitor had to reimburse owner for its attorney fees for
its misrepresentations at hearing;

[3] intentional and bad faith publishing of patently misleading
press release about court's rulings on nationally available,
widely-read Internet site was egregious and vexatious
misconduct justifying imposition of sanctions;

[4] owner did not act improperly by filing motion for
sanctions;

[5] Court had authority to enjoin patently misleading press
release because it potentially could have tainted impartiality
of jury; and

[6] Court had inherent authority to impose sanctions,
including attorneys' fees, under its inherent authority, for

defendant competitor's intentional and bad faith publishing of
patently misleading press release.

Motions granted.

West Headnotes (15)

[1] **Federal Civil Procedure** 🔑 Inherent
authority

Courts have inherent power to impose sanctions
on a party for bad faith conduct that offends the
legal process.

2 Cases that cite this headnote

[2] **Federal Civil Procedure** 🔑 Authority to
Impose

**Federal Civil Procedure** 🔑 Inherent
authority

A court ordinarily should use the federal rules of
civil procedure if the conduct in question could
be adequately sanctioned under the rules, but if in
the informed discretion of the court, neither the
statute nor the rules are up to the task, the court
may safely rely on its inherent power.

1 Cases that cite this headnote

[3] **Federal Civil Procedure** 🔑 Inherent
authority

**Federal Civil Procedure** 🔑 Monetary
Sanctions

**Federal Civil Procedure** 🔑 Non-monetary
sanctions

Sanctions based on a court's inherent power
may include assessing fees and costs, excluding
evidence or defenses, or even the dismissal of a
party's claims.

1 Cases that cite this headnote

[4] **Federal Civil Procedure** 🔑 Inherent
authority

**Federal Civil Procedure** 🔑 Reasonableness or bad faith in general; objective or subjective standard

Generally, a court must find that the party acted in bad faith before the court may invoke its inherent powers; bad faith may be found in the conduct of the litigation.

2 Cases that cite this headnote

[5] **Federal Civil Procedure** 🔑 Dismissal, vacation and default judgment motions

Defendant competitor's representations regarding reasonable excuse for neglect at default hearing, that it was unable to retain defense counsel and prepare defenses until after discovering entry of default, were in bad faith, supporting sanctions against defendant under court's inherent power, where competitor did have attorney research settlement possibilities and defenses to complaint after receiving it even if attorney had not been "retained" as "litigation" counsel. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

1 Cases that cite this headnote

[6] **Federal Civil Procedure** 🔑 Excusable neglect

**Federal Civil Procedure** 🔑 Meritorious cause of action or defense

A court ordinarily should set an entry of default aside unless the movant either fails to present a reasonable excuse for his neglect or fails to show he has a meritorious defense to the merits of the action. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

1 Cases that cite this headnote

[7] **Federal Civil Procedure** 🔑 Grounds and Factors

**Federal Civil Procedure** 🔑 Meritorious cause of action or defense

Generally a court should set aside the default where the moving party acts with reasonable promptness and alleges a meritorious defense; other factors a court may consider are the

personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

1 Cases that cite this headnote

[8] **Attorneys and Legal Services** 🔑 Contracts and retainers in general

Attorney-client relationships arise out of substance and intent, even in the absence of a written contract. Restatement (Third) of The Law Governing Lawyers § 14.

1 Cases that cite this headnote

[9] **Federal Civil Procedure** 🔑 Inherent authority

**Federal Civil Procedure** 🔑 Computation; items and services compensable

**Federal Civil Procedure** 🔑 Non-monetary sanctions

Sanctions under court's inherent power to address defendant competitor's bad faith representations to court at default hearing regarding reasonable excuse for neglect could include reimbursing plaintiff for attorneys fees and costs, to include, but not limited to, travel and lodging expenses, incurred in connection with plaintiff's motion for default judgment, defendants' motion to set aside entry of default, and default hearing, and plaintiff's motion for sanctions, and striking defendant's separate defenses as asserted in answer such that defendant could not directly or indirectly rely on them. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

