Highly Confidential – Attorneys' Eyes Only

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 9:19-cv-80474-DMM
District Judge Middlebrooks, Magistrate Judge Brannon

SOLID 21, INC.,

     Plaintiff,

     v.

ULYSSE NARDIN, USA INC. A/K/A
ULYSSE NARDIN, INC.; and ULYSSE
NARDIN SA,

     Defendants.

**EXPERT REPORT OF DUVALL O'STEEN**

**OCTOBER 7, 2019**

Highly Confidential – Attorneys' Eyes Only

## I.      INTRODUCTION

1.      I have been retained by counsel for Solid 21, Inc. ("Solid 21") in the above-captioned

matter to provide an independent expert opinion on the market for fine jewelry and watches as it

pertains to Solid 21's RED GOLD® trademark.  To this end, I have been asked to analyze how

Ulysse Nardin's use of the RED GOLD® mark contributes to a likelihood of confusion among

consumers.

2.      This report contains my opinions based on information known as of the date of this

report, as well as my knowledge, education, training, and experience.  I reserve the right to

update or amend this report to the extent that additional information comes to light.

## II.     QUALIFICATIONS

3.      I am a jewelry industry veteran with 20 years of experience in the jewelry industry. I

currently serve as a writer, trend reporter, luxury communications consultant and publicist

specializing in the fine jewelry industry. Following more than a decade of service as the Director

of Jewelry PR & Promotion for the World Gold Council jewelry team in the U.S. office, I

established my own business providing expertise and creativity to mostly high-end jewelry

brands such as Yvel, Assael, PICCHIOTTI, Gemvara, Virtual Diamond Boutique and more

seeking to promote their brands and grow their market in the U.S. I specialize in public relations,

copy writing, training and communications.

4.      I have conceived, written, produced and performed gold sales training tools, videos,

online interactive modules, as well as brand publications (magazines, blogs, etc.).  I have

extensive media training and have appeared as an expert guest on QVC, Shop NBC and Jewelry

Television. I was a regular contributor to *InStore* magazine's Style Counsel trend column, and I

Highly Confidential – Attorneys' Eyes Only

have been quoted in various fashion features in a wide variety of publications from *InStyle* to the *Wall Street Journal*.

5.      I worked at the World Gold Council ("WGC") for over a decade, from June 1999 to December 2010.  The WGC is the market development organization for the gold industry. It works across all parts of the industry, from gold mining to investment, with the goal of stimulating and sustaining demand for gold.[1]  The WGC is headquartered in London, and has offices in India, China, Singapore, Japan and the United States,[2] where I worked.  During my tenure at WGC, I was responsible for trend-tracking, any and all product development initiatives, retail promotions, gold jewelry sales training, public relations, special events and more. Towards this end, I was intimately familiar with consumer magazines and brand websites.  I regularly attended trade shows to note trends in fine jewelry and luxury watches.

6.      At WGC, I also supported and assisted with co-op advertising campaigns, sponsored events and PR initiatives, working closely with large and small jewelry/watch brands like David Yurman, John Hardy, Ippolita, Robert Lee Morris, Roberto Coin, Tissot Watches and more, as well as retail brands across all distribution channels, from the high end with stores like Nieman Marcus and Saks Fifth Avenue, as well as mass market brands like Kay Jewelers, Zales, Wal-Mart, Sam's Club, etc. I performed frequent and systematic market research, which required familiarity with print advertising from luxury watch brands like Patek Phillipe, Rolex, Ulysses Nardin, etc. for comparing with WGC advertising campaigns.

7.      I also co-conceived and produced the nationwide "May is Gold Month" retail promotion which is still in existence to this day, now managed by the Richline Group and its broad network

---

[1] World Gold Council, Who We Are, http://www.gold.org/who-we-are.
[2] World Gold Council, Our offices, https://www.gold.org/who-we-are/our-offices.

Highly Confidential – Attorneys' Eyes Only

of retail partners.  I have worked with a wide variety of companies from start-ups to seasoned veterans and huge international conglomerates. If there was a trend emerging in any segment of the market, whether it be fashion/style related or retail/promotion related (e.g. popularity of rose gold luxury watches, the rise of flash sale sites like Gilt.com, "dirty gold,"  "conflict diamonds," the high-end trend toward personal appearances, the rise of social media, etc.), I was aware of the trend, reporting on it and including such information in my team's regular reporting to the gold miners that sat on the board of WGC.

8.      I have also frequently traveled to jewelry retail stores across the country doing merchandising and training work on behalf of clients/brands, and I have traveled across the globe attending trade shows. I was invited by *National Jeweler* magazine to speak on an expert panel regarding US Jewelry trends at the Turkish Jewelry Show, and I have been attending the VicenzaOro and BaselWorld shows for many years.

9.      I am being compensated at a rate of $100 per hour, which is not dependent on the outcome of my opinions or this litigation.

10.      A copy of my curriculum vitae is included as Appendix 1, which includes a list of all publications I have authored in the past ten years and cases in which I have testified as an expert at trial or deposition within the past four years.

**III.    SUMMARY OF OPINIONS**

11.      I understand that in the Eleventh Circuit, the factors to consider whether an accused infringer's use of a trademark is likely to cause confusion are strength of the mark, similarity between the plaintiff's mark and the infringing use, similarity between the products offered by the two, similarity of sales and advertising methods, the accused infringer's intent, and actual confusion.

Highly Confidential – Attorneys' Eyes Only

12.     My opinions are that RED GOLD® is a strong brand that Solid 21 has built up extensively through its marketing and promotion efforts, including extravagant runway shows that generated major publicity, Solid 21 smartly promoting its mark through celebrity endorsements and association, as well as traditional print and Internet advertising.  Consumers of high-end luxury jewelry and watches have come to associate RED GOLD® with Chris Aire and Solid 21.

13.     Ulysse Nardin's use of "Red Gold" is not only identical to the RED GOLD® mark, but it is used in luxury watches that are directly competitive with those offered by Solid 21 and are advertised and sold to the same consumer base.  These factors weigh towards a conclusion that Ulysse Nardin's use of the mark at issue is likely to cause confusion with consumers.

14.     A list of documents on which I considered in forming my opinions is included as Appendix 2.

## IV.     THE ROLE OF BRANDS AND TRADEMARKS

15.     Trademarks serve to identify the origin of a product to consumers and differentiate the trademark owner from its competitors.[3]  The owner of a trademark has exclusive rights to use that trademark in commerce and these rights protect the trademark owner against imitation or undue association by competitors.

16.     Trademarks are a critical component of brands,[4] which identify a product or group of products sold by a single company and differentiate them from those of its competitors.  The trademarked elements of a brand can come to represent the brand's identity and are often among a company's most valuable assets.[5]

---

[3] RG_UN00035139-RG_UN00035729, p. 142.
[4] RG_UN00035793- RG_UN00035794.
[5] RG_UN00035139-RG_UN00035729, p. 21.

Highly Confidential – Attorneys' Eyes Only

17.     A brand serves to signal to consumers as to the quality and origin of a product and thus helps consumers choose between a wide range of alternatives available in the market. It is through the brand that a firm communicates consistency and delivers a promise to the consumer that they can rely on when making a purchase.  Accordingly, brands play a prominent role in consumers' purchase decisions.

18.     One of these roles is that brands reduce consumer search "costs" by saving consumers time and effort.[6] For instance, consumers might use familiar brand names to more efficiently browse the jewelry available at Saks Fifth Avenue. In addition, consumers are able to decide whether to buy a new product if it is associated with a brand that the consumer has purchased in the past or is otherwise familiar with.

19.     Along similar lines, brands can also signal a certain level of product quality. Such signals can be useful to consumers who have little prior experience with a given product. Consumers can justifiably assume that successful brands have maintained a consistent level of quality over a period of time.[7] In situations in which the quality of a given product is difficult for consumers to assess, brands can be particularly important indicators of product quality.[8]

20.     Some brands are able to engage customers by creating a bond between the consumer and the brand. Consumers come to associate these brands as part of their identity. Consumers purchase such products at least in part because they wish to associate their identities with certain features of a given brand.[9] For instance, a Rolex watch owner might derive satisfaction from the watch because it infers to others that the consumer is sophisticated and wealthy enough to be

---

[6] RG_UN00035139-RG_UN00035729, p. 142.
[7] RG_UN00035139-RG_UN00035729, p. 34.
[8] RG_UN00035139-RG_UN00035729, p. 34.
[9] RG_UN00035732- RG_UN00035763.

Highly Confidential – Attorneys' Eyes Only

able to afford such a luxury product. Brands can even act as symbolic devices that allow consumers to project their self-image, values, and personal traits.[10]

21.     Brands can also create loyalty among their customers and allow companies to sell similar products to retain existing customers. It takes much more effort and expense to acquire new customers than it does to retain existing customers. Retaining existing customers allows a brand to count on steady revenues and can form a barrier to competitors trying to increase their market share. Additionally, loyal customers are more likely to spread positive messages about the brand through word of mouth.