3 Cases that cite this headnote

[10] **Federal Civil Procedure** 🔑 Inherent authority

**Federal Civil Procedure** 🔑 Misrepresentation or omission of facts

Intentional and bad faith publishing of patently misleading press release about court's rulings

on nationally available, widely-read Internet site was egregious and vexatious misconduct justifying imposition of sanctions under court's inherent power; release stating that "[court] has rejected [plaintiff's] motions for summary relief" improperly suggested that court had denied plaintiff's motion for summary judgment or otherwise ruled on merits of case and Patent and Trademark Office (PTO), by agreeing to reexamine plaintiff's claims, did not "formally reject[ ] all claims," strike "core claims as unallowable," "suspend[ ]" patent, or "advise[ ]" defendant of those actions.

1 Cases that cite this headnote

[11]    **Federal Civil Procedure**  ⚖  Motions; time for filing

Plaintiff patent owner sufficiently attempted to mitigate situation before seeking intervention from court, and thus did not act improperly by filing motion for sanctions against defendant competitor for its intentional and bad faith publishing of patently misleading press release about court's rulings on nationally available, widely-read Internet site, where plaintiff had sent clear proposed retraction for defendant to publish but defendant refused to print it, and, instead, offered to print its own clarification that plaintiff deemed insufficient, and parties were not able to quickly resolve that issue, and press release contained damaging information and continued to be available without retraction.

[12]    **Federal Civil Procedure**  ⚖  Gag orders and similar restraints

Courts may disallow prejudicial extrajudicial statements by litigants that risk tainting or biasing the jury pool through imposition of a "gag order."

4 Cases that cite this headnote

[13]    **Constitutional Law**  ⚖  False Statements in General

False and misleading statements are not protected by the First Amendment. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

[14]    **Injunction**  ⚖  Telecommunications

Court had authority to enjoin patently misleading press release about court's rulings on nationally available, widely-read Internet site, particularly since it potentially could have tainted impartiality of jury.

3 Cases that cite this headnote

[15]    **Federal Civil Procedure**  ⚖  Inherent authority

**Federal Civil Procedure**  ⚖  Misrepresentation or omission of facts

**Federal Civil Procedure**  ⚖  Monetary Sanctions

Court had inherent authority to impose sanctions, including attorneys' fees, under its inherent authority, for defendant competitor's intentional and bad faith publishing of patently misleading press release about court's rulings on nationally available, widely-read Internet site.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*619** Bernard Joseph Dimuro, Dimuro Ginsberg & Mook PC, John Minh Tran, Alexandria, VA, Erik Paul Belt, Kerry L. Timbers, Meredith Lee Ainbinder, Bromberg & Sunstein LLP, Boston, MA, Conrad Moss Shumadine, Willcox & Savage PC, Norfolk, VA, for Plaintiff.

Ernest Dorchester Buff, Harry Anagnostopoulos, Margaret Anne Lacroix, Theodore James Pierson, Jr., Ernest D. Buff & Associates LLC, Bedminster, NJ, Richard Johan Conrod, Jr., Stephen Edward Noona, Kaufman & Canoles PC, Norfolk, VA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RAYMOND A. JACKSON, District Judge.

Before the Court are two Motions for Sanctions filed by American Science and Engineering, Inc. ("Plaintiff"). These matters have been fully briefed and are ripe for judicial determination.

## I. FACTUAL AND PROCEDURAL HISTORY

This matter stems from Plaintiff's claims against Autoclear, LLC, Control Screening, LLC, and Scan–Tech Security, LP, **\*620** ("Defendants") alleging that Defendants have infringed certain patents, in violation of 35 U.S.C. § 271(a), (b), and (c), by manufacturing, using, offering to sell, and/or selling within the United States x-ray inspection systems and methods that are covered by one or more claims of Plaintiff's parents.