22.     Brand awareness can facilitate a purchase decision because consumers are more comfortable purchasing a product that carries a familiar brand. A brand does not have to have high awareness among the general population to be valuable, so long as it is known within it target market. It is generally understood that the more exclusive a product appears to be, the higher the value consumers will ascribe to it. Therefore, with luxury brands, the key is not necessarily to have broad awareness among the general consuming population but among the target market, in particular.

23.     Brand associations cue positive connections in consumers' minds and create value by, among other things, creating goodwill for the firm and affecting consideration, perceived quality, recommendation, loyalty, and purchase decisions.

24.     One of the most important benefits of a strong brand is that its products are often able to command a price premium, which in turn creates higher profit margins for the brand owner. Additionally, firms with strong brands typically generate more interest from investors.  For this reason, firms with strong brands can often access capital more cheaply.

---

[10] RG_UN00035139-RG_UN00035729, p. 35.

Highly Confidential – Attorneys' Eyes Only

25.     There are many other benefits created by having strong brands.  For instance, the stronger a brand and the more loyal its customers, the more forgiving they are of mistakes.  Strong brands are more likely to recover from setbacks and maintain sales.  Additionally, a firm can leverage a strong brand for the purposes of brand extensions, both across products (i.e., product line and product category extensions) and markets (i.e., new channels and geographic markets). Brand extensions can also maintain or renew interest in an existing brand.

26.     In luxury markets, brands are especially important and are often are the most important differentiating factor among competing products and companies.  Luxury brands are often brands that consumers identify themselves with. As mentioned above, consumers purchase such brands in order to align their personal identity with that of the brand. Luxury brands connect the prestigious, aspirational qualities associated with their brand to their customers' personal identities. Luxury brands are symbols that ennoble both the product and the bearer.

27.     Luxury brands that lose control of their identity can lose their cachet, and thus their ability to compete in this market. All of the above is especially true for those luxury brands that specialize in low volume and/or bespoke products. Solid 21's RED GOLD® pieces are very exclusive and are made in very small numbers, sometimes as low as 10 to 20 pieces per style. In fact, Chris Aire estimates that approximately 30% of RED GOLD® pieces are custom-designed and manufactured.[11] For these brands, each individual product's originality (and concomitant exclusivity) are central to the brand's appeal to consumers.

28.     If another company sells products that infringe on the trademarked items, then the trademark owner loses the ability to control the brand identity. The infringing company might decide to extend the brand in a way that reduces the value of the trademark or may simply not

---

[11] Conversation with Chris Aire.

Highly Confidential – Attorneys' Eyes Only

produce goods of the same quality as the original trademark owner. For example, if a low-end watchmaker tried to pass off their product as a Rolex watch, the Rolex brand could lose some of its cachet and, consequently, its brand equity.

29.     Luxury brands must maintain a balance between mainstream awareness and desirability on the one hand and limited sales and distribution on the other. In other words, luxury brands should be "desired by all but consumed only by the happy few."[12]  Because luxury brands are desired by many but purchased by few, black market operators prosper. Luxury brand owners often devote significant resources fighting these unauthorized transactions in order to preserve the value of their brands.

30.     Luxury brands target a small number of wealthy customers.  These are customers who can afford, and are willing to pay, the high prices commanded by luxury products in order to augment their personal identities.  The relatively small size, homogeneity, and exclusivity of a luxury brand's customer base creates a tendency for there to be a high degree of communication among its members.  This high degree of communication means information about luxury brands tends to be spread quickly through the relevant market by word of mouth advertising.

31.     Consequently, word of mouth advertising, which plays an important role in purchase decisions in many markets,[13] is especially impactful in shaping consumer perceptions of luxury brands.[14] This increases the importance of maintaining control over the management of a luxury brand's reputation and distinctiveness. Information that even a relatively small number of consumers are exposed to can spread rapidly through the target market.

---

[12] RG_UN00036335- RG_UN00036339.
[13]  RG_UN00035836- RG_UN00035847.
[14]  RG_UN00035848- RG_UN00035860.

Highly Confidential – Attorneys' Eyes Only

## V.      BACKGROUND ON THE RED GOLD® MARKET

### A.      Solid 21 and the RED GOLD® Brand

32.      Chris Aire is a well-known jeweler and jewelry designer. He is the owner of Solid 21 and operates under the name Chris Aire Fine Jewelry and Timepieces ("CAFJT"),[15] a company with its principal place of business in Calabasas, California.[16]  Solid 21 owns the RED GOLD® trademark in a class of goods which includes fine jewelry, watches among them.[17] Today, the majority of CAFJT's sales are obtained through sales Chris Aire makes personally with clients at events, trunk shows, and private meetings, but its products are also available online through its website, chrisaire.com, as well as on Amazon.[18] Prior to the summer of 2017, CAFJT sold products in the Chris Aire jewelry store in Beverly Hills and in multiple retail outlets, including Saks Fifth Avenue, Bailey Banks and Biddles, and Cadoro.[19]

33.      The RED GOLD® collection comprises a variety of jewelry, including watches, rings, bracelets, necklaces, cuff links, and dog tags, ranging from $405 to $260,000,[20] one of which is shown below.

---

[15] Throughout this report, any references to Solid 21 will include Chris Aire Fine Jewelry and Timepieces ("CAFJT") unless otherwise specified.
[16] RG_UN00034966-67.
[17] Complaint, Page 1.
[18] Conversation with Chris Aire;
https://www.amazon.com/s?rh=n%3A7141123011%2Cp_4%3AChris+Aire&ref=w_bl_sl_s_wa_web_7141123011.
[19] Conversation with Chris Aire.
[20] RG_UN00034997.

Highly Confidential – Attorneys' Eyes Only



34.     Clientele for Chris Aire's Red Gold has included a host of high-profile celebrities, including Muhammad Ali, Jay-Z, and Allen Iverson.  The RED GOLD® collection has been featured in various award shows, including the Oscars and the Emmy's.[21]  RED GOLD® has been a registered trademark since December 16, 2003 and has achieved incontestable status on August 21, 2009.[22]

   **B.     Ulysse Nardin's Products**

35.     I understand that Ulysse Nardin, Inc. is a Florida-based company that distributes and sells Ulysse Nardin watches in the United States.  Ulysse Nardin SA, its Swiss parent company, manufactures these watches and sells them to Ulysse Nardin, Inc. to distribute in the United States.  Both companies are part of the Kering Group.  I understand that Ulysse Nardin products are offered through retailers, dealers, stores, and boutiques, including those in the United States.

---

[21] RG_UN00035033.
[22] Complaint.

Highly Confidential – Attorneys' Eyes Only

36.     Ulysse Nardin watches are squarely in the luxury watch market, including models such as their El Toro and Moonstruck watches.  Consumers can purchase these watches from prices ranging from more than $8,000 to more than $60,000.

## VI.    THE LIKELIHOOD OF CONFUSION ARISING FROM ULYSSE NARDIN'S USE OF THE RED GOLD® MARK

37.     When another company uses a brand or trademark without authorization, it often can result in harm to the brand or trademark owner. One way the use of a brand or trademark can lead to harm is through consumer confusion. Consumers may be confused about the source of a product or about one company's relationship to another. Consumer confusion is a crucial issue for brand owners because much of the value of brands is lost if consumers are confused about the origin of a product or are uncertain about whether a product is or is not related to a particular brand.

38.     Source confusion occurs when a consumer mistakenly believes that a product or service that bears another company's brand or trademark is produced or offered by the company that owns the brand or trademark. Furthermore, even when consumers are aware of the source of different products, the use of a brand or trademark can cause a consumer to mistakenly assume that there is some sort of business relationship between the two companies. This type of confusion can take many forms, including in cases in which consumers mistakenly believe that there exists a sponsorship or licensing agreement between two brands, when consumers mistakenly believe that the brand or trademark owner approved the use of its brand or trademark, or when consumers mistakenly believe that two companies are otherwise connected or affiliated. For instance, the presence of the RED GOLD® mark on advertising for a Ulysse Nardin watch could lead a consumer to believe that Ulysse Nardin and Chris Aire collaborated on a watch.

Highly Confidential – Attorneys' Eyes Only

39.     I was provided the likelihood of confusion factors by counsel that are used in the Eleventh Circuit.  They are as follows:

- Strength of the mark

- Similarity between the plaintiff's mark and the infringing mark

- Similarity between the products offered by plaintiff and defendant

- Similarity of sales methods

- Similarity of advertising methods

- Defendant's intent

- Actual confusion

### A.      Strength of the Mark

40.     The more recognizable a mark, the more likely consumers will be confused if they see that mark on another brand's products. Therefore, having a strong mark contributes to consumer confusion because the unauthorized use of the mark will lead consumers to be confused about the source, origin, sponsorship, license, approval, connection, or affiliation of the unauthorized products that bear the mark.