On September 13, 2007, Plaintiff filed a Complaint, sent Defendants a courtesy copy that same day, and formally served Defendants on October 3, 2007. On October 26, 2007, the Clerk filed an entry of default against Defendants, and Plaintiff moved for default judgement on November 9, 2007. On November 9, 2007, Defendants filed an Answer to the Complaint and a Motion to Set Aside Entry of Default. On May 1, 2008, the Court conducted a hearing and denied the Motion for Default Judgment. On October 23, 2008, Plaintiff filed a Motion for Sanctions concerning alleged misrepresentations made to the Court ("First Motion"). On November 19, 2008, Plaintiff filed an Emergency Motion for Sanctions concerning the issuance of an allegedly false and misleading press release ("Second Motion"). On December 4, 2008, the Court conducted a hearing on these two motions for sanctions.

## II. LEGAL STANDARD

[1]   [2]   [3]   Courts have inherent power to impose sanctions on a party for bad faith conduct that offends the legal process. *Chambers v. NASCO,* 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (explaining that inherent power is not displaced by statutory sanctions, because where "each of the other mechanisms reaches only certain individuals

or conduct, the inherent power extends to a full range of litigation abuses"). If the conduct in question could be adequately sanctioned under the Rules, a court should ordinarily use the rule, but "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50, 111 S.Ct. 2123. Such sanctions may include assessing fees and costs, excluding evidence or defenses, or even the dismissal of a party's claims. *See, e.g., Carefirst of Md., Inc. v. First Care, P.C.,* 422 F.Supp.2d 592, 597–600 (E.D.Va.2006); *Macias v. Target Stores Inc.,* 188 Fed.Appx. 210, 211–13 (4th Cir.2006); *Price v. First Star Mortgage,* No.2:03cv568, 2006 WL 2381921, at *3 (E.D.Va. Aug.15, 2006), *aff'd,* 296 Fed.Appx. 369 (4th Cir.2008).

[4]   Generally, the Court must find that the party acted in "bad faith" before the Court invokes its inherent powers. *See Chambers,* 501 U.S. at 49–50, 111 S.Ct. 2123. Bad faith may be found in the "conduct of the litigation." *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (quoting *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)).

## III. DISCUSSION

### A.   First Motion for Sanctions: Defendants' Misrepresentations to the Court

[5]   Plaintiff has alleged that Defendants made material misrepresentations to the Court in order to avoid default, which Plaintiff has only recently discovered and were unknown to Plaintiff and the Court when Plaintiff argued its Motion for Default Judgment in May. Specifically, Plaintiff argues that while Defendants avoided default judgment by claiming that they did not have representation until after the default was entered, Defendants in fact had counsel working on the defense of this matter. (Pl's 1st Mot. Sanctions, 1.) Therefore, Plaintiff contends that Defendants' claims of inadvertence and mistake were made disingenuously, and that Defendants have misled the Court and multiplied **\*621** the issues in the litigation. (Pl's 1st Mot. Sanctions, 1.)

Specifically, Plaintiff contends that on October 4, 2008, the day after Defendants were served with the Complaint, Defendants' CEO, Mr. Bradley Conway, instructed Autoclear's longtime patent prosecution counsel, Mr. Ernest Buff, to perform a validity search to find prior art that could be used to challenge the validity of one of Plaintiff's patents at issue. (Pl's Mem. Supp. 1st Mot. Sanctions, 3.) Additionally,

American Science and Engineering, Inc. v. Autoclear, LLC, 606 F.Supp.2d 617 (2008)

Plaintiff alleges that Mr. Conway discussed the pending litigation and defense strategy on numerous occasions, both internally and with Mr. Buff, during the period between receiving the Complaint and the date the answer was due. (Pl's Mem. Supp. 1st Mot. Sanctions, 3.) Plaintiff also contends that there is no evidence to show that Defendants actually interviewed or contacted other counsel, despite Defendants' argument in their Motion to Set Aside Default that they required time to do so. (Pl's Rep. 1st Mot. Sanctions, 4–5.) Plaintiff learned of these matters during discovery, and has provided the Court with Defendants' privilege logs in support of its motion. Plaintiff argues that Defendants' delay was not motivated by a need to find counsel, but instead, to buy time to design around Plaintiff's patent. (Pl's Mem. Supp. 1st Mot. Sanctions, 6–7.)