41.     As noted above, Solid 21 has owned the trademark registration on RED GOLD® on fine jewelry (including watches) since December 16, 2003.  Further, on August 21, 2009, the USPTO approved a Declaration of Use and Incontestability for the RED GOLD® mark. I understand from counsel that the existence of the trademark and the Declaration of Use and Incontestability provide Solid 21 with a presumption of having a strong mark.

42.     I have also reviewed marketing and advertising material that indicate that RED GOLD® is a brand that has received significant investment of both time and resources from Chris Aire.

Highly Confidential – Attorneys' Eyes Only

CAFJT has sold products marketed under the RED GOLD® brand since 1989.[23] Since that time, the trademark has been used in advertising, other promotional material and live fashion events, and media coverage of the brand.

43.     CAFJT has advertised the RED GOLD® brand and associated products in multiple publications.  Below is an example of an ad from a 2019 issue of Robb Report.[24]

---

[23] Conversation with Chris Aire.
[24] RG_UN00034952-53.

Highly Confidential – Attorneys' Eyes Only



The highly coveted Chris Aire Parlay watch series
from our exquisite signature RED GOLD® collection.

44.     The below shows a RED GOLD® ad from a 2002 edition of Vibe Magazine.[25]

---

[25] RG_UN00035865-66.

Highly Confidential – Attorneys' Eyes Only



45.     The below shows the first page of a two-page ad from a 2006 edition of Source

Magazine.  Note the RED GOLD® mark and jewelry contrast to the largely black and white

ad.[26]

---

Highly Confidential – Attorneys' Eyes Only



46.     The below shows a RED GOLD® ad from an August 2005 edition of Southwest

Airlines' Spirit magazine.  The ad features the RED GOLD® mark prominently at the top of the

page.[27]

---

[27] RG_UN00035867-70.

Highly Confidential – Attorneys' Eyes Only



47.      The RED GOLD® mark has also been featured on television.  It was advertised in a 60-second television commercial that ran on CNN in 2010.[28]  The ad shows two models dancing while wearing pieces from the RED GOLD® collection.  During the ad, the narrator says: "Gorgeous, elegant, stunning, exclusive, and timeless.  Chris Aire RED GOLD® Collection available now.  RED GOLD® is a registered trademark of Solid 21 Inc."  The final frame from this ad is shown below.

---

[28] RG_UN00036340.

Highly Confidential – Attorneys' Eyes Only



48.     CAFJT and Solid 21 have also promoted the RED GOLD® brand through fashion shows. CAFJT's first fashion show was in 2004 during New York Fashion Week.  This fashion show was the first ever all-jewelry show.  The show was broadcast on MTV live, and jewelry was modeled by supermodels (including Naomi Campbell, May Andersen, Rosie Hunting-Whiteley, and Tyson Beckford), NBA athletes (including Vince Carter, Damon Stoudamire, Mark Jackson, Antwan Jamison, and Elton Brand), and musicians (including Nelly and Wyclef Jean).  Many celebrities were in attendance, including tennis stars Serene and Venus Williams, Metallica Drummer Lars Ulrich, and actress Connie Nielson.  The show featured multiple pieces of RED GOLD® jewelry, including a halter top worn by Naomi Campbell that cost over $10 million.[29] The image below shows a page from a Chris Aire catalog depicting Naomi Campbell wearing this halter top at the 2004 Chris Aire fashion show in New York.[30]

---

[29] RG_UN00035892-94; https://www.blabbermouth.net/news/lars-ulrich-and-connie-nielsen-attend-chris-aire-fashion-show/.
[30] RG_UN00035895-36036, p. 131.

Highly Confidential – Attorneys' Eyes Only



NAOMI CAMPBELL IN DIVINE HALTER
The ultimate expression of desire and achievement, the Divine Halter is a testament to the beauty and exquisite brilliance of the woman it encapsulates. This headlining jewel sparkles with 235 handpicked round brilliant diamonds hand-crafted in 18 karat gold and platinum from our exquisite signature Red Gold Collection weighing a total 242.98 carats. The Divine Halter is valued at 10 million USD.

49.     CAFJT followed up the 2004 fashion show with two other shows in New York City, one in Las Vegas on the roof of Caesars Palace, one in Washington, D.C., and one in Beverly Hills. The shows featured RED GOLD® jewelry and extravagant RED GOLD® pieces, including a custom-made diamond gown that cost $41 million.[31]  A picture of this gown from a CAFJT catalog is shown below.[32]

---

[31] RG_UN00036044-47; RG_UN00036048-50; RG_UN00036051; RG_UN00036056; RG_UN00036060-62; RG_UN00036063-64; RG_UN00036065; RG_UN00036066; 2004 Fashion Show Program.
[32] RG_UN00035895-36036, p. 84.

Highly Confidential – Attorneys' Eyes Only



50.     The shows were attended by many celebrities, featured well-known sponsors (including MTV, World Gold Council, First Bank, GT Bank, Trau Brothers, Diageo), and were covered by multiple press outlets. For instance, the show featuring the RED GOLD® halter top by Naomi Campbell was described as the "best in show" in the New York Post's coverage of the event. The New York Post wrote that "Naomi Campbell is walking in jeweler Chris Aire's show wearing the first gown made entirely out of the designer's signature red gold."[33]

---

[33] RG_UN00035892-94; RG_UN00036037-43; RG_UN00036044-47; RG_UN00036048-50; RG_UN00036051; RG_UN00036056; RG_UN00036060-62; RG_UN00036063-64; RG_UN00036065; RG_UN00036066; 2004 Fashion Show Program.

Highly Confidential – Attorneys' Eyes Only

51.  CAFJT marketed the RED GOLD® trademark in promotional material before and after the fashion shows. The Las Vegas show was titled, "RED GOLD® RUSH," and advertised the fact that the show featured pieces from the RED GOLD® collection, shown below.[34]



---

[34] RG_UN00036065.

Highly Confidential – Attorneys' Eyes Only

52.     Programs for the show also featured the RED GOLD® mark and highlighted specific pieces from the RED GOLD® collection, shown below.[35]



53.     Similarly, materials sent to potential sponsors included the RED GOLD® trademark. The materials mentioned the $41.1 million RED GOLD® dress, Ellen DeGeneres in a RED GOLD® chain, and Muhammad Ali in a RED GOLD® watch.  Additionally, the materials for a 2008 show identified the benefits of being a "RED GOLD® Sponsor."[36]

54.     The many celebrities, including actors, entertainers, musicians, and athletes who purchase and wear RED GOLD® jewelry further increase the power of the RED GOLD® brand.  Having

---

[35] 2004 Fashion Show Program.
[36] RG_UN00036037-43; RG_UN00036066.

Highly Confidential – Attorneys' Eyes Only

celebrities wear and endorse a brand's jewelry is especially valuable in the fashion industry as the fashion choices of celebrities are frequently covered by the press.  In turn, the press coverage showing celebrities wearing a brand's jewelry helps increase the desirability and cachet of the brand.

55.     Celebrities that have worn RED GOLD® products are numerous and include Muhammad Ali, Ellen DeGeneres, Geena Davis, Allen Iverson, Jay Z, Will Smith, Eva Longoria, and many others.  Numerous pictures of celebrities wearing RED GOLD® products can be found in CAFJT's catalogs, including the late Muhammad Ali below.[37]



---

[37] RG_UN00035895-36036; *see also* https://chrisaire.com/pages/celebrity-sightings.

Highly Confidential – Attorneys' Eyes Only

56.     In fact, Muhammad Ali partnered with CAFJT (then known as 2 Awesome) to make a piece of RED GOLD® jewelry in the shape of boxing gloves.  This piece was signed by Ali and auctioned off at a 2002 RED GOLD® event to benefit the Muhammad Ali Parkinson Research Center, which can be seen below.[38]

# RED GOLD® FOR GOOD.



Featured Muhammad Ali Boxing Gloves. One of kind 18k gold from Chris Aire Signature Red Gold® collection. Signed by the G.O.A.T Muhammad Ali himself, with a certificate of authenticity. This pair of boxing gloves are micro pave set with 7.00 carats of round brilliant VVS1 D-F color diamonds.  All proceeds will benefit Muhammad Ali Parkinson Research Center. Truly a set to treasure.

57.     Further, numerous press outlets have covered celebrities wearing RED GOLD® jewelry.[39]

58.     The RED GOLD® mark is also prominently publicized through Internet marketing and advertising.  As it stands today main page of the CAFJT website (www.chrisaire.com) prominently features the RED GOLD® collection, which can be seen below.