Defendants counter that they have "repeatedly and sincerely admitted mistake in failing to respond to Plaintiff's complaint within the procedural time frame...." (Defs' Mem. Opp. 1st Mot. Sanctions, 1.) Defendants aver that they did not retain defense counsel for this litigation until after becoming aware of the entry of default; Mr. Buff (defense counsel) and Mr. Stephen Noona (local counsel) were retained on November 6, 2008 and November 9, 2008, respectively. (Defs' Mem. Opp. 1st Mot. Sanctions, 2–3.) Defendants argue that prior to the execution of the November 6 retainer agreement, Mr. Buff was acting only in his capacity as Defendants' prosecution counsel rather than as litigation defense counsel. (Defs' Mem. Opp. 1st Mot. Sanctions, 4.) Defendants further contend that after Mr. Buff's law firm discovered the entry of default, Defendants decided to retain Mr. Buff as defense counsel. (Defs' Mem. Opp. 1st Mot. Sanctions, 6.) Additionally, Defendants argue that the privilege log entries show only that "Defendants were strategizing and preparing for settlement discussions—which, if failed, would unfortunately result in litigation," and that Mr. Buff's involvement in these communications was only as patent prosecution counsel. (Defs' Mem. Opp. 1st Mot. Sanctions, 7–8.) Finally, Defendants argue that they had no ulterior motive for delaying the proceedings, because they became aware of distinguishing features of their designs in 2002 rather than during the delay in 2007. (Defs' Mem. Opp. 1st Mot. Sanctions, 8–9.)

 [6]    [7]    According to Rule 55(c) of the Federal Rules of Civil Procedure, the Court may set aside the entry of default when good cause is shown. "[A] court should ordinarily set [an entry of default] aside unless the movant either fails to present a reasonable excuse for his neglect or fails to show he

has a meritorious defense to the merits of the action." *Moran v. Mitchell*, 354 F.Supp. 86, 87 (E.D.Va.1973). Generally the Court should set aside the default "where the moving party acts with reasonable promptness and alleges a meritorious defense." *Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir.1967). Other factors the Court may consider are "the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory  **\*622** action, and the availability of sanctions less drastic." *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204–05 (4th Cir.2006). At issue here are Defendants' representations regarding their promptness and reasonable excuse for neglect.

In opposing default judgment, Defendants essentially argued: (1) that Mr. Conway and Autoclear were unsophisticated with respect to patent litigation and had never before hired out-of-state litigation counsel, (2) that Autoclear had difficulty obtaining defense counsel and subsequently preparing defenses but did so promptly after the default, and (3) that Defendants had some confusion "caused by Plaintiff stopping and starting matters" and mistake regarding the date the answer to the Complaint was due. (Defs' Mem. Supp. Mot. Set Aside Default, 2, 5; Conway Decl., ¶¶ 3–5.) At the default hearing, the Court determined that the first argument was false: Mr Conway is an attorney, Autoclear had been involved in patent litigation before, and Mr. Conway had retained litigation counsel. The Court admonished Mr. Conway for his "reckless disregard for the facts" and warned him that his future representations would be viewed "very keenly." (Default Hr'g Tr., 29.)

In considering the motion for default judgment and the motion to set aside the entry of default, the Court relied on Defendants' second argument, that Defendants had acted reasonably and promptly in the three weeks between discovering the default and seeking to vacate it. (Mem. Op. & Order, Docket No. 55, 6.) The Court relied on Defendants' representations that defense counsel was retained and defenses were prepared only *after* discovering the entry of default. (Default Hr'g Tr., 8–9.) Accordingly, on May 1, 2008,[1] the Court vacated the entry of default and denied the motion for default judgment.