---

[38] RG_UN00036067-68.
[39] *See, e.g.*, RG_UN00036069-75; RG_UN00036076-77; RG_UN00036078-78; RG_UN00036079; RG_UN00036080-87.

Highly Confidential – Attorneys' Eyes Only



59.     RED GOLD® has been continuously featured on CAFJT for many years, since at least 2002 if not longer.  An archived version from 2002 of Solid 21's former trade name's website (2 Awesome, found at 2AwesomeInt.com) shows RED GOLD® prominently featured even at that time, seen below.[40]

---

[40] RG_UN00035887-88.

Highly Confidential – Attorneys' Eyes Only



60.     CAFJT also heavily promoted RED GOLD® through social media.  Below are 2018

Facebook and 2019 Instagram posts, respectively, of RED GOLD®.[41]



---

[41] https://www.instagram.com/chrisairebeverlyhills/?hl=en (Sept. 3, 2019 Instagram post);
https://www.facebook.com/pages/category/Jewelry-Watches/Chris-Aire-Fine-Jewelry-Timepieces-
1707890336202974/ (August 29, 2018 Facebook post).

Highly Confidential – Attorneys' Eyes Only



61.     In addition to the website, the RED GOLD® mark is promoted in Solid 21's catalogs.

An example is seen below.[42]

---

[42] RG_UN00035895-36036, p. 12.

Highly Confidential – Attorneys' Eyes Only



PARLAY | 50mm Chronomatic

Time is idolized in the aesthetic splendor of the Parlay 50mm Chronomatic. This full pave diamond timepiece features three thousand, two hundred and seventy-seven (3,277) round diamonds of impeccable, color clarity and brilliance set in 18 karat gold from our exquisite signature Red Gold Collection. Total diamond weight is 25.84 carats.

62.     RED GOLD® was also promoted in point-of-purchase materials from the Beverly Hills store when it was open, seen below.[43]



---

[43] RG_UN00035891.

Highly Confidential – Attorneys' Eyes Only

63.     Unsurprisingly, the RED GOLD® mark has garnered extension press and media coverage.  For instance, it appeared in TV coverage from the Emmy's, a segment from CBS News Los Angeles, a segment from Fox 11's Good Day LA, a segment from The Sharon Osbourne Show, and on the TV show "Life of Luxury."[44]  Many articles have also been written about RED GOLD®, including that it is trademarked and "exclusive to Chris Aire."[45]

64.     Solid 21 has also expended resources and efforts towards policing unauthorized uses of the RED GOLD® mark.  In 2007, Solid 21 sent a cease and desist letter to Makur Designs due to Makur's use of the RED GOLD® mark on its jewelry.  Solid 21 successfully defended Makur's attempt to cancel the RED GOLD® trademark in the Patent & Trademark Office.[46] Concurrently, Solid 21 also notified the World Gold Council[47] ("the market development organization for the gold industry") of this unauthorized use because they were advertising partners with Makur. In response, World Gold Council acknowledged Solid 21's RED GOLD® trademark and agreed tto cease using the mark in advertising campaigns.[48]

65.     I understand that in 2011, Chris Aire and Solid 21 launched lawsuits over infringement of the RED GOLD® mark against a number of watch manufacturers, including Ulysse Nardin, Breitling, Hublot, and others. In 2011, Solid 21 was able to reach a settlement agreement with Kobold Watch Company to stop selling watches using the RED GOLD® mark.[49]  I also understand that in 2018, Solid 21 resolved its long-running litigation against Hublot of America (an LVMH subsidiary), who recognized the registration and incontestable status of Solid 21's RED GOLD® mark after the litigation concluded.[50]

---

[44] Conversation with Chris Aire.
[45] https://www.beverlyhillsmagazine.com/jewelry-watches/chris-aire-fine-jewelry/.
[46] RG_UN00004654-56; RG_UN00017133-41; RG_UN00010616; RG_UN00004653.
[47] https://www.gold.org/who-we-are.
[48] RG_UN00017133-41; RG_UN00036129-31.
[49] RG_UN00036132-36.
[50] Complaint, Ex. 4.

Highly Confidential – Attorneys' Eyes Only

66.     My review of the evidence shows that CAFJT has devoted significant resources to brand building. These activities include spending millions of dollars on marketing (including advertising and staging innovative runway shows), attracting sales and endorsements from numerous famous actors, athletes, and musicians, and generating media coverage. CAFJT has also protected its mark through defensive legal actions.

67.     Further, in my experience at World Gold Council, including systematic and frequent market research, I was not aware of "Red Gold" being regularly in use prior to Chris Aire's trademark in late 2003. I had never heard the term, nor seen it any jewelry or watch advertising, prior to meeting Mr. Aire in 2004-2005. As part of the World Gold Council jewelry team's research, we frequently perused fashion and lifestyle publications in search of trends, discovering new talent, comparing advertising creative to our own campaigns, and the like.  We also received many meeting requests, press releases and pitches about new gold products from industry professionals and public relations teams who sought our support or who desired to be a part of our promotional activities. It is safe to say that if "Red Gold" was being used in the market, my team at WGC would have come across it or been aware of it.

68.     Even today, CAFJT clearly does not the RED GOLD® mark to describe any particular alloy or look of a watch, but rather as branding.  For example, CAFJT's Parlay GMT Blue appears, as the name, suggests, blue, rather than any shade of red or gold.  Yet, it is part of the RED GOLD® collection, putting to bed any notion that "Red Gold" is used here descriptively.[51]

69.     The evidence provided in this case supports the conclusion that RED GOLD® is a strong brand.

---

[51] *See infra* ¶ 75.

Highly Confidential – Attorneys' Eyes Only

### B.      Similarity of the Marks

70.     The degree of similarity between the mark used by the trademark owner and the accused

competitor is a factor in determining likelihood of confusion.  The greater the degree of

similarity between these uses, the more likely there will be consumer confusion.

71.     Ulysse Nardin's use of "Red Gold" in the marketing and promotional materials for its

watches is identical to Solid 21's registered trademark.  The image below shows a 2010 Ulysse

Nardin ad in International Watch for one of its El Toro watches that uses "Red Gold."[52]

---

[52] *See, e.g.*, RG_UN00034950-51.  There are a number of similar Ulysse Nardin ads in various publications for a number of different models, including the El Toro and Moonstruck watches, placed in publications including Robb Report, Elite Traveler, etc.

Highly Confidential – Attorneys' Eyes Only



Highly Confidential – Attorneys' Eyes Only

72.     The image below is from Ulysse Nardin's 2007 watch collection catalog, which also shows the use of "Red Gold" in an identical manner to Solid 21's mark.[53]



73.     Ulysse Nardin's use of "Red Gold" is clearly identical to Solid 21's RED GOLD® mark, and thus its unauthorized use contributes to a likelihood of confusion.

    **C.      Similarity Between the Products Offered by Solid 21 and Ulysse Nardin**

74.     Another factor to consider whether consumers are likely to be confused is if the accused infringer uses the mark on the same or similar type of product as the trademark owner.  Here,

---

[53] UN0002089-231, p. 27.  The image quality of the produced document is less than ideal.

34

Highly Confidential – Attorneys' Eyes Only

Ulysse Nardin offers the same type of products – luxury watches – that the trademark owner

offers under its RED GOLD® mark.

75.     CAFJT sells a variety of luxury jewelry, including watches, under the RED GOLD®

mark.  These RED GOLD® watches are part of the luxury jewelry market and range in price

from approximately $6,325 to $250,000 dollars.[54]  The images below show some of the watches

that are marketed under the RED GOLD® collection.[55]



76.     Similarly, Ulysse Nardin uses "Red Gold" on their luxury watches, including models

such as El Toro, Moonstruck, and Perpetual Calendar.  These watches range in price from $5,355

to $67,200, with offerings from 2006 to 2018.[56]  Images of some of these watches can be seen

below.[57]

---

[54] Catalog Prices.pdf, chris-air-2_6_2013.pdf ("Catalogue").  I understand from Mr. Aire that the prices for RED
GOLD® products in the CAFJT catalogue have not changed significantly over time.  *See also* RG_UN00035028-32
(2017 RED GOLD® watch price range); https://chrisaire.com/search?q=red+gold+watch.
 (2019 RED GOLD® watch price range).
[55] *See, e.g.*, Capitoll Hill; Parlay GMT Blue; Aire Traveler.
[56] UN0002876.
[57] *See, e.g.*, UN0002089-231, p. 27; UN0002062; RG_UN00024370-71.

Highly Confidential – Attorneys' Eyes Only





77.     Third-party coverage of Ulysse Nardin products has also tied "Red Gold" to their

watches, further reinforcing how CAFJT and Ulysse Nardin compete with each other.[58]  A 2017

article in Watch Analyzer described a Ulysse Nardin watch as a "Ulysse Nardin North Sea

Minute Repeater Red Gold Watch."[59]

---

[58] This third party may also be confused as to "Red Gold's" association with Ulysse Nardin.
[59] RG_UN00025211-15.