The Court has since learned that, during the period between the filing of the Complaint and the entry of default, Defendants *did* have an attorney who was working on this case. In fact, Mr. Conway himself testified that he authorized Mr. Buff to perform a validity search, which would be useful

in potential settlement discussions and to defend the litigation in case "the proceeding would—would go further." (Conway Dep., 122–23). Additionally, there are multiple privilege log entries describing documents dated early to mid-October, with descriptions such as "notes taken of attorney's instructions in meeting with attorney after lawsuit," and "upon litigation, attorney requested scientist to review and comment on patents," and "notes taken from attorney in meeting ... include ... patent invalidity grounds." (Ex. F to Pl's Mem. Supp. 1st Mot. Sanctions). Defendants admit that these entries show that Defendants were "strategizing and preparing for settlement discussions—which, if failed, would unfortunately result in litigation." (Defs' Mem. Opp. 1st Mot. Sanctions, 7.)

Specifically, the Court has determined that: (1) Defendants had a long relationship with Mr. Buff, who was retained as patent prosecution counsel; (2) Mr. Buff was directed to explore defenses to the Complaint and consider settlement possibilities; and (3) Defendants, immediately following the entry of default, officially retained Mr. Buff as litigation counsel.

**[8]**    Defendants' formalistic definition of Mr. Buff's role is not persuasive. Under the law, attorney-client relationships arise out of substance and intent, even in the absence of a written contract. *See Nicholson* **\*623** *v. Shockey,* 192 Va. 270, 64 S.E.2d 813, 817–18 (1951); *see also* Restatement (Third) of The Law Governing Lawyers § 14 (2000) ("A relationship of client and lawyer arises when a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person and either the lawyer manifests to the person consent to do so or the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.").

While Defendants contend that Mr. Buff was not "retained" as "litigation" counsel, the Court finds that Defendants had an attorney-client relationship with Mr. Buff, that Mr. Buff actually worked on this case prior to the entry of default, that Mr. Buff understood the significance of the Complaint and Defendants' duty to answer it, and that Mr. Buff was ultimately officially retained as litigation counsel approximately ten days after the entry of default. Accordingly, the Court finds that Defendants' argument is entirely devoid of substance. The Court believes that if Defendants had the time and sophistication to have an attorney research settlement possibilities and defenses to the Complaint, they certainly

had time to answer it. Furthermore, the Court finds that Defendants' statements that they had trouble securing counsel were disingenuous and misleading.

Had the Court been aware of these facts before the Court vacated the entry of default and denied the motion for default judgement, the Court would not have been persuaded that Defendants had acted with diligence. Therefore, the Court would not have granted Defendants' motion to set aside the entry of default.

The Court concludes that Defendants clearly exercised bad faith in their dealings with the Court. Defendants deliberately withheld from the Court information related to their activities after receiving the Complaint, and such information was material to the Court's determination. Moreover, this information was withheld even after the Court reprimanded Mr. Conway, during the default judgment hearing, for making patently false assertions in his affidavit attached to the Motion to Set Aside Entry of Default. (Default Hr'g Tr., 29.) The Court also warned counsel that "this Court takes very seriously chicanery and deception, and that's what you need to address." (Default Hr'g Tr., 17.) Additionally, the Court instructed Mr. Buff that "[the Court] just want[s] to be sure that [it] is given accurate information." (Default Hr'g Tr., 21.) Despite this clear admonishment from the Court, Defendants did not fully disclose their prior relationship with Mr. Buff and the work performed on this case prior to the entry of default.

**[9]**    Given the gravity of Defendants' misconduct, the Court finds that sanctions are appropriate. The Court has considered vacating its earlier Memorandum Opinion and Order setting aside the entry of default, and therefore granting default judgment; however, the Court has determined that less severe sanctions will suffice. Drawing on its inherent power,[2] the Court orders Defendants to reimburse Plaintiff for attorneys fees and costs, to include, but not limited to, travel and lodging expenses, incurred in connection with: (1) Plaintiff's Motion for Default Judgment, Defendants' Motion to Set Aside Entry of Default, and the Default Hearing, **\*624** and (2) Plaintiff's First Motion for Sanctions. Moreover, the Court exercises its inherent discretion to strike Defendants' First, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Separate Defenses asserted in the Amended/Supplemental Answer filed on August 11, 2008. These Defenses are stricken such that Defendants cannot directly or indirectly rely on them.