Highly Confidential – Attorneys' Eyes Only

78.     It is clear that Ulysse Nardin's watches directly compete with CAFJT's in the same rarefied luxury market.  Thus, Ulysse Nardin's use of the RED GOLD® mark in the same market, and at the same or substantially similar price points, contributes to a likelihood of confusion among consumers.

### D.     Similarity of Sales and Advertising Methods

79.     Another factor to consider whether consumers are likely to be confused is when the accused infringer markets and advertises their products using similar methods and channels, where they will likely reach the same consumers.

80.     As discussed above, CAFJT has earned publicity and purchased advertising related to the RED GOLD® trademark in a variety of printed publications (like magazines) and television programs. Ulysse Nardin employs similar and oftentimes identical channel to market their watches using "Red Gold."  For example, CAFJT advertises in numerous luxury and watch publications, including Robb Report, Watch Time, International Watch, DuPont Registry, Wristwatch Annual, Source, Vogue, Savoy, and many others.[60]

81.      Likewise, Ulysse Nardin has advertised – including their "Red Gold" products – extensively in many of the same publications.  These include at least Robb Report, International Watch, Wristwatch Annual, and DuPont Registry.[61]  A comparison of CAFJT's RED GOLD® watch ad in Interntional Watch next to Ulysse Nardin's "Red Gold" watch ad in the same publication is shown below.[62]

---

[60] *See, e.g.*, RG_UN00034952-53; RG_UN00036249-50.
[61] *See, e.g.*, UN0002063; UN0002051; RG_UN00025216-20; RG_UN00034950-51.
[62] RG_UN00034950-51; RG_UN00036249-50.

Highly Confidential – Attorneys' Eyes Only



Highly Confidential – Attorneys' Eyes Only



82.     Both CAFJT and Ulysse Nardin also market and sell their watches online.  As discussed

above, consumers can purchase CAFJT's RED GOLD® watches through chrisaire.com and

Highly Confidential – Attorneys' Eyes Only

Amazon.  On the other hand, consumers can browse Ulysse Nardin's products through its website www.ulysse-nardin.com and purchase them through vendors such as Chrono 24, including those titled "Red Gold."[63]  CAFJT and Ulysse Nardin also promote their products through social media such as Facebook and Instagram.[64]

83.     CAFJT and Ulysse Nardin also sell to the same retailers.  For instance, retailers that have sold products from both companies include Westtime, Cadoro, and Horology.[65]  CAFJT also sells their RED GOLD® products to high-end retailers such as Saks Fifth Avenue.

84.     Additionally, for this type of rarefied market where the products are so pricey and so few of each watch are made,[66] the specific geographic location of where the sellers are is irrelevant. Customers who can afford such watches tend to travel all over and oftentimes buy such watches when they see a celebrity friend wear it or view it in a catalog.

85.     Thus, Ulysse Nardin clearly targets the same consumers as CAFJT by using the RED GOLD® mark on the same types of watches, advertised in the same manner, in many cases in the exact same publications, and sells them in the same places to the same consumers.  This weighs towards a likelihood of confusion.

E.      Ulysse Nardin's Intent

86.     Based on my review of the evidence, I believe that Ulysse Nardin's use of "Red Gold" on its watches was done with the intent to exploit the goodwill and cachet that CAFJT had built with the RED GOLD® mark.  As discussed above, before 2003 I had never heard of "Red Gold" used in this context and it was certainly not well-known in the field of fine jewelry and watches,

---

[63] https://www.chrono24.com/ulyssenardin/dato-compax-triple-calendar-datora-valjoux-72c-18k-red-gold--id4830743.htm.
[64] https://www.facebook.com/pages/category/Jewelry-Watches/Chris-Aire-Fine-Jewelry-Timepieces-1707890336202974/; https://www.instagram.com/chrisairebeverlyhills/?hl=en; https://www.facebook.com/UlysseNardinwatches/; https://www.instagram.com/ulyssenardinofficial/.
[65] UN0002035; UN0002035; *see also* conversation with Chris Aire.
[66] *See, e.g.*, UN0002034 (El Toro watch limited to 500 pieces).

Highly Confidential – Attorneys' Eyes Only

despite the fact that my full-time responsibilities ensured that I would be aware of any such developments. "Pink gold" and "rose gold" were the common descriptors used at that time, and are still used today. As discussed above, Chris Aire's development and promotion of the RED GOLD® brand, especially with his elite celebrity clientele, is what helped propel "Red Gold" into something that other companies like Ulysse Nardin would want to use – which they did.

87.     It is also clear that Ulysse Nardin does not use "Red Gold" in a descriptive sense. A review of internal emails shows that once they discovered that a "company in California" (undoubtedly Solid 21) was suing major Swiss watch companies for using "Red Gold," they simply changed all their ads and the like from using "Red Gold" to "rose gold."[67] This demonstrates that Ulysse Nardin could, and did, use "rose gold" interchangeably with "Red Gold"—and that "Red Gold" had no special meaning and did not relay anything descriptive about the material that was any different from "rose gold." Ulysse Nardin could have also used "pink gold" as an alternative. To the extent that Ulysse Nardin used "Red Gold" next to material aspects of the various watches, the intention appears to be to free ride off of the cachet of Solid 21's trademark, not to accurately describe its watches or their material.This demonstrates that Ulysse Nardin could and should have described their products (including the El Toro watch) as "rose gold" to begin with, but instead chose the term that had strong branding associated with it.

88.     Other evidence supports that Ulysse Nardin uses "Red Gold" on watches where it should be using "rose gold" instead. A 2017 Watch Analyzer article on a Ulysse Nardin watch describes it as a "Ulysse Nardin North Sea Minute Repeater Red Gold Watch."[68] Yet, the article goes on to indicate that this watch is available in either "18-karat rose gold" or "18-karat white gold" models – but not "red gold." As such, to the extent that "Red Gold" is some sort of

---

[67] UN0016808.
[68] RG_UN00025211-15.

descriptor, it is unclear why it is titled a "Red Gold" watch when it is anything but.  Because it is clearly not a descriptor here, the only reason "Red Gold" is used is to exploit the cachet and branding of the RED GOLD® mark.

89.     I understand that discovery is ongoing and reserve the right to amend my opinion should more evidence come to light.

### F.     Actual Confusion

90.     I offer no opinion as to consumers who were actually confused by Ulysse Nardin's use of "Red Gold," although I understand they exist.

### G.     Consumer Degree of Care

91.     While I understand that "consumer degree of care" is not necessarily a likelihood of confusion factor in the Eleventh Circuit, I understand that it is used in courts elsewhere and have been asked to opine on it here.

92.     Consumer involvement refers to the amount of care that goes into a purchase.  Despite the high price of RED GOLD® jewelry, there is likely a variation in the degree of care exercised by its target market. The target market for Solid 21's RED GOLD® watches and Ulysse Nardin's is a small and exclusive group of affluent consumers with high net worth – the price point speaks for itself.  Even though a $30,000 watch is a very expensive purchase to almost everyone, it may not seem excessively extravagant to the celebrities and socialites who purchase RED GOLD® watches.  The consumers who can afford such purchases are the "1%'ers" – those who are affluent enough that even a $30,000 purchase is nothing to them.  These consumers tend not to exercise a great degree of care when making such purchases because they are typically more interested in buying into the "cachet" that surrounds a successful brand.  As discussed above, CAFJT's RED GOLD® is well-associated with celebrities and consumers want to own "Red Gold" because they are aware of that association and wish to take part in it.

Highly Confidential – Attorneys' Eyes Only

93.     Further, even more careful consumers who are aware of the RED GOLD® brand and its association with Solid 21 and CAFJT may purchase a Ulysse Nardin watch believing that there has been some collaboration between Ulysse Nardin and Solid 21/CAFJT when none in fact exists.  Additionally, they may spread that mistaken belief to other potential purchasers.

94.     Thus, to the extent that consumer degree of care factors into the likelihood of confusion analysis, this factor would support a finding that consumers are likely to be confused.

**VII.   CONCLUSION**

95.     My analysis of the likelihood of confusion factors in regards to Ulysse Nardin's use of "Red Gold" in the marketing and sale of their watches weighs towards a finding of consumer confusion.