**B. Second Motion for Sanctions: Defendants' Misleading Press Release**

 **[10]**    In a separate motion, Plaintiff has requested that the Court remedy another act of misconduct by Defendants, namely, the issuance of a false and misleading press release regarding this litigation. Specifically, Plaintiff alleges that on November 16, 2008 (a Sunday evening), Defendants issued a press release which reported that "a Federal District Court has rejected American Science and Engineering, Inc.'s motions for summary relief in their action with Control Screening, LLC, and AutoClear, LLC, its affiliate. The District Court also denied AS & E's motion for injunctive and other relief ... [T]he Federal Court did not sustain AS & E's objections to proceeding to full fact finding and a jury trial." (Ex. A to Pl's Mem. Supp.2d Mot. Sanctions.) The press release also states that "the U.S. Patent and Trademark Office (USPTO) has formally rejected all claims of AS & E's core ... patent" and that those patent claims are now invalid. (Ex. A to Pl's Mem. Supp.2d Mot. Sanctions.) Plaintiff alleges that Defendants issued the press release through the news release distributor Business Wire, and that the press release has been widely disseminated and is available to Plaintiff's investors and customers and to any potential members of a jury pool in this case. (Pl's 2d Mot. Sanctions, 1–2; Ex. B to Pl's Mem. Supp.2d Mot. Sanctions.) Plaintiff further states that these misstatements have harmed AS & E's reputation and may even negatively impact the company's stock price. (Pl's 2d Mot. Sanctions, 2.)

Defendants contend that they acted in good faith and expeditiously to correct the press release, and that Plaintiff failed to mitigate after Defendants clearly demonstrated their willingness to cooperate without the need for judicial intervention. (Defs' Opp. 2d Mot. Sanctions, 2.) Defendants aver that they issued a clarification statement on Business Wire within three days after the initial press release was issued, and that such statement was very similar to the redaction previously proposed by Plaintiff. (Defs' Opp. 2d Mot. Sanctions, 3–4; Ex. A to Defs' Opp. 2d Mot. Sanctions.) Defendants further argue that they would have willingly continued to work with Plaintiff to resolve this issue in a timely manner, but that Plaintiff instead filed this motion. (Defs' Opp. 2d Mot. Sanctions, 4–5.) Finally, in support of their clarification statement, Defendants argue that "a 'lay person' of the kind who reads press releases on Business Wire would likely be able to appreciate the difference between 'summary judgment' and 'summary relief.' " (Defs' Opp. 2d Mot. Sanctions, 7.)

The Court finds that the statement that "[the Court] has rejected [Plaintiff's] motions for summary relief" improperly suggests that the Court has denied Plaintiff's motion for summary judgment or otherwise ruled on the merits of the case. Plaintiff has not even filed a motion for summary judgment, and the Court has not yet ruled on the merits of the case, including on the infringement or the validity of the two patents at issue. Defendants have filed a motion for partial summary judgment, but the Court has not yet addressed that motion. The Court also finds the statements regarding the USPTO's actions are false. While the USPTO has agreed **\*625** to reexamine Plaintiff's claims, it has not "formally rejected all claims," "struck AS & E's core ... claims as unallowable," "suspended" Plaintiff's patent, or "advised" Defendants of those actions. Accordingly, the Court finds that Defendants' press release contains false, misleading, and damaging statements, and that Defendants have acted improperly.