Dated: October 7, 2019


_Duvall O'Steen_
_____
Duvall O'Steen

# DUVALL O'STEEN

145 East 29th St, Apt 6C
New York, NY 10016
(917) 363-3724
duvallosteennyc@gmail.com

Duvall is a veteran of the fine jewelry industry, a luxury communications expert and freelance writer specializing in high-end jewelry.  Following more than a decade of service as the Director of Jewelry Public Relations & Promotion for World Gold Council, Duvall established her own freelance business providing expertise, creativity and innovation to fine jewelers worldwide seeking to promote their brands in the U.S. market. Duvall has conceived, written and produced sales training manuals, presentations and modules for the gold jewelry industry at large, as well as for specific high-end jewelry brands. She has extensive media training and has appeared as an expert guest in prime-time spots on QVC, Shop NBC and Jewelry Television. Duvall was a regular contributor to *InStore Magazine*'s "Style Counsel" column and has been quoted in various fashion features in a wide variety of national print publications including *W*, *InStyle*, *The Wall Street Journal*, and *Dallas Morning News,* among others.

With over 20 years of management experience in luxury brand communications, Duvall has worked with renowned brands such as Ben Bridge Jeweler, PICCHIOTTI, Assael, Yvel and many more. She excels in innovative copy writing, award-winning special event production, public speaking, brand-specific training and creative consumer communications.

## COMMUNICATIONS EXPERIENCE

**Freelance Luxury Communications Consultant**                **February 2011 to present**
Duvall O'Steen LLC
- Clients include *Yvel, Karizia, Marli New York, Christina Malle, Luxury Brand Group* (including *Assael, Picchiotti, Cirari, Ben Bridge Jeweler, the JCK Show, VicenzaOro, VTse, Virtual Diamond Boutique,* and *Gemvara*).
- Providing expert luxury marketing consulting to promote brand awareness, stimulate press exposure and ensure consistency of messaging across all consumer media.
- Social Media management, strategy and messaging.
- Luxury Copy Writing, including conception, management, writing and publication of branded blogs, magazines, marketing campaigns, brand identity tools, naming of new products, and website content.
- Branded Training, including developing content for brand-specific training of selling associates and live and video presentations.
- Brand Spokesperson, including personal appearances at selling events and broadcast retail appearances.

**Director, Jewelry PR & Promotion**                **June 1999 to Dec 2010**
World Gold Council
- Stimulated demand for gold jewelry in the US through strategic, research-based, integrated marketing and public relations initiatives. Achieved annual increases in US gold jewelry retail sales for eight consecutive years.
- Directed all public relations outreach for the gold jewelry category. Produced annual product catalogue, generating over 200 annual product placements, quotes and gold themed editorials in consumer magazines, reaching over 78 million impressions annually.

- Served as spokesperson and gold expert for broadcast television segments, including crisis public relations.
- Developed and produced annual nationwide retail promotions, achieving on-average double digit year-over-year sales growth in the gold category in the month of May for six years for over a dozen participating retailers.
- Conceived and produced celebrity campaigns, including consumer content initiatives, such as "Legendary Gold" with Debra Messing for *InStyle* magazine, and product development initiatives such as *Leaves of Change*™, a celebrity charity benefit featuring Susan Sarandon, Brooke Shields, and Whoopi Goldberg that generated millions of press impressions.
- Produced successful press, fashion and trade events, including trade show exhibitions, charity benefits, design competitions, trade seminars. Voted "best jewelry event at JCK" for three years.
- Developed and distributed sales training and retail Point-of-Sale materials, as well as web content for World Gold Council websites and social media.
- Regularly volunteered with public speaking, consulting, design competition judging or project management for industry associations such as Jewelry Design Professionals Network, Jewelers for Children charity, Jewelry Information Center, Women's Jewelry Association, and F.I.T., among others.  Nominated for Women's Jewelry Association Award for Excellence in 2007.
- Served on the executive board of the Jewelry Information Center from 2004 to 2009. Served on the advisory council for the Jewelry Information Center in 2010.

## CUSTOMER SERVICE / RELATIONSHIP MANAGEMENT EXPERIENCE

**Manager, Customer Relations**                         **Aug 1994 to May 1999**
Bledsoe Dodge, Inc.
- Successfully led entire management team in internal process improvement campaign and secured the first newly redesigned "Chrysler Five Star Award for Excellence" in the Dallas/Fort Worth area.
- Developed and led cross functional teams in internal process mapping and process re-design, based on customer feedback, to increase customer satisfaction, loyalty and retention.
- Managed pro-active local consumer research, distribution and analysis of results.
- Successfully negotiated action plans with each department manager to resolve customer disputes or recurring problems.
- Effectively led new employee orientation, corporate culture development initiatives (mission statement, core values, company newsletter), charitable work with local community and internal event planning.

## OTHER PROFESSIONAL EXPERIENCE

**Professional Actor**                                 **1992 to present**
Freelance
- Regularly performing in live theatre productions as well as television commercials, independent film projects, etc.

**Volunteer**                                         **on-going**
- Long history of volunteerism in leadership capacities with various charities including Pajama Program, Citizen Schools, The All Stars Project, St Joseph's Young Adults Group, etc.

**EDUCATION:**

**Master of Liberal Arts** in Interdisciplinary Studies with a focus in Art History
Southern Methodist University, Dallas, Texas                    December 1998

**Bachelor of Arts** in Theatre Arts and Psychology, *Summa Cum Laude*
Texas Woman's University, Denton, Texas                    December 1992

**PUBLICATIONS WITHIN LAST TEN YEARS:**

- "Obsessed by Pearls" by Assael. Writer and Managing Editor. Bimonthly digital publication at https://assael.com/blog. (2017-present).
- YVEL Magazine, volume 1, issue 1. (2012).
- OPT online training module for gold and the World Gold Council cooperative advertising campaign partners. (2004-2008).
- Gold portion of Finlay Fine Jewelry's online interactive jewelry sales training program.
- Jewelry 101, Gold Section (a gold jewelry sales training series produced by Jewelers of America). (2001).

**CASES TESTIFIED WITHIN LAST FOUR YEARS:**

- None.

**Appendix 2 – Materials Considered**

| Document | Bates number |
|---|---|
| Bloomberg Solid 21 Company Profile | RG_UN00034966-67 |
| Solid 21, Inc. v. LVMH, Richemont International S.A., Rolex, Ulysse Nardin, Inc. Montres Corum Complaint Filed September 22, 2010 | RG_UN00034968-96 |
| "Signature Red Gold." Chris Aire Fine Jewelry & Timepieces, retrieved from chrisaire.com/collections/signature-red-gold, accessed October 19, 2017. | RG_UN00034997-5018 |
| "CONQUEROR MEN'S WATCH." Chris Aire Fine Jewelry & Timepieces, retrieved from chrisaire.com/collections/signature-red-gold/products/aire-conqueror-mens-watch-1, accessed October 19, 2017. | RG_UN00035019-21 |
| "CAPITOL HILL WATCH." Chris Aire Fine Jewelry & Timepieces, retrieved from, chrisaire.com/collections/signature-red-gold/products/aire-capitol-hill-watch, accessed October 19, 2017. | RG_UN00035022-24 |
| "GOLD WATCH - PARLAY 50 MM AMBIDEXTROUS CHRONOMATIC." Chris Aire Fine Jewelry & Timepieces, retrieved from chrisaire.com/collections/signature-red-gold/products/aire-gold-watch-parlay-50-mm-ambidextrous-chronomatic, accessed October 19, 2017. | RG_UN00035025-27 |
| https://chrisaire.com/search?q=red+gold+watch, accessed November 27, 2017. | RG_UN00035028-32 |
| "Purple Reign," Modern Jeweler, retrieved from http://www.modernjeweler.com/print/Modern-Jeweler/Purple-Reign/1$169, accessed November 27, 2017. | RG_UN00035033-34 |
| Belge, Rambourg, and Dargnies, EMEA Equity Research Report: Luxury Goods, HSBC, retrieved from, http://www.hsbcnet.com/nutshell/attachments/pdf/emea-luxury-goods.pdf. | RG_UN00035039-46 |
| "Hard Luxury Goods Market to Reach US$126.11 bn by 2022, Globally: Transparency Market Research," PR Newswire, October 4, 2017, retrieved from https://www.prnewswire.com/news-releases/hard-luxury-goodsmarket-to-reach-us12611-bn-by-2022-globally-transparency-market-research-649387883.html, accessed October 18, 2017. | RG_UN00035047-51 |
| Swatch Group, Chow Tai Fook, and Rolex together accounted for 38% of hard luxury sales in 2015. See, Global Powers of Luxury Goods 2017, The New Luxury Consumer, Deloitte, retrieved from, https://www2.deloitte.com/content/dam/Deloitte/global/Documents/consumer-industrial-products/gx-cip-globalpowers- | RG_UN00035052-103 |