At the hearing, Plaintiff argued that Defendants have neither denied that the press release contained false and misleading information, nor have they offered a single excuse for its issuance. Plaintiff further averred that as a publicly traded company, it was damaged by misleading information available on popular financial internet publications, and that some of their investors did read the press release and called the company with concerns. Furthermore, Plaintiff argued that such nationally available information has the potential to influence any potential jury pool in this case. Defendants countered that Plaintiff did not sufficiently mitigate the situation before seeking intervention from the Court. Defendants contended that they quickly offered to print a clarification, which Plaintiff rejected, and that before they could offer a new version, Plaintiff filed the motion for sanctions.

 **[11]**    The Court finds that Plaintiff sent a clear retraction to Defendants, which Defendants refused to print. Instead, Defendants offered to print their own clarification, which Plaintiff deemed insufficient. As the parties were not able to quickly resolve this issue, and the press release containing damaging information continued to be available without retraction, the Court finds that Plaintiff did not act improperly by filing this motion with the Court. Moreover, the Court is far more concerned with the actions of Defendants than those of Plaintiff.

At the hearing, Defendants explained that the press release was meant to convey that the Court vacated

the entry of default, and that any misleading statements were unintentional and the result of Defendants' oversight. Defendants' attorney, Mr. Buff, stated that he had edited an earlier version of the press release. Mr. Buff speculated that Mr. Conway issued the press release, but could not state so with certainty.[3] The Court finds that both Mr. Buff and Mr. Conway are attorneys, that both are deemed capable of understanding the difference between default judgment and summary judgment, and that it is difficult for the Court to believe that the issuance of this press release was accidental. It is incredible that Defendants would issue a press release concerning the Court's denial of default judgment, which occurred in May 2008, approximately six months after the Court's ruling. Additionally, Defendants do not provide any excuse for the misleading statements about actions taken by the USPTO.

Accordingly, the Court concludes that Defendants issued the objectionable press release intentionally and in bad faith. Furthermore, even if the misstatements were unintentional, the Court finds that the issuance of a patently misleading press release on a nationally available, widely-read internet site is completely irresponsible.

 **[12]**   **[13]**   **[14]**   **[15]**   The Supreme Court has held that civil litigants have a constitutional right to an impartial jury. *Thiel v. S. Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). Courts may disallow prejudicial extrajudicial statements by litigants  **\*626**  that risk tainting or biasing the jury pool. *United States v. Brown,* 218 F.3d 415 (5th Cir.2000). Additionally, false and misleading statements are not protected by the First Amendment. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("False statements of fact harm both the subject of the falsehood *and* the readers of the statement"); *Cornwell v. Sachs,* 99 F.Supp.2d 695, 708 (E.D.Va.2000) ("An injunction that restrains only false or misleading commercial speech 'is consistent with the First Amendment' ") (quoting *In re Corey,* 892 F.2d 829, 839 (9th Cir.1989)). Accordingly, the Court has authority to enjoin false statements, particularly those that could potentially taint the impartiality of a jury. Additionally, the Court has inherent authority to impose sanctions, including attorneys' fees, under its inherent authority. *Chambers,* 501 U.S. at 55–58, 111 S.Ct. 2123.

The Court finds that publishing false information about the Court's rulings is egregious and vexatious misconduct

justifying the imposition of sanctions. Accordingly, the Court grants the following relief requested by Plaintiff:

(1) Within 24 hours of his Order, Defendants shall cause the removal of the November 16th press release from Business Wire and any other website which Defendants know are displaying the November 16th press release;

(2) Defendants shall issue a corrected press release, in the form of Plaintiffs Exhibit D to its Memorandum in Support of its Motion for Sanctions, and shall disseminate it in the same manner:hat the November 16th press release was disseminated;[4]

(3) To the extent that Defendants are or become aware of instances of dissemination by any third party of the November 16th press release or any article or publication based on the press release, Defendants will take the necessary steps to provide the corrected release to he publisher within 24 hours of notice;

   (4) Within 5 days of this Order, Defendants shall file a statement with the Court stating what steps it has taken to comply with this Order; and

   (5) Within 14 days of this Order, Defendants shall pay to AS & E the sum of $10,000 as partial reimbursement for the attorneys' fees incurred by AS & E as a result of the issuance of the November 16th press release.