1

| | |
|---|---|
| luxury-2017.pdf. | |
| Kapferer, J. (1997). Managing Luxury Brands. Journal of Brand Management, 4, pp 251-259. | RG_UN00035104-18 |
| Keller, Kevin Lane (2013), Strategic Brand Management, 4th Edition. New York, NY: Pearson Education Limited. | RG_UN00035139-729 |
| Social Identity as a Useful Perspective for Self-Concept-based Consumer Research. Americus Reed II. Psychology and Marketing. Vol. 19(3): 235–266 (March 2002). | RG_UN00035732-63 |
| "What are brands for?" The Economist, August 30, 2014, retrieved from http://www.economist.com/news/business/21614150-brands-are-most-valuable-assets-many-companies-possessno-one-agrees-how-much-they, accessed November 27, 2017. | RG_UN00035764-72 |
| https://finance.google.ca/finance?q=NASDAQ%3AAAPL&ei=2LP4W ZDELdihjAGGq76QBw. | RG_UN00035773-75 |
| Michael Lynn (1991), "Scarcity Effects on Value: A Quantitative Review of the Commodity Theory Literature," Psychology and Marketing, 8(1), 43-57. | RG_UN00035776-92 |
| Aaker, D. A. (1996). Building Strong Brands. New York: The Free Press, p. 94. | RG_UN00035793-94 |
| Corbellini, Erica and Saviolo, Stefania. (2009). Managing Fashion and Luxury Companies. Milan, ETAS, 2003. | RG_UN00035795-97 |
| M. Breazeale, C. Long, and D. Ott, "Public Luxury Representatives" in "The Management of Luxury," B. Berghaus, G. Muller-Stewans, and S. Reinecke, EOS. (London: Kogan Page), 2014. | RG_UN00035798-809 |
| Roose, Kevin, "Snapchat's New Test: Grow Like Facebook, Without the Baggage," The New York Times, November 15, 2017, retrieved from https://www.nytimes.com/2017/11/15/business/snapchats-new-test-growlike-facebook-without-the-baggage.html, accessed November 30, 2017. | RG_UN00035810-15 |
| Altieri, Paul, "An Overview of Rolex Tiffany Dials," Bob's Watches, June 14, 2016, retrieved from https://www.bobswatches.com/rolex-blog/rolex-info/history-rolex-tiffany-dials.html, accessed October 26, 2017. | RG_UN00035816-22 |
| Clark, Murray, "7 of this Year's Best Watch Collaborations," Fashion Beans, October 27, 2016, retrieved from http://www.fashionbeans.com/2016/7-of-this-years-best-watch-collaborations/, accessed October 26, 2017. | RG_UN00035823-30 |
| Sha Yang, Mantian (Mandy) Hu, Russell S. Winer, Henry Assael, Xiaohong Chen, (2012) An Empirical Study of Word-of-Mouth Generation and Consumption. Marketing Science 31(6):952-963. https://doi.org/10.1287/mksc.1120.0738. | RG_UN00035836-47 |

| | |
|---|---|
| Bughin, Doogan, and Vetvik "A new way to measure word-of-mouth marketing," McKinsey Quarterly, April 2010, retrieved from https://www.mckinsey.com/business-functions/marketing-and-sales/our-insights/a-newway-to-measure-word-of-mouth-marketing, accessed November 27, 2017 | RG_UN00035848-60 |
| Registered Trademark No. 2,793,987, "Red Gold", Solid 21 Incorporated, Registered December 16, 2003 (TRADEMARK CERTIFICATE, p. 3). | RG_UN00035861-63 |
| Source Magazine, February 2006, (The Source 1 2-06 and The Source cover 2-06. | RG_UN00035864 |
| Invoice from Vibe Magazine to 2 Awesome International, September 2, 2002, (VIBE MAG AD RECEIPT). | RG_UN00035865-66 |
| Spirit Magazine, August 2005 (PLAYER MAG OTHERS, p. 4). | RG_UN00035867-70 |
| "Chris Aire Beverly Hills," https://chrisaire.com/, accessed October 19, 2017. | RG_UN00035871-75 |
| Player Magazine, 2005 (PLAYER MAG CHRIS AIRE AD 2005). | RG_UN00035876-78 |
| Savoy, May 2003, (SAVOY MAG 2003). | RG_UN00035879-81 |
| https://web.archive.org/web/20030801143456/ https://chrisaire.com/ accessed November 27, 2017. | RG_UN00035887-88 |
| https://web.archive.org/web/20020921011115/http://2awesomeint.com: 80/, accessed November 27, 2017. | RG_UN00035889-90 |
| "Chris Aire Hits the Runway with $175 Million of Diamonds," Rapaport Diamonds, September 29, 2004, retrieved from http://www.diamonds.net/News/NewsItem.aspx?ArticleID=10488&ArticleTitle=Chris+Aire+Hits+the+Runway +With+%24175+Million+of+Diamonds, accessed November 27, 2017. | RG_UN00035892-94 |
| "Chris Aire Beverly Hills," p. 66, (Final-preview-lookbook, p. 66). | RG_UN00035895-6036 |
| RED GOLD SPONSORS PA, p. 7. | RG_UN00036037-43 |
| "Ice, Ice Baby," JQ, January/February 2006, p. 40 (JQ, p. 3) | RG_UN00036044-47 |
| "Iceman Debuts $41.1 Million Diamond Dress," Rapaport Diamond Report, pp. 236-237 (Rapaport 1 10-05, Rapaport 2 10-05, and Rapaport cover 10-05) | RG_UN00036052-55 |
| "FromPageOne" (PRESS-DD) | RG_UN00036056-59 |
| ""Player at the Chris Aire Jewelry Show," Player Magazine, Holiday 2004, pp. 142-143 (PRESS 2004)." | RG_UN00036060-62 |
| "Best in Shows," New York Post, September 7, 2006, (NY POST, p. 2). | RG_UN00036063-64 |
| LAS-VEGAS-RG-SHOW-INVITATION. | RG_UN00036065 |
| RED GOLD SPONSORS PA0001. | RG_UN00036066 |
| ALI RED GOLD SHOW. | RG_UN00036067-68 |
| "Quintanilla, Michale, "Bling-Bling King," Los Angeles Times, January 10, 2003, retrieved from http://articles.latimes.com/2003/jan/10/entertainment/et-quintanilla10, accessed November 27, 2017" | RG_UN00036069-75 |

3

| | |
|---|---|
| "Good Investment,"<br>Billboard, November 1, 2003, p. 98, retrieved from<br>https://books.google.ca/books?id=0REEAAAAMBAJ,<br>accessed November 27, 2017 | RG_UN00036076-77 |
| "Quintanilla, Michale, "Bling-Bling King," Los Angeles Times, January 10, 2003, (JEWELRY AND<br>CONSUMER PRESS ON CHRIS AIRE TRADEMARK RED GOLD 016)." | RG_UN00036078 |
| "The New Rage," In Touch, May 12, 2003. | RG_UN00036079 |
| ""Ice, Ice Baby," The Washington Times, November 1, 2002, retrieved form<br>https://www.washingtontimes.com/news/2002/nov/1/20021101-095625-2877r/, accessed November 27, 2017." | RG_UN00036080-87 |
| "Business Plan," Chris Aire Incorporated, August 21, 2007, p. 9<br>(Updated business plan 8.21.07). | RG_UN00036088-111 |
| "Petition to Cancel, June 25, 2002, Makur Designs Inc v. Solid 21 Incorporated, Registration No. 2,793,987,<br>United States Patent and Trademark Office (MARKUR CANCELLATION0002)." | RG_UN00036112-14 |
| Letter from Philip Furgang to Scott W. Kelley, July 13, 2007 (MAKUR DESIGN) | RG_UN00036115-17 |
| ""Petition for Cancellation,"<br>United States Patent and Trademark Office, filed December 10, 2008 (petition to cancel)" | RG_UN00036118-24 |
| "Letter from Philip<br>Furgang to George E. Akwo, June 12, 2009 (CANCELLATION WITHDRA)" | RG_UN00036125 |
| ""Who we are", World Gold Council, retrieved from<br>https://www.gold.org/who-we-are, accessed November 27, 2017." | RG_UN00036126-28 |
| POLICING RED GOLD MARK, p. 1. | RG_UN00036129-31 |
| "Settlement Agreement and Mutual Release between Solid 21, Inc. and Kobold Trading Company, LLC, March 21, 2011 (Kobold Settlement Agreement (Executed by Kobold))." | RG_UN00036132-36 |
| "Mills, Lourdes, "Iced Out: The Serious Style of Chris Aire," 944 Magazine, September 2005,<br>(944_Magazine_September_2005_PG2)." | RG_UN00036137 |
| "Always a step ahead of the times," Chrono24, retrieved from<br>https://about.chrono24.com/company/, accessed November 27, 2017. | RG_UN00036156-60 |
| COVER-OF-IW-CA-AD-2011 and CA-AD-IN-IW-2011 | RG_UN00036249-50 |
| Prince, Christopher, "Five Watches that Are Out of this World," Mojeh Men, October 23, 2015, retrieved from<br>https://mojehmen.com/watches/watch-talk/five-watches-are-out-world, accessed November 27, 2017. | RG_UN00036254-55 |