Finally, the Court orders Defendants to reimburse Plaintiff for all attorneys' fees and costs associated with bringing the Second Motion for Sanctions, including any such fees and costs not covered by the $10,000 requested by Plaintiff.

The Court further finds that these incidents are part of a deliberate pattern of deceit by Defendants throughout this litigation. The Court finds at least four instances of Defendants' deceptive behavior. First, Mr. Conway made numerous misrepresentations in his November 19, 2007 affidavit regarding his experience with patent litigation and hiring litigation counsel. Second, Defendants withheld information about their representation and activities prior to the entry of default, and the Court relied upon these misrepresentations in granting Defendants' Motion to Set Aside Entry of Default in May 2008. Third, in June 2008, Mr. Conway claimed status as inside counsel, despite stating in his November 19, 2007 affidavit that he  **\*627**  has "only practiced law full time for one year of [his] life," in

1981, that he has "never personally handled any litigation matter before any court in any capacity as an attorney," and that "any legal involvement that [he has] with [his] companies is minimal."[5] (Conway Decl., ¶ 2.) Because of Defendants' improper tactics, the Court granted Plaintiff's protective order[6]. Finally, in November 2008, Defendants filed a misleading, unnecessary, and damaging press release about the status of the litigation. All of these actions were intended to inappropriately influence this litigation. The second and fourth instances of misconduct are the subjects of the Court's sanctions in this Memorandum Opinion and Order.

## IV. CONCLUSION

For the reasons stated above Plaintiff's First Motion for Sanctions is **GRANTED.** Defendants are **ORDERED** to reimburse Plaintiff for attorneys fees and costs, to include, but not limited to, travel and lodging expenses, incurred in connection with (1) Plaintiff's Motion for Default Judgment, Defendants' Motion to Set Aside Entry of Default, and the Default Hearing, and (2) Plaintiff's First Motion for Sanctions. In addition, Defendants' First, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Separate Defenses asserted in the Amended/Supplemental Answer filed on August 11, 2008 are **STRICKEN.**

Plaintiff's Second Motion for Sanctions is also **GRANTED.** Defendants are **ORDERED** to take corrective action on the press release as indicated above and to pay Plaintiff's attorneys fees and costs associated with bringing the Second Motion for Sanctions.

Plaintiff is further **ORDERED** to file a statement of its fees and costs within thirty (30) days of the date of this Memorandum Opinion and Order.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel.

**IT IS SO ORDERED.**

### All Citations

606 F.Supp.2d 617

## Footnotes

1   The Court ruled from the bench on May 1, 2008 and issued a Memorandum Opinion and Order consistent with its rulings or May 23, 2008.

2   The Court relies on its inherent power rather than Rule 11, which reaches a narrower range of conduct, or 28 U.S.C. § 1927, which applies only to attorneys. *See Chambers,* 501 U.S. at 50, 111 S.Ct. 2123 (stating that "if in the informed discretion of the Court, neither the statute or the Rules are up to the task, the Court may safely rely on its inherent power").

3   As Mr. Conway did not attend the December 4, 2008 hearing, and the pleadings did not address the matters of who issued the press release or for what purpose, the Court could not press further on those matters.

4   At the hearing, the Court ordered Defendants to issue Plaintiff's correction within forty-eight (48) hours of the hearing.

5   Mr. Buff also stated at the Default Hearing that "[Mr. Conway] was at all times acting and trying to act as a fact-finder, not acting as an attorney in that sense...." (Default Hr'g Tr., 20.)

6   On October 15, 2008, the Court granted Plaintiff's Protective Order, filed July 17, 2008. The Court found that Mr. Conway could not be treated as Defendants' inside counsel, that Plaintiff's counsel was appropriate acting as inside counsel, and that the levels of confidentiality proposed by Plaintiff were appropriate.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATION OF SERVICE

I hereby certify that on June 18, 2021, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.

By  */s/ Craig J. Mariam*
Craig J. Mariam