| | |
|---|---|
| "The Times Sees Circulation Growth in First Quarter," The New York Times Press Release, May 1, 2015, retrieved from https://www.nytco.com/the-times-sees-circulation-growth-in-first-quarter/, accessed November 27, 2017. | RG_UN00036295-96 |
| The Wall Street Journal Media Kit, retrieved from http://www.wsjmediakit.com/products, accessed November 27, 2017. | RG_UN00036297-301 |
| "Financial Times 2016 Annual Results," Financial Times, April 3, 2016, retrieved from, https://aboutus.ft.com/en-gb/announcements/financial-times-2016-annual-results/, accessed November 27, 2017. | RG_UN00036302-305 |
| "How to Spend it Media Kit," Financial Times, retrieved from, http://www.fttoolkit.co.uk/d/products/weekend/how-to-spend-it/audience.php, accessed November 27, 2017. | RG_UN00036306-307 |
| "Latest ABC Figures Show The Economist's Continued Growth In Digital Sales And Focus On Circulation Profitability," The Economist Press Release, February 9, 2017, retrieved from http://press.economist.com/stories/10570-latest-abc-figures-show-the-economists-continued-growth-in-digitalsales-and-focus-on-circulation-profitability, accessed November 27, 2017. | RG_UN00036308-10 |
| Alliance for Audited Media, Consumer Magazines – Search Results, as of June 30, 2017, retrieved from http://abcas3.auditedmedia.com/ecirc/magtitlesearch.asp, accessed November 27, 2017. | RG_UN00036311-19 |
| "The New Christophorus," Porsche Press Release, February 26, 2016, retrieved from https://newsroom.porsche.com/en/company/porsche-christophorus-customer-magazine-layout-new-12264.html, accessed November 27, 2017. | RG_UN00036320-23 |
| Aaker, D. A., (1991), Managing Brand Equity, New York, NY: The Free Press, page 21. | RG_UN00036324-34 |
| Kapferer, J-N (2012). The New Strategic Brand Management: Advanced Insights and Strategic Thinking, 5th Edition. London: Kogan Page 23. | RG_UN00036335-39 |
| Chris Aid Commercial.mov | RG_UN00036340 |
| TV Coverage 2.mov | RG_UN00036341 |
| TV Coverage 1.mp4 | RG_UN00036342 |
| Expert Report of Jennifer Vanderhart, Oct. 7, 2019 | |
| Expert Report of Russell S. Winer, Ph.D., Dec. 4, 2017 | |
| http://www.sparkle.com/how-nigerian-born-designer-chris-aire-became-a-jeweler-to-the-stars/#.XZvhJ0ZKiUk, accessed Oct. 7, 2019 | |
| Emails | UN0016803-05 |
| Emails | UN0016806-07 |
| Emails | UN0016808 |

| | |
|---|---|
| Capitol Hill, CAFJT, https://chrisaire.com/collections/signature-red-gold/products/aire-capitol-hill-watch | |
| Catalog Prices | |
| Chris Aire Beverly Hills 2013 Catalog | |
| Parlay GMT Blue, CAFJT, https://chrisaire.com/collections/signature-red-gold/products/chris-aire-watch-parlay-gmt-blue | |
| Parlay GMT, CAFJT, https://chrisaire.com/collections/mens-watches/products/aire-gold-watch-parlay-42-mm-gmt-limited-edition-par01-3-12 | |
| Red Gold Watches, https://chrisaire.com/search?q=red+gold+watch | |
| Aire Traveler 5, CAFJT, https://chrisaire.com/collections/mens-watches/products/aire-traveler-5-time-zones-mens-watch-2 | |
| Ulysse Nardin Dato Compax, Chrono24, https://www.chrono24.com/ulyssenardin/dato-compax-triple-calendar-datora-valjoux-72c-18k-red-gold--id4830743.htm | |
| Rapaport Diamond Report | RG_UN00036048-50 |
| The $50 Million Dress | RG_UN00036051 |
| 2004 Fashion Show Program | |
| Facebook Red Gold Aug. 29, 2018 | |
| Instagram Red Gold Sept. 3, 2019 | |
| RED GOLD® Ads | RG_UN00000633-34 |
| RED GOLD® Ads | RG_UN00000635 |
| RED GOLD® Ads | RG_UN00000636 |
| RED GOLD® Ads | RG_UN00002835 |
| RED GOLD® Ads | RG_UN00002836 |
| RED GOLD® Ads | RG_UN00003456 |
| CAFJT Press Coverage | RG_UN00009386 |
| Robb Report RED GOLD® Ad | RG_UN00034952-53 |
| Ulysse Nardin Ad | RG_UN00020819-20 |
| Ulysse Nardin Ad | RG_UN00024368-69 |
| Ulysse Nardin Ad | RG_UN00024370-71 |
| Ulysse Nardin Ad | RG_UN00025211-15 |
| Ulysse Nardin Ad | RG_UN00034939-40 |
| Ulysse Nardin Ad | RG_UN00034941 |
| Ulysse Nardin Ad | RG_UN00034942 |
| Ulysse Nardin Ad | RG_UN00034943 |
| Ulysse Nardin Ad | RG_UN00034944-45 |
| Ulysse Nardin Ad | RG_UN00034946-47 |
| Ulysse Nardin Ad | RG_UN00034948-49 |
| Ulysse Nardin Ad | RG_UN00034950-51 |
| Ulysse Nardin Ad | RG_UN00034954-57 |
| Ulysse Nardin Ad | RG_UN00034958 |
| Ulysse Nardin Ad | RG_UN00034959-63 |
| Ulysse Nardin Ad | RG_UN00034964-65 |
| Ulysse Nardin Ad | UN0000001-18 |

| Ulysse Nardin Ad | UN0000019-182 |
|---|---|
| Ulysse Nardin Ad | UN0000183-326 |
| Ulysse Nardin Ad | UN0000488-627 |
| Ulysse Nardin Ad | UN0000705-848 |
| Ulysse Nardin Ad | UN0000849-876 |
| Ulysse Nardin Ad | UN0000877-972 |
| Ulysse Nardin Ad | UN0000973-1077 |
| Ulysse Nardin Ad | UN0001437-1584 |
| Ulysse Nardin Ad | UN0001585-1697 |
| Ulysse Nardin Ad | UN0002032 |
| Ulysse Nardin Ad | UN0002033 |
| Ulysse Nardin Ad | UN0002034 |
| Ulysse Nardin Ad | UN0002035 |
| Ulysse Nardin Ad | UN0002036 |
| Ulysse Nardin Ad | UN0002037 |
| Ulysse Nardin Ad | UN0002038 |
| Ulysse Nardin Ad | UN0002039 |
| Ulysse Nardin Ad | UN0002040 |
| Ulysse Nardin Ad | UN0002041 |
| Ulysse Nardin Ad | UN0002042 |
| Ulysse Nardin Ad | UN0002043 |
| Ulysse Nardin Ad | UN0002044 |
| Ulysse Nardin Ad | UN0002045 |
| Ulysse Nardin Ad | UN0002046 |
| Ulysse Nardin Ad | UN0002047 |
| Ulysse Nardin Ad | UN0002048 |
| Ulysse Nardin Ad | UN0002049 |
| Ulysse Nardin Ad | UN0002050 |
| Ulysse Nardin Ad | UN0002051 |
| Ulysse Nardin Ad | UN0002052 |
| Ulysse Nardin Ad | UN0002053 |
| Ulysse Nardin Ad | UN0002054 |
| Ulysse Nardin Ad | UN0002055 |
| Ulysse Nardin Ad | UN0002056 |
| Ulysse Nardin Ad | UN0002057 |
| Ulysse Nardin Ad | UN0002058 |
| Ulysse Nardin Ad | UN0002059 |
| Ulysse Nardin Ad | UN0002060 |
| Ulysse Nardin Ad | UN0002061 |
| Ulysse Nardin Ad | UN0002062 |
| Ulysse Nardin Ad | UN0002063 |
| Ulysse Nardin Ad | UN0002064 |
| Ulysse Nardin Ad | UN0002065 |
| Ulysse Nardin Ad | UN0002066 |
| Ulysse Nardin Ad | UN0002067 |

| Ulysse Nardin Ad | UN0002068 |
|---|---|
| Ulysse Nardin Ad | UN0002069 |
| Ulysse Nardin Ad | UN0002070 |
| Ulysse Nardin Ad | UN0002071 |
| Ulysse Nardin Ad | UN0002072 |
| Ulysse Nardin Ad | UN0002074-75 |
| Ulysse Nardin Ad | UN0002089-2231 